# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NICHOLAS LUONGO, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> DESKTOP METAL, INC., RIC FULOP, JAMES HALEY, ALI EL-SIBLANI, and MICHAEL JAFAR, <br><br> Defendants. | Case No. 1:21-cv-12099-IT <br><br> Consolidated Action <br><br> Consolidated with: <br> No. 1:22-cv-10059-IT <br> No. 1:22-cv-10173-IT <br> No. 1:22-cv-10297-IT |

## CONSOLIDATED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Reed R. Kathrein (*pro hac vice*)
Lucas E. Gilmore (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Raffi Melanson (BBO# 688650)
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
raffim@hbsslaw.com

*Attorneys for Lead Plaintiff*
*Sophia Zhou*

[Additional counsel on signature page]

Brenda Szydlo (*pro hac vice*)
Dean P. Ferrogari (*pro hac vice*)
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bszydlo@pomlaw.com
dferrogari@pomlaw.com

*Attorneys for Lead Plaintiff Yichun Xie*

Daryl Andrews (BBO #658523)
Glen DeValerio (BBO #122010)
ANDREWS DEVALERIO LLP 265
Franklin Street, Suite 1702
Boston, Massachusetts 02110
Telephone: (617) 936-2796
daryl@andrewsdevalerio.com
glen@andrewsdevalerio.com

*Liaison Counsel for Lead Plaintiff Yichun*
*Xie*

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................2

II.    JURISDICTION AND VENUE ............................................................................15

III.   PARTIES ..............................................................................................................16

       A.     Lead Plaintiffs.............................................................................................16

       B.     Corporate Defendant ...................................................................................16

       C.     Individual Executive Defendants................................................................18

       D.     Former Company Employees ......................................................................21

IV.    BACKGROUND ALLEGATIONS.......................................................................25

       A.     Desktop Metal—A Net Negative Revenue SPAC Which Pursued a
              Rapid Merger Strategy with the Hope of Achieving Profitability........................25

       B.     The Gold Mine That is 3D Printing Dental Technology ........................................29

       C.     EnvisionTEC's 3D Printing Dental Technology for Medical Grade
              Dental Implants...........................................................................................32

              1.     3D Printers ........................................................................................33

              2.     Resins................................................................................................34

              3.     Light-Based Curing Boxes...............................................................39

       D.     Regulatory Regime for Medical Devices....................................................41

              1.     Establishment Registration ..............................................................43

              2.     Device Labeling................................................................................46

              3.     Premarket Notification .....................................................................47

V.     DEFENDANTS' FRAUD SCHEME ...................................................................50

       A.     The Company Announces Plans to Acquire EnvisionTEC—a 3D
              Printing Company Operating in the Highly Lucrative 3D Printing
              Dental Industry............................................................................................50

B.      The Company Launches Desktop Health and Touts FDA Clearance of
        Products................................................................................................................55

C.      Post-Acquisition, Defendants Push Unrealistic Sales Targets on Sales
        Team ....................................................................................................................58

D.      Defendants Instruct EnvisionTEC Staff to Manufacture Flexcera Resin
        Intended for Permanent Patient Use in a Non-FDA Approved Facility
        and to Apply False Labels to Disguise Unlawful Origin......................................61

E.      Corporate Officers Take No Action To Alert Authorities or the Public
        Regarding Non-FDA Approved Manufacturing of Flexcera Resin.......................66

F.      Defendants Instruct Sales Team to Market and Sell Dental Resin
        Curing Boxing for Purposes Not Cleared by the FDA ...........................................68

G.      Customer Complaints Regarding Resin Cured with PCA 4000 ...........................74

H.      Desktop Employees Blow the Whistle on Defendants' Fraud Scheme.................77

I.      The Truth Emerges ...............................................................................................78

VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS......83

A.      Summary of Defendants' Fraud Scheme ..............................................................83

B.      Materially False and Misleading Statements Issued During the Xie
        Class Period ........................................................................................................84

        1.      Company Announces EnvisionTEC Acquisition (Jan. 15, 2021)..............84

        2.      Company Presents on Acquisition to Analysts/Investors (Jan.
                15, 2021) ..................................................................................................86

        3.      Defendants Announce EnvisionTEC Merger Completion (Feb
                17, 2021) ..................................................................................................88

C.      Materially False and Misleading Statements Issued During the Zhou
        Class Period ........................................................................................................90

        1.      The Company's FY 2020 Annual Report Filed on Form 10-K
                (Mar. 15, 2021) ........................................................................................92

        2.      The Company's 4Q20 Earnings Calla and Fourth Quarter and
                Full Year 2020 Investor Presentation (March 15, 2021) ..........................94

        3.      Defendants Announce Launch of Desktop Health (Mar. 15,
                2021) ........................................................................................................95

4.      Defendants Announce FDA Clearance for Flexcera (May 12, 2021) ...........................................................................96

5.      Defendants Publish Video Introducing Flexcera Products on Website and on Twitter (May 12, 2021) .....................................99

6.      The Company's 1Q21 Quarterly Report Filed on Form 10-Q (May 17, 2021) .....................................................................101

7.      The Company's 1Q21 Earnings Call and 1Q21 Investor Presentation (May 17, 2021) .....................................................102

8.      The Company's Form S-1 Registration Statement (May 26, 2021) and Subsequent Prospectuses and Registration Statements ...............................................................................105

9.      Defendants Announce CE Mark Certification and International Launch for Flexera (June 10, 2021) .........................................107

10.     Defendant Fulop's Public Statement Regarding FDA Approval at Stifel Cross Sector Insight Conference (June 10, 2021) .....................110

11.     Defendant Jafar's Interview with *Inside Dental Technology* (June 2021) ...........................................................................111

12.     Defendant Jafar's Interview with California Business Journal (June 2021) ...........................................................................113

13.     Defendants Release 2Q21 Quarterly Report on Form 10-Q (Aug. 11, 2021) .....................................................................115

14.     The Company's 2Q21 Press Release and Earnings Call (Aug. 11, 2021) .....................................................................116

15.     Statements on the Company's Website ...................................117

VII.    ADDITIONAL SCIENTER ALLEGATIONS .................................................120

A.      Defendant El-Siblani Knowingly or Recklessly Disregarded FDA Regulations that Restricted the Sale of the Company's Dental Channel Products ...............................................................................121

B.      Defendants' Imputed Knowledge about Core Operations ...................123

C.      "Resignation" of El-Siblani and Jafar ...............................................126

VIII.   LOSS CAUSATION ...............................................................................127

IX.     CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ...............................134

XIE CLASS PERIOD CLAIMS ....................................................................................134

ZHOU CLASS PERIOD CLAIMS ..............................................................................138

X.      PRAYER FOR RELIEF ................................................................................................143

XI.     JURY TRIAL DEMANDED .........................................................................................143

## TABLE OF DEFINED TERMS

| Term | Definition |
| --- | --- |
| ¶¶ | Refers to paragraphs in this pleading, the Consolidated Class Action Complaint |
| F.# | Refers to Figure [#] |
| FE-# | Refers to Former Employee [#]—generally, a former Company employee interviewed as part of Lead Plaintiffs' independent investigation and thereafter relied upon to corroborate the factual allegations of misconduct pled herein |
| Xie | Lead Plaintiff Yichun Xie |
| Xie Class Period | The period from January 15, 2021 to March 14, 2021, inclusive. Members of the Xie Class may also qualify as members of the Zhou Class and vice versa. |
| Zhou | Lead Plaintiff Sophia Zhou |
| Zhou Class Period | The period from March 15, 2021 to November 15, 2021, inclusive. |
| | |
| 510(k) | Section 510(k) of the Food, Drug, and Cosmetic Act requires device manufacturers intending to market a medical device to notify the FDA. This is premarket notification is known as a 510(k). This filing must demonstrate that the device to be marketed is as safe and effective, that is, substantially equivalent, to an already existing, legally marketed device. |
| AM or 3D printing | Additive manufacturing ("AM") is a process that builds a three-dimensional ("3D") object by sequentially building two-dimensional ("2D") layers and joining each to the layer below, allowing device manufacturers to create complex objects/devices built as a single piece and to rapidly produce alternative designs without the need for retooling. |
| The Company | Refers to Defendant Desktop Metal post-acquisition of EnvisionTEC. Explanations of Desktop Metal's conduct, as alleged herein, include conduct by EnvisionTEC, Desktop Health, and their officers and employees. Additionally, explanations of the acts and conduct by EnvisionTEC, Desktop Health, or their officers or employees, as alleged herein, are also attributed to Desktop. |
| Desktop Metal | Defendant Desktop Metal, Inc.—a publicly traded technology company which purports to design and offer additive manufacturing technologies (that is, 3D printing systems) that produce end parts for commercial users. |
| Desktop Metal Individual Defendants | Defendants Fulop and Haley |
| Desktop Health | Refers to the additive healthcare business launched by the Company in March 2021 to manage, among other products, the Company's EnvisionTEC dental |

| | |
|---|---|
| | channel business. Defendant Jafar served as President and CEO of Desktop Health during the Zhou Class Period. |
| El-Siblani | Defendant Ali El-Siblani (also referred to by colleagues as "Al" or "Siblani")—a former director and executive officer of the Company from February 2021, when Desktop Metal acquired EnvisionTEC, up to his "resignation" on November 5, 2021. Before the Desktop-EnvisionTEC acquisition, El-Siblani reigned as EnvisionTEC's CEO for nearly 19 years. The Company chose El-Siblani to continue oversight of its EnvisionTEC segments after the acquisition, including those based out of EnvisionTEC's former U.S. headquarters in Dearborn, Michigan. Moreover, El-Siblani's official executive title remained "Chief Executive Officer of the EnvisionTEC US LLC" (a wholly owned subsidiary of Desktop). As a Director and EnvisionTEC's CEO, El-Siblani was "extremely hands-on" with EnvisionTEC's day-to-day operations, touching on all operational matters from strategy to sales to manufacturing, including the fraud alleged herein. |
| EnvisionTEC | The privately held technology company specializing in dental industry 3D printing, among other things, that was acquired by Desktop Metal in February 2021. Prior to acquisition, EnvisionTEC had corporate headquarters in Dearborn, Michigan, and Gladbeck, Germany, with secondary production facilities in the Greater Los Angeles area, Montreal, Canada, Kiev, Ukraine, and Woburn, Massachusetts. Upon information and belief, these facilities were acquired by the Company during the Desktop-EnvisionTEC acquisition. |
| Exchange Act | The Securities Exchange Act of 1934 |
| FDA | The U.S. Food and Drug Administration |
| Flexcera | The trade name for the Company's proprietary dental resins used in the fabrication of 3D printed dentures and teeth, which comes in two separate, specialized forms: Flexcera Smile and Flexcera Base. The former is an FDA Class 1 Medical Device for the fabrication of lifelike denture teeth. The latter is an FDA Class 2 Medical Device for the fabrication of premium denture bases. Both are formulated exclusively for use with the Company's EnvisionTEC 3D printers. FDA filings and former employee accounts show that Flexcera was formerly known as, or substantially the same as, E-Dent 1000, another FDA-regulated dental resin made by the Company.

As discussed herein, during the Class Periods, Defendants caused the Company to manufacture, sell, and mislabel Flexcera resin from non-FDA certified facilities, in contravention to applicable health and safety laws. The Company recalled these products in 2022. |
| Forms 10-K and 10-Q | Refers to annual (10-K) and quarterly (10-Q) financial reports filed with the SEC. The phrase "#QYY" refers to the # quarter of the YY year (e.g., 1Q21). |
| Fulop | Defendant Ric Fulop—the Chief Executive Officer ("CEO") of Desktop, who has served in that role since co-founding Desktop Metal in 2015 and, in that role, made |

| | |
|---|---|
| | several positive statements regarding the FDA certification status and physical properties of the Company's premier dental resins throughout the Class Periods. |
| Haley | Defendant James Haley—the Chief Financial Officer ("CFO") of the Company from February 2021 to December 2022, who previously served as Desktop Metal's Vice President of Finance from August 2020 until February 2021 (the date of the EnvisionTEC acquisition). |
| Individual Defendants | Defendants Fulop, Haley, El-Siblani, and Jafar |
| Jafar | Defendant Michael Jafar—a relative of El-Siblani who was brought on by the Company to serve as the President and CEO of Desktop Health on March 15, 2022, when Desktop Health was created, up through his two-weeks noticed separation from the Company on June 30, 2022. |
| PCA 4000 | A "curing box" apparatus manufactured by the Company for the curing of industrial resins. During the Class Periods, the PCA 4000 had not been sufficiently tested by EnvisionTEC to determine whether it could fully cure EnvisionTEC dental resins to desired product specifications and thus, had not been recognized by the FDA as an appropriate device for curing Flexcera resin. As discussed below, however, in late March 2021, the Company instructed its dental channel sales team to push sales of the PCA 4000 for use with Flexcera over the objection and noted concerns of sales members of the dental sales team. |
| PSLRA | The Private Securities Litigation Reform Act |
| SPAC | A special purpose acquisition company, also known as a "SPAC" or "blank check company" for short, is a shell company listed on a public exchange established for the purpose of raising capital to finance the purchase of an unidentified private company, thus making the acquired company public without going through the traditional initial public offering process. Here, the Company went public through a SPAC merger with Trine that closed on December 9, 2020. |
| Trine | Trine Acquisition Corp.—the SPAC that on December 9, 2020, transformed Desktop Metal from a medium-sized enterprise into a $2.5 billion public company. |
| SEC | The U.S. Securities and Exchange Commission |
| Soliciting Materials | SEC Form PRE 14A is required for all corporations that hold shareholder votes. Also known as a "Preliminary Proxy Statement," it discloses all relevant details related to the issues being put forward for a shareholder vote. |

Pursuant to the Court's September 19, 2022 Order (Dkt. No. 18) in the *Xie* Action and the Court's July 7, 2022 Memorandum and Order (Dkt. No. 73) in the related *Luongo* Action, Court-appointed Lead Plaintiffs Yichun Xie ("Xie") and Sophia Zhou ("Zhou") (collectively, "Lead Plaintiffs"), by and through their respective undersigned counsel, respectfully submit this Consolidated Class Action Complaint for Violations of the Federal Securities Laws.

Based on their respective theories of liability and the evidence uncovered through their investigation, Lead Plaintiffs have modified their respective alleged Class Periods. Specifically, Lead Plaintiff Xie, on the one hand, brings this consolidated action against Defendants Desktop Metal, Fulop, and Haley pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of herself and all other persons or entities who purchased or otherwise acquired Desktop Metal, Inc. ("Desktop Metal" or the "Company") securities between January 15, 2021, and March 14, 2021, inclusive (the "Xie Class Period"), and were damaged thereby (the "Xie Class"). Lead Plaintiff Zhou, on the other hand, brings this consolidated action pursuant to Sections 10(b) and 20(a) of the Exchange Act against Defendants Fulop, El-Siblani, and Jafar on behalf of herself and all other persons or entities who purchased or otherwise acquired Desktop Metal securities between March 15, 2021, and November 15, 2021, inclusive (the "Zhou Class Period"), and were damaged thereby (the "Zhou Class"). Notwithstanding Lead Plaintiffs' modification of the alleged Class Periods, all previous putative Class members' claims remain covered and are being prosecuted.

Lead Plaintiffs allege the following based upon personal knowledge, upon their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing independent investigation of their undersigned counsel, including from:

(i) the Company's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) the Company's press releases and reports; (iv) the Company's website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Company securities; (vii) consultation with investigators and experts; (viii) accounts from former Company employees; and (ix) additional materials and data concerning the Company and industry as identified herein.

## I.    INTRODUCTION

1.    This consolidated class action arises from Desktop Metal and its top officers' materially false and misleading statements and omissions concerning the manufacturing and product compliance practices and procedures at the Company's recently acquired dental three-dimensional printing ("3D printing") subsidiary, EnvisionTEC. During the Class Periods, Desktop Metal and the Individual Defendants excited investor interest in the Company's then-revenue negative 3D printing business by repeatedly touting the value of EnvisionTEC's 3D printing technology and comprehensive library of biocompatible 3D printing materials—including multiple FDA-listed and 510(k)[1]-cleared resins for the manufacturing of FDA-regulated medical devices—which would allow the Company to expand into the $10 billion dental industry market. Unbeknownst to investors, however, senior Company executives and directors knowingly and/or recklessly violated FDA manufacturing, packaging, and labeling regulations in multiple ways during the Zhou Class Period to sell higher margin dental products, thereby boosting sales and

---

[1] As discussed in further detail below, *see* Part I.B.3, Section 510(k) of the Food, Drug, and Cosmetic Act requires manufacturers to notify the FDA of their intent to market certain "medical devices," including dental implants like those that can be 3D printed using EnvisionTEC's technology. This premarket notification is known as a 510(k). After filing, the FDA may certify the device if the manufacturer demonstrates that the device to be marketed is as safe and effective, that is, substantially equivalent to, an already existing, legally marketed device.

revenue numbers. Moreover, reckless senior Company executives and directors failed to perform adequate due diligence when acquiring EnvisionTEC, which, if done, would have revealed material deficiencies in its manufacturing and product compliance practices that emanated from the top. The truth of Defendants' fraud only came to light when the Company publicly disclosed that an employee blew the whistle on the Company's rampant FDA violations. With this news, the later disclosure of the results of the Company's Audit Committee investigation, and the immediate ousting of Director and Executive Defendant Ali El-Siblani (EnvisionTEC's co-founder and CEO), the Company's stock price plunged, erasing hundreds of millions in market capitalization and causing investors to suffer substantial damages. Accordingly, Lead Plaintiffs bring this consolidated class action complaint under Sections 10(b) and 20(a) of the Exchange Act on behalf of purchasers of Desktop Metal common stock during the Xie and Zhao Class Periods.

2.     Before going public and acquiring EnvisionTEC, the Burlington, Massachusetts-based Desktop Metal began as a venture capital startup founded in 2015 with the goal of creating the next generation of 3D printers, dubbed "Additive Manufacturing 2.0," that could produce metal-made parts and components. For this core business segment, the Company utilizes a proprietary "microwave enhanced sintering" technology, which purportedly offers the fastest metal 3D printing technology for end-user parts in the market—up to 100 times the speed of legacy technologies and 20 times cheaper than existing laser-based metal 3D printing technologies—and can print with a wider range of metal alloys, including steel, aluminum, titanium, and copper. As such, the Company's metal 3D printers can help in the design and development of automotive parts, consumer goods, manufacture of industrial equipment, and design of mechanical systems. Yet despite this technological prowess, Desktop Metal remained in the red, incurring tens of millions of dollars in net losses each year.

3.      On December 10, 2020, Desktop Metal achieved a major milestone in its business strategy when it went public through a business combination with Trine Acquisition Corp., a special purpose acquisition company or SPAC, valuing the post-combination Desktop Metal at nearly $2.5 billion in equity value. Thereafter, Desktop Metal began trading on the New York Stock Exchange under the ticker symbol "DM." Significantly, the de-SPAC transaction with Trine immediately injected over $575 million in gross proceeds into the Company, which Desktop stated it would use to support its plans for "constructive consolidation" in the 3D printing industry.

4.      Consistent with its previously announced M&A strategy, and just one month after going public, Desktop Metal announced on January 15, 2021 that it had set its sights on acquiring 3D printing competitor EnvisionTEC for $300 million, paying $150 million in cash and the remaining $150 million in stock. Co-founded by Defendant El-Siblani in 2002 and based in Dearborn, Michigan, EnvisionTEC was touted as the original inventor of Digital Light Printing ("DLP") 3D printing technology and a leader in area-wide photopolymer additive manufacturing ("AM") for mass production applications. The Company justified the expensive acquisition by highlighting EnvisionTEC's leadership in the growing dental market, its 3D printing technology, and its comprehensive library of biocompatible 3D printing materials—including multiple FDA-listed and 510(K)-cleared resins for the manufacturing of FDA-regulated medical devices. Securities analysts at Benchmark applauded the acquisition, remarking in a January 25, 2021 report to its clients that "EnvisionTEC adds a new leg in polymer AM including a leading position in dental markets"[2]—valued by market researchers to be a nearly $10 billion industry by 2030.

---

[2] *See* "Desktop Metal, Inc. (DM): Generational Additive Manufacturing Platform in the Making," BENCHMARK (Jan. 25, 2021).

5.      At the time, the crown jewel of EnvisionTEC's dental portfolio was Flexcera, a new light-curable brand of resin developed for the fabrication of high-impact and removable denture bases formulated exclusively for use with EnvisionTEC 3D printers. (In simpler terms, these resin products are analogous to ink cartridges purchased for at-home computer-to-paper printing). Just one bottle of Flexcera could cost a customer anywhere between $500 and $750. And as relayed by former Company employees, larger purchasers could go through five to ten bottles per week, providing a large recurring revenue source on top of the sale of 3D printing hardware (e.g., printers, curing boxes, and accessories). While Flexcera was still awaiting 510(k) clearance with the FDA, the resin promised to be a best seller, with Defendants claiming the new resin provided "ceramic-like strength in a bottle" and made dentures "3X more resistant to fracture" and "2X more resistant to moisture."

**F.1     Sales Image for Flexcera Base and Smile Resin**



6.      In addition to Flexcera, the Company began to offer the Parts Curing Apparatus 4000 ("PCA 4000"), a light-based curing solution EnvisionTEC had developed for finishing (i.e., hardening) objects or devices that had been 3D printed using continuous digital light manufacturing ("cDLM") or digital light processing ("DLP") platforms. As relayed by former employees, the Company designed and marketed the PCA 4000 to compete with the Otoflash—a

third-party manufactured device viewed as the "gold standard" for curing 3D printed dental products, including the Company's medical device-grade resins—which, prior to the PCA 4000, Defendants had to purchase and resell to customers at a low margin.

**F.2      Sales Image for PCA 4000**



7.       Significantly, while the PCA 4000 could be used for curing industrial resins, the PCA 4000 had not been sufficiently tested by EnvisionTEC—like the Otoflash—to determine whether it could fully cure EnvisionTEC dental resins to desired product specifications. Thus, before the Company could properly market and sell the PCA 4000 to customers for use in curing medical devices made from EnvisionTEC dental resins (i.e., Flexcera), the Company would first need to complete internal testing and amend its FDA-filed 510(k) premarket notification applications to include utilization of the PCA 4000.

8.       The Xie Class Period, which asserts claims against Desktop Metal, Fulop, and Haley, begins on January 15, 2021—the date Defendants first announced the planned EnvisionTEC acquisition and made representations regarding EnvisionTEC's products, including its touted FDA-regulated materials. Approximately one month later, on February 17, 2021, Defendants also caused the Company to issue a press release announcing that it had completed its acquisition of EnvisionTEC ("EnvisionTEC Acquisition"). In the press release, Defendants noted

that EnvisionTEC would now operate as a wholly owned subsidiary of Desktop Metal and continue to be led by EnvisionTEC co-founder Ali Siblani, who would serve as Chief Executive Officer of the EnvisionTEC business, reporting directly to Desktop Metal's Chief Executive Officer, Defendant Ric Fulop. The Company would go on to disclose that El-Siblani had been appointed as a Director of the Company's Board of Directors. These statements concerning the EnvisionTEC Acquisition were false and misleading and omitted material information because they conveyed the false impression to investors that Desktop Metal had conducted adequate due diligence into EnvisionTEC's manufacturing and product compliance practices and procedures. But as described in further detail below, had Defendants conducted such due diligence, as they recklessly suggested they had done, it would have revealed material deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures emanating from the top.

9.     The Zhou Class Period, which asserts claims against Desktop Metal, Fulop, El-Siblani, and Jafar, begins on March 15, 2021, when Defendants published its Fourth Quarter and Full Year 2020 results, issued a flurry of positive statements regarding its acquisition and integration of EnvisionTEC, and announced the launch of a new business segment known as Desktop Health. In the Company's press release summarizing the financial results, Defendants claimed that the Company had now "[e]ntered [the] photopolymer additive manufacturing market through EnvisionTEC acquisition, which closed in the first quarter of 2021," and that "[o]ur acquisition of EnvisionTEC in February strengthens our market position by adding a compelling lineup of production-focused photopolymer printers and over 190 qualified materials to our portfolio." Later that day, Defendants hosted an earnings conference call during which Defendant Fulop reiterated prior representations regarding the FDA clearance process for EnvisionTEC's medical grade, photopolymer dental products, stating: "We've got [the Company has] several

materials that have either received FDA 510(k) clearance or are in process, including proprietary

materials for permanent crowns and full arch implant dentures with industry leading performance."

Immediately thereafter, Defendant Fulop directed investors' attention to slide 22 of an investor

presentation published on the earnings call, which included the representation:

> E-Dent 1000[3] and E-Denture Pro [FN]: superior materials for high-quality monolithic dentures and outstanding fully digital permanent premium dentures; biocompatible resins with incredible strength and aesthetics
>
> [FN] Materials pending 510(k) clearance.

("FN" footnote in original.)

10.     That same day (March 15, 2021), Defendants also announced the launch of a new

additive healthcare business—Desktop Health—whose umbrella would cover the Company's

recently acquired EnvisionTEC dental channel business. The press release included a quote from

Defendant Fulop in which he suggested Desktop Health's core business segment—the 3D printed

medical and dental device industry—would provide a "key opportunity" for Desktop Metal.

Additionally, Defendants revealed that they had tapped Defendant Jafar—an individual with no

medical or dental expertise—to serve as CEO of the new healthcare business.

11.     Defendants' March 15, 2021 representations concerning the EnvisionTEC

acquisition and integration, together with the Company's new dental product portfolio, impressed

securities analysts. For example, on March 16, 2021, Josh Sullivan of Benchmark wrote to clients,

"The thesis for DM is that unique additive manufacturing technologies and capital resources enable

a first mover opportunity to build/acquire a generational broad-based Additive 2.0 platform. To

---

[3] *See* Part I.B.2 *infra* ¶¶ 74, 90 (alleging that E-Dent 1000 was the same product and/or substantially equivalent to the Company's later trademarked brand of premium dental resins, Flexcera, based on former employee accounts and FDA filings).

that end, since becoming public, DM has significantly expanded the platform with the $300M

EnvisionTEC acquisition expanding the polymer AM portfolio, launched new product iterations

(P-1, Studio System 2), enabled software differentiation with Live Sinter, added new materials

such as copper and aluminum to the AM suite, and yesterday announced the launch of Desktop

Health."[4]

12.     Defendants repeated and/or built upon these claims regarding the EnvisionTEC

integration and its new dental product portfolio throughout the Class Periods. For example, just

two months later, on May 12, 2021, Defendants issued a press release announcing that Flexcera

(f/k/a E-Dent 1000)—its proprietary resin for use in 3D fabrication of high-quality dental

prosthetics—had been granted 510(k) premarket clearance by the FDA. In promotional materials,

Defendants claimed that Flexcera was "a new FDA cleared resin for the fabrication of beautiful,

functional dentures with ceramic-like strength," and that Flexcera could "provide the flexibility of

plastic and the strength of ceramic." On May 26, 2021, Defendants similarly hyped its PCA 4000

curing apparatus in its public SEC filings, stating it was "a solution[] for curing parts printed using

our CDLM or DLP platforms and utilize[s] a unique system of ultraviolet light emitting diode

(LED) light sources that uses both 385 nanometer wavelengths to deep cure and 405 nanometer

wavelengths to achieve smooth surface on each part."

13.     Defendants' promotion of the Company's Flexcera and PCA 4000 products,

however, were materially false and misleading statements that artificially inflated Desktop's stock

price. Unbeknownst to investors, Defendants, in an effort to boost production and revenues,

knowingly or recklessly caused the Company to manufacture certain lots of Flexcera resin (later

---

[4] *See* "Desktop Metal, Inc. (DM): Update 4Q:20: FY21 Guidance Shows the Upside and
Realities of Growing AM Platform," BENCHMARK (Mar. 16, 2021).

sold for permanent patient use) at a Montreal, Canada facility that lacked required FDA certification for manufacturing Class II medical devices like Flexcera. This resin, in turn, was shipped to, repackaged in, and given a label indicating German origins at the Company's Dearborn, Michigan facility—which also lacked required FDA approvals for handling the resin—before being sold to dental industry customers for permanent patient use. Additionally, Defendants had directed EnvisionTEC sales personnel to market and sell the PCA 4000 to customers for purposes of curing EnvisionTEC dental resins to desired medical grade specifications and biocompatibility requirements, even though the PCA 4000 had not passed internal testing for use with Flexcera and was not identified in Desktop's 510(k) application for Flexcera that was cleared by the FDA. These concealed manufacturing deficiencies and FDA compliance failures at EnvisionTEC presented a material risk to the commercialization of EnvisionTEC's products (as evidenced by later FDA recalls and revenue filings), and as a result, rendered Defendants' positive statements about the Company's acquisition and successful integration of EnvisionTEC materially misleading and/or lacking a reasonable basis.

14.    Multiple sources confirm Defendants' efforts to conceal material deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures. To start, following a cursory independent internal investigation prompted by a whistleblower complaint, Defendants admitted in a November 15, 2021 press release that they had found "compliance issues with certain shipments of EnvisionTEC's Flexcera dental resins and its PCA 4000 curing box" and that they would be "notify[ing] the FDA and consult[ing] with them on the appropriate voluntary market action with respect to these products."

15.    Further, numerous former employees contacted in connection with Lead Plaintiffs' investigation confirmed that Defendants not only knew of the Company's EnvisionTEC-related

manufacturing and product compliance practices and procedures, but also orchestrated them to boost production and revenue. For example, FE-5—a senior manager at EnvisionTEC who reported directly to Defendant El-Siblani for many years—relayed that Defendant El-Siblani himself ordered and orchestrated the Company's manufacture and distribution of non-FDA compliant Flexcera resin. As relayed by FE-5: around the time the Company was preparing to officially launch Flexcera, Defendant El-Siblani called the head chemist at the Company's Montreal, Canada facility with instructions that he "up his production" of Flexcera resin, even though El-Siblani—the 20-year, "hands on" EnvisionTEC CEO knew the facility lacked requisite FDA certifications. After receiving El-Siblani's telephonic order, the Montreal facility unlawfully manufactured the requested Flexcera resin and then shipped the resin across the U.S.-Canada border to Dearborn, Michigan, in large drums. Employees in Dearborn then poured the batched resin into smaller, itemized bottles that could be sold to customers in the dental industry. The senior manager further stated that Defendant El-Siblani instructed them to produce sticker labels for the Montreal-manufactured resin at the Dearborn facility. After generating nearly 100 labels, the senior manager confronted Defendant El-Siblani regarding the senior manager's belief that the practice stood on infirm legal ground. But Defendant El-Siblani reportedly brushed the senior manager's concerns aside by saying that the practice was fine and "only temporary." Yet despite his representation that sales of Montreal-manufactured Flexcera resin would be "only temporary," Defendant El-Siblani continued to instruct the chief chemist in Montreal to manufacture Flexcera resin that would later be sold for permanent patient use. The senior manager recalled ordering at least "a thousand or more" labels for the non-FDA compliant resin. As a result of the above-described scheme, the Company sold Montreal-made Flexcera resin to customers from on or about

April 1, 2021 (before the May 15 official launch date of Flexcera), until October 2021 (before the Company launched an internal investigation based on a whistleblower complaint).

16.     Reliable former Company employees have also confirmed Defendants' scheme to push the sale of EnvisionTEC products for non-FDA authorized uses to inflate Desktop Metal's reported revenues. In particular, a former EnvisionTEC sales manager explained that on a March 2021 sales call, Defendant El-Siblani ordered the dental channel sales team to begin pushing EnvisionTEC's "homemade" PCA 4000 as the default curing unit for EnvisionTEC dental resins, even though (i) the PCA had not been sufficiently tested and (ii) FDA had not yet authorized such a use. But when a sales representative raised concerns with El-Siblani about the practice and told El-Siblani that he would not sell the PCA 4000 based on his conversations with the Company's engineers in Germany, Defendant El-Siblani rebuffed the sales representative's concerns and threatened his sales team: "This is the one I am telling you to sell, so do it." Soon after the Company began pushing the PCA 4000 into the market, customers began to report problems with the Company's resin not properly curing, frequently complaining that Flexcera was coming out of the PCA 4000 "gummy" and that the recommended curing times were inaccurate.

17.     Investors started to learn the truth on November 8, 2021, when the Company disclosed in a Form 8-K filing that the Audit Committee of its Board of Directors had "engaged a third party to conduct an independent internal investigation as a result of a whistleblower complaint relating to, among other matters, manufacturing and product compliance practices and procedures with respect to a subset of its photopolymer equipment and materials at its EnvisionTec US LLC facility in Dearborn, Michigan." The Company stated that while the investigation remained ongoing, "the Company has taken initial actions, including implementing changes in the management of and procedures associated with manufacturing the applicable products." In a

separate Form 8-K filing with the SEC, the Company also announced that Defendant El Siblani had notified Desktop of his intent to resign as a member of the Company's Board of Directors and as an employee of the Company in his role as Chief Executive Officer of EnvisionTEC US LLC. Although Desktop Metal falsely represented that "the decision of Mr. Siblani was not the result of any disagreement relating to the Company's operations, policies or practices," the press was quick to connect El-Siblani's abrupt departure with the internal investigation.[5] On this news, the Company's stock fell $1.02 over the next two trading days, or 9.2%, from $9.02 per share at the close of trading on November 8, 2021 to $8.19 per share at the close of trading on November 10, 2021.

18.     Then, on November 15, 2021, after the market closed, the Company revealed that "based on compliance issues with certain shipments of EnvisionTEC's Flexcera dental resins and its PCA 4000 curing box, the Company ha[d] determined that it will notify the FDA and consult with them on the appropriate voluntary market action with respect to these products." On this news, the Company's stock fell $1.19, or 15%, to close at $6.83 per share on November 16, 2021, on unusually heavy trading volume.

19.     All told, the Company's stock lost nearly $700 million in shareholder value on the disclosure of Defendants' fraudulent conduct during the Class Periods.

---

[5] *See, e.g.*, Lucia Maffei, "Desktop Metal discloses whistleblower complaint related to EnvisionTec," BOSTON BUSINESS JOURNAL (Nov. 9, 2021), https://www.bizjournals.com/boston/news/2021/11/09/desktop-metal-discloses-whistleblower-complaint.html (noting Desktop Metal's refusal to respond to whether El-Siblani's departure had anything to do with the internal investigation).

**F.3     Desktop Metal (DM) Closing Stock Price Throughout Class Periods**



20.     In the aftermath, Defendants' fraud was further confirmed when the Company initiated two recalls with the FDA. First, on January 6, 2022, the Company initiated a recall for "FLEXCERA SMILE -a Dental resins for the fabrication of artificial teeth" that was manufactured from April 1, 2021 to September 15, 2021 because it was "[m]anufactured in a non-FDA registered manufacturing facility" and because the "product was mislabeled as being of German origin." Based on the Company's recall submission, the FDA determined that the product was a "nonconforming material/component." Among other things, the FDA ordered customers to "stop dispensing and distributing and quarantine [the identified] lots"—approximately "795 units" in total. Additionally, notifications of the recall were sent to all direct accounts of EnvisionTEC. Second, on January 20, 2022, the Company commenced a recall for all "PCA 4000 Curing Units" with "SKU number ACC-06-1000" sold to non-industrial users because the device "may not fully

- 14 -

cure EnvisionTEC dental resins to desired product specifications." Again, the Company sent notifications to all direct accounts of EnvisionTEC directing them to "stop utilizing the PCA 4000 to print medical devices made from EnvisionTEC dental resins." As a result of Defendants' concealment of manufacturing and compliance deficiencies at EnvisionTEC and in the wake of the ensuing internal investigation and recalls, Defendant Jafar's employment at Desktop was terminated.

21.     With this consolidated action, investors now seek redress pursuant to the federal securities laws.

**II.     JURISDICTION AND VENUE**

22.     This consolidated action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

23.     The court has subject matter jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa (granting federal courts exclusive jurisdiction over Exchange Act violations), and 28 U.S.C. § 1331 (federal question jurisdiction).

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c), and 28 U.S.C. § 1391(b) and (d). At all relevant times, Desktop Metal conducted business and maintained its headquarters, located at 63 Third Avenue, Burlington, Massachusetts 01803, in this District. Additionally, many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.

25.     In connection with the acts alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.   PARTIES

#### A.   Lead Plaintiffs

26.   Lead Plaintiff Xie, as set forth in her certification filed with this Court (*Xie v. Desktop Metal*, No. 22-cv-10297-IT, Dkt. No. 1-3), purchased Desktop Metal securities at artificially inflated prices during the Xie Class Period, retained those shares throughout the Xie Class Period, and suffered substantial losses upon the revelation of the corrective disclosures alleged herein.

27.   Lead Plaintiff Zhou, as set forth in her certification filed with this Court (Dkt. No. 38-1), purchased Desktop Metal securities at artificially inflated prices during the Zhou Class Period, retained those shares throughout the Zhou Class Period, and suffered substantial losses upon the revelation of the corrective disclosures alleged herein.

#### B.   Corporate Defendant

28.   Defendant Desktop Metal, Inc. ("Desktop Metal" or the "Company") is a publicly traded technology company that purports to design and offer additive manufacturing technologies—that is, 3D printing systems—for large-scale, end-user part printing. Organized under Delaware law and headquartered in Burlington, Massachusetts, the Company operates in offices around the United States, Canada, the United Kingdom, and Germany.

29.   Founded in October 2015, the Company began as a startup focused on 3D metal printing processes that would be fast and small enough for office settings. In April 2017, the Company released its first pair of metal 3D printing systems, gaining some private investment acclaim. In December 2020, the five-year-old startup started trading its stock on the New York

Stock Exchange ("NYSE") under the symbol "DM" through a reverse, special acquisition company merger ("SPAC merger").[6]

30.     Upon completion of its SPAC merger, Desktop Metal embarked on a "constructive consolidation" acquisition spree in the 3D printing market with the aim of turning the Company profitable. To that end, in January 2021, Desktop Metal announced it would be purchasing EnvisionTEC, Inc. ("EnvisionTEC") and certain of its affiliates ("EnvisionTEC Group"), a company specializing in photopolymer printing for medical, dental, professional, and industrial markets. The EnvisionTEC Acquisition was completed on February 17, 2021. Nearly one month later, on March 15, 2021, the Company announced a new business segment—Desktop Health— with the goal of taking EnvisionTEC's core dental technology and reinvigorating it within Desktop's business lines, with plans to expand in orthopedics, ophthalmology, dermatology, plastic surgery, and cardiology spaces.

31.     Explanations of Desktop Metal's conduct, as alleged herein, include conduct of EnvisionTEC and Desktop Health. Additionally, liability for the acts and conduct by EnvisionTEC and Desktop Health, as alleged herein, are also attributed to Desktop Metal and the Company.

32.     Before being acquired, EnvisionTEC was a privately held technology company with a North American corporate headquarters in Dearborn, Michigan, and an international headquarters in Gladbeck, Germany. It also had a production facility in the Greater Los Angeles area, as well as additional facilities in Montreal, Canada, for materials research, in Kiev, Ukraine, for software development, and in Woburn, Massachusetts, for robotic 3D printing research and

---

[6] As more fully explained in footnote 11 and ¶¶ 52-55, *infra*, a special purpose acquisition company, also known as a "SPAC" or "blank check company" for short, is a shell company listed on a public exchange established for the purpose of raising capital to finance the purchase of an unidentified private company, thus making the acquired company public without going through the traditional initial public offering process.

development. Upon information and belief, these facilities were acquired by Desktop Metal during the Desktop-EnvisionTEC acquisition.

**C.      Individual Executive Defendants**

33.      Defendant Ric Fulop ("Fulop") is the Chief Executive Officer ("CEO") of Desktop Metal—a position he has occupied since the Company's founding in 2015 up through the present. Fulop co-founded Desktop in 2015 with six other graduates of the Massachusetts Institute of Technology. As CEO, Fulop regularly signed, approved of, or had the power to exercise control over Company public statements and regulatory filings, including those filed with the SEC. Additionally, Fulop frequently spoke to investors regarding the Company's products, including its dental products sector and other medical devices subject to FDA 510(k) premarket notification. As set forth below, both the Xie Class and the Zhao Class assert claims against Fulop.

34.      Defendant James Haley ("Haley") is Chief Financial Officer ("CFO") of Desktop Metal—a position he assumed on February 12, 2021 and will step down from at the end of December 2022. Haley previously served as Desktop Metal's Vice President of Finance from August 2020 until February 2021. As CFO and/or Vice President, Haley regularly signed, approved of, or had the power to exercise over Company public statements and regulatory filings, including those filed with the SEC. As noted below, Haley also participated in and/or oversaw the Company's corporate due diligence for the acquisition of EnvisionTEC. As set forth below, the Xie Class asserts claims against Haley.

35.      Defendant Ali El-Siblani ("El-Siblani") was a Director and Chief Executive Officer of the Company's wholly owned subsidiary EnvisionTEC US LLC from February 16, 2021, when Desktop Metal completed its acquisition of EnvisionTEC and certain of its affiliates, up to November 5, 2021, when El-Siblani purportedly notified Desktop Metal of his intent to resign as a member of the Company's Board of Directors, as an employee, and as Chief Executive Officer

of EnvisionTEC US LLC.[7] While the Company claims El-Siblani's decision to resign was not the result of any disagreement relating to the Company's operations, policies, or practices, the allegations herein support the inference that this representation is false; rather, El-Siblani was forced to leave the Company due to the wrongful conduct Desktop Metal's Board of Directors Audit Committee uncovered in connection with a November 4, 2021 whistleblower complaint concerning manufacturing and product compliance practices and procedures at EnvisionTEC.

36.    Before Desktop Metal acquired EnvisionTEC, El-Siblani had been a co-founder and the CEO of EnvisionTEC and various of its affiliates since 2002. After Desktop Metal acquired EnvisionTEC, El-Siblani was appointed as a Director of the Company's Board of Directors and signed SEC filings on the Company's behalf. In addition, El-Siblani was featured in the Company's SEC filings during the Zhou Class Period as one of the select members of the Company's Executive Officer team. Further, as CEO of EnvisionTEC US LLC, El-Siblani reported directly to CEO Fulop and continued to have the same responsibilities, duties, and authority over EnvisionTEC's business activities, including overseeing all EnvisionTEC aspects of the Company's manufacturing and compliance procedures, including those based out of EnvisionTEC's former headquarters in Dearborn, Michigan. Moreover, as a result of the EnvisionTEC Acquisition in February 2021, Desktop Metal entered into several lease agreements with entities controlled by El Siblani, for facilities located in Dearborn, Michigan, and Gladbeck, Germany. As discussed herein, several former employees report that, as a Director of Desktop

---

[7] According to the Company proxy statements on file with the SEC, El-Siblani was appointed to the board of directors pursuant to the terms of the purchase agreement and plan of merger among Desktop, EnvisionTEC, and El-Siblani. Also in those proxy statements, the Company stated it "believe[d] Mr. Siblani is qualified to serve on our Board of Directors due to his extensive entrepreneurial and management experience and leadership in the additive manufacturing market."

Metal and CEO of EnvisionTEC, El-Siblani was highly involved in and "extremely hands-on" with the Company's EnvisionTEC-related day-to-day operations, touching on all operational matters from strategy to sales to manufacturing. Accordingly, El-Siblani was a "maker" of Defendants' oral and written statements insofar as they related to EnvisionTEC. As set forth below, the Zhou Class asserts claims against El-Siblani.

37.     Defendant Michael Jafar—a relative of El-Siblani—was brought on by the Company to serve as the President and CEO of Desktop Health on March 15, 2021, when Desktop Health was created, up through his separation from the Company on June 30, 2021. As CEO of Desktop Health, Jafar frequently gave public statements, provided interviews, and appeared in print and digital media on behalf of the Company touting Desktop and its dental channel product line, including Flexcera. Additionally, in the Company's Definitive Proxy dated April 27, 2022, Jafar is identified as one of the select members of the Company's executive team for relevant portions of the Zhou Class Period. Further, former employees confirm that, after taking the helm of Desktop Health, Jafar kept tabs on day-to-day operations of the Company's EnvisionTEC subsidiaries and frequently attended and/or ran dental channel sales team meetings.[8] Accordingly, Jafar was a "maker" of Defendants' oral and written statements insofar as they related to Desktop Health. As set forth below, the Zhou Class asserts claims against Jafar.

38.     Defendants Fulop, Haley, El-Siblani, and Jafar (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to

---

[8] On June 13, 2022, Desktop announced that the Company had entered into a separation agreement with Jafar. "Desktop Metal, Inc. Announces Cessation of Michael Jafar as Chief Executive Officer, Effective from June 30, 2022," S&P CAPITAL IQ (June 13, 2022, 7:30 am EDT), https://www.marketscreener.com/quote/stock/DESKTOP-METAL-INC-57948431/news/Desktop-Metal-Inc-Announces-Cessation-of-Michael-Jafar-as-Chief-Executive-Officer-Effective-from-40717884/.

control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors (i.e., the market). The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein. Moreover, their knowledge, actions, and scienter are imputable to the Company.

**D.**     **Former Company Employees**

39.     As part of the undersigned counsels' ongoing independent investigation, former Desktop Metal and EnvisionTEC employees with direct and indirect personal knowledge of the facts and actions alleged herein were interviewed. For ease of reference, the following is a summary of the positions and backgrounds of seven former employees relied upon and directly cited as sources in this complaint. Their information has been partially anonymized, in part, to protect these employees from harassment and/or expressed concerns of potential retaliation.

**1.**     **FE-1**

40.     FE-1 is a former senior financial advisor for the Company's Burlington-based operations who was hired around the time the Desktop-EnvisionTEC acquisition was announced. FE-1 was hired to help create and fill out the Company's financial department, which included significant work on integrating financial aspects of acquired companies—such as EnvisionTEC— into Desktop Metal own financial structure. He worked closely with Quinlan who led the M&A department. During this time, FE-1 reported directly to the Company's CFO, Defendant Haley,

and advised on financial matters relating to all the acquisitions the Company made during FE-1's employment. FE-1 resigned nearly a year after joining Desktop Metal due to, among other things, FE-1's view that the Company lacked a strategic direction on financial matters.

**2.      FE-2**

41.      FE-2 worked at the Company's EnvisionTEC business from 2019 through 2021, during which they oversaw all accounting activities for EnvisionTEC's United States and German operations, including after EnvisionTEC was acquired by Desktop Metal. (FE-2 lacked "effective operational authority" over the German accounting operations, which instead reported to local management.) During their tenure, FE-2 reported directly to Defendant El-Siblani. And as part of their duties, FE-2 aided in responding to Desktop Metal's due diligence requests by submitting information to Desktop Metal (and its independent advisor, KPMG International Ltd., one of the "Big Four" multinational accounting organizations).

**3.      FE-3**

42.      FE-3 is a former sales manager for the Company's EnvisionTEC operations who worked as part of the Company's six-person dental channels sales team under the then-Director of Dental Channel Sales, P. Christian Rose, Defendant El-Siblani, and (after the launch of Desktop Health) Defendant Jafar. As a member of the Company's dental channel sales team, FE-3 had extensive knowledge regarding the Company's dental channel products and sales practices, managed one of the Company's multi-state geographic dental sales territories, and was responsible for selling all products necessary—from printers to resin to curing boxes—for EnvisionTEC customers to employ the Company's 3D printing dental solution. FE-3 also participated in the Company's weekly dental channel sales calls, which were frequently attended and/or led by Defendant El-Siblani. This included the March 2021 sales call discussed in detail herein, during

which Defendant El-Siblani commanded the sales team to sell the PCA 4000 for use with Flexcera despite lack of sufficient testing and FDA clearance. FE-3 resigned from EnvisionTEC in mid-2021 after their years of work, citing disagreements with Defendant El-Siblani, his interference with sales, and his "do this or I'm firing you" management style as their reasons for resigning.

**4.     FE-4**

43.     FE-4 is another former sales manager of the Company's EnvisionTEC dental channel sales team who worked under Mr. Rose, Defendant El-Siblani, and (after March 2021) Defendant Jafar. FE-4 has over 10 years of experience in the dental industry. While at EnvisionTEC, FE-4 only sold the Company's dental line of products (of which FE-4 his highly knowledgeable) and did so across a territory spanning several states. FE-4 reports that, during their employment, they paid close attention to the Company's sales numbers. Like FE-3, FE-4 also attended the Company's weekly dental channel sales meetings, including the March 2021 call described below, and was aware, based off conversations with their colleagues, that the PCA 4000 lacked adequate testing to ensure it could sufficiently cure Flexcera resin.

**5.     FE-5**

44.     FE-5 is a former senior manager at the Company's EnvisionTEC subsidiary who discovered Defendants' scheme during their employment and notified Company executives and the human resources department of their concerns. Prior to the Desktop-EnvisionTEC acquisition, FE-5 had worked at EnvisionTEC for many years and, because of their position, possessed extensive knowledge regarding most aspects of EnvisionTEC's work. FE-5 reported directly to Defendant El-Siblani and was viewed by many former EnvisionTEC employees as a direct communications conduit between the Company's EnvisionTEC executives and its employees (including managers). At FE-5's request, Lead Plaintiffs have omitted additional identifying

information (e.g., their job title, start date, etc.) due to FE-5's fear of retaliation, particularly from Defendant El-Siblani who, as discussed below, was reported by several former employees (both cited and uncited) to be cruel and extremely aggressive against anyone who crossed him.

**6.      FE-6**

45.      FE-6 is a source material research expert who specializes in 3D dental implant technologies. FE-6 is also a former EnvisionTEC employee. During the Class Periods, FE-6 worked in a senior research position for one of the nation's largest producers and sellers of dentures and dental implants, which had invited the Company to pitch its Flexcera Base and Flexcera Smile 3D printing products (including resins, printers, and curing boxes). As part of FE-6's due diligence to confirm the Company's reported quality claims about Flexcera, FE-6 sent the Company's product out to an independent dental laboratory for validation testing using Desktop Metal's instructions for use. This testing was to confirm that the Company's products conformed with the several standards that dental devices must meet to be safe and effective for patients. As discussed below, the validation testing revealed several non-conformance issues regarding Flexcera and its physical properties, which FE-6 reported to the Company's managers.

**7.      FE-7**

46.      FE-7 worked as a service engineer for EnvisionTEC's biomaterials 3D printing team at the Dearborn, Michigan facility from 2018 to 2021. There, FE-7 reported to both Defendant El-Siblani and Carlos Carvalho, a manager in EnvisionTEC's German office. In early to mid-2020, FE-7 also began working in a customer-facing role with the dental product 3D printing team (under Technical Services Manager Miguel Gomez), from which they became familiar with the dental resins sold to customers for use in the 3D printers and the dental resins the Company was developing for potential sale to customers. During their employment, FE-7 personally observed

the working conditions at the Dearborn, Michigan facility, as well as EnvisionTEC's practices for repackaging and reselling products made by third-party manufacturers.

## IV.     BACKGROUND ALLEGATIONS

### A.     Desktop Metal—A Net Negative Revenue SPAC Which Pursued a Rapid Merger Strategy with the Hope of Achieving Profitability

47.     Desktop Metal is a publicly owned technology company founded in 2015 that designs and markets additive manufacturing technologies—more popularly known as 3D printing systems—focused on bringing the production of end-use parts up to a mass production level. In simple terms, 3D printing is a process that builds a three-dimensional ("3D") object by sequentially building two-dimensional ("2D") layers and joining each to the layer below. This process allows device manufacturers using 3D printing systems to create complex devices built as a single piece and to rapidly produce alternative designs without the need for retooling production machinery. This process competes with traditional manufacturing on at least four axes: (1) speed (i.e., time to manufacture traditional vs. AM); (2) accuracy (i.e., level of detail); (3) properties (i.e., whether the isotropic properties match existing materials used in traditional production); and (4) finish (i.e., whether the items are produced with different surfaces/textures/finishes).

48.     Before going public, Desktop Metal operated as a small-to-medium sized enterprise consisting of approximately 180 employees in its primary office in Burlington, Massachusetts, and 20 to 30 more workers scattered among office/production buildings around the I-95 belt, including one in Wilmington, Massachusetts. At that time, the Company primarily focused on 3D printing systems that could make objects out of different metal alloys, including steel, aluminum, titanium, and copper using a proprietary "microwave enhanced sintering" technology.[9]

---

[9] While metal 3D printers were around for decades before Desktop Metal entered the market, such printers were limited in terms of materials, speed, and accessibility because metals have high melting points. Desktop Metal's printers address these limits by printing down layers of

49.     In April 2017, the Company revealed its first two products: a metal 3D printing system catered to engineers and small production runs (the Studio System) and an industrial version intended for manufacturers and large-scale printing (the Production System). At launch, the Studio System cost approximately $120,000 and included a printer and sintering furnace. The Production System, which shipped in 2018, carried a loftier price of $420,000.

**F.4     Desktop Metal 2020 Product Portfolio, Including Studio and Production Systems[10]**

[03]



50.     According to its SEC filings, the Company generated less than $23 million in product revenue and an additional $3.7 million in service revenue ($26.4 million in total) in 2019 versus $51.5 million in total costs. In 2020, the Company reported only $16.5 million in revenue—

metal and ceramic powders that are mixed in a soft polymer. Once an item is printed, it goes into a furnace to be rapidly cooked. Heat burns off the polymer. Gases are filtered by charcoal. And the metal is fused together at a temperature that will not cause melting or deformation. Additionally, ceramics can be laid down in a printed design to keep metal separated and unfused. As such, pieces created by Desktop Metal machines can be separated later by hand.

[10] Desktop Metal, Investor Presentation (Aug. 2020), https://www.desktopmetal.com/uploads/Desktop-Metal-Investor-Presentation.pdf.

a decrease of $9.9 million or 38%—and $31.5 million in total costs—a difference purportedly due to decreased customer demand and long sales cycles imposed from COVID-19.

51.     As put by FE-1—a former senior financial advisor for the Company—prior to going public, Desktop was a relatively "tiny" manufacturing operation whose internal structure was "not ready for primetime." Nevertheless, the Company oriented itself to go public so that it could attract quick and massive capital influxes, especially of the magnitude offered by its going-public vehicle of choice, a "SPAC acquisition."[11]

52.     To that end, on August 26, 2020, the Company entered into an Agreement and Plan of Merger (the "SPAC Merger Agreement") with the SPAC Trine Acquisition Corp. ("Trine")—a zero-revenue public company with no purpose other than to take Desktop Metal public—and Trine's merger subsidiary, Sparrow Merger Sub, Inc., through which Trine acquired Desktop Metal. Under the SPAC Merger Agreement's terms, if Trine's shareholders approved the agreement, Sparrow Merger Sub would merge with Desktop Metal, Trine and Sparrow would operate under the brand name of Desktop Metal, and Desktop Metal's operations would carry on within a public company shell and trade under the ticker symbol "DM."

53.     According to the August 26, 2020 press release announcing the SPAC Merger, the SPAC-led public debut had the potential to generate as much as $575 million to $625 million in cash to support the Company's plans for "constructive consolidation in the additive manufacturing

---

[11] A special purpose acquisition company, "SPAC" for short, is a company established for the purpose of raising capital to finance the purchase of another "target" company. As part of the SPAC process, a SPAC first lists itself on a stock exchange and raises proceeds through an initial public offering. The listed SPAC then identifies a target investment company, normally an unlisted private company, to execute a reverse takeover (often referred to as a "de-SPAC" transaction), thereby bringing the private company public. The SPAC, which is the surviving entity, then assumes the identity of the target company, changing its name and applicable security listings.

industry."[12] In addition, in Desktop Metal's August 26, 2020 investor presentation encouraging approval of the SPAC Merger, the Company claimed to have a compelling M&A pipeline, stating that it had identified over 60 opportunities and that it was in contact and under analysis with more than 10 potential entities to acquire.

**F.5    Excerpt from Trine-Desktop Metal Investor Presentation Filed on Form 425 with the SEC on Aug. 26, 2020**



54.    On December 8, 2020, Trine held a special meeting, at which the SPAC's stockholders approved the business combination. Pursuant to the terms of the Merger Agreement, the companies completed the above-described transaction the following day (December 9, 2020), thereby elevating Desktop Metal from a company leaking nearly $10-20 million a year in gross losses to a $2.5 billion public enterprise with a $580 million war chest to capitalize on growth opportunities.

---

[12] *See* Press Release, Desktop Metal, "Desktop Metal to Become Public, Creating the Only Listed Pure-Play Additive Manufacturing 2.0 Company" (Aug. 26, 2020), https://www.businesswire.com/news/home/20200826005382/en/.

55.     As noted by analysts, the Company's lofty $2.5 billion valuation—based in part on a $100 million revenue guidance for FY 2021—featured at least one key drawback: specifically, it increased the Company's execution risk tremendously. As such, "it basically ma[de] it a requirement that it [the Company] does not miss revenue expectations in upcoming quarters."[13]

56.     Flush with funds from the SPAC Merger, the newly public Desktop Metal wasted no time embarking on its aggressive merger and acquisitions campaign as a means of expanding into more lucrative 3D printing product lines and pulling Desktop Metal into the black. As discussed below, the first target to cross the Company's M&A sights was EnvisionTEC, given its dental industry portfolio and the potentially lucrative revenues projected by industry experts for 3D printed dental implants (estimated to be nearly $20 million from dental products alone).

57.     By the end of 2021, the "not ready for prime time" Massachusetts manufacturer's rushed acquisition strategy would cause it to balloon in size, amassing approximately 1,400 employees and scattered enterprises across the United States, including Desktop Health in Southern California (launched March 15, 2021), Adaptive 3D Technologies in Plano, Texas (acquired May 17, 2021), Aerosint SA in Hestal, Belgium (acquired July 12, 2021), The ExOne Company in North Huntingdon, Pennsylvania (acquired August 11, 2021), and AIDRO Srl in Taino VA, Italy (acquired September 9, 2021).

## B.     The Gold Mine That is 3D Printing Dental Technology

58.     Dental 3D printing is viewed by several analysts as the golden goose of the 3D printing industry. In 2021 alone, the global dental 3D printing market was valued to be nearly

---

[13] *See* Mobility Matters Research, "Desktop Metal: High Risk, High Reward," SEEKING ALPHA (Jul. 13, 2021), https://seekingalpha.com/article/4438970-desktop-metal-stock-dm-high-risk-high-reward.

$2 billion. Market analysts expect that number to compound annually at about 20-25% through the end of the decade.

**F.6     U.S. Dental 3D Printing Market Projection for 2020-2030 by Grand View Research[14]**



59.     These market researchers are bullish on dental 3D printing for several reasons. Demand and adoption of dental 3D printers is increasing due to the design and development of advanced products (e.g., invisible aligners, fabricated teeth, etc.). The technology has become incredibly user friendly and scalable for smaller operations. Individuals are growingly aware of the importance of oral health. And factors such as the rising geriatric population, favorable government policies, and improving healthcare infrastructure are expected to create a positive market outlook.

---

[14] *See* "Dental 3D Printing Market Size, Share & Trends Analysis Report By Application (Orthodontics, Prosthodontics, Implantology), By Technology (Vat Photopolymerisation, Polyjet Technology), By End Use, And Segment Forecasts, 2022 – 2030," GRAND VIEW RESEARCH (June 29, 2022), https://www.grandviewresearch.com/industry-analysis/dental-3d-printing-market.

**F.7     U.S. Dental 3D Printing Market Projection for 2020-2030 by MarketsAndMarkets[15]**



60.     Additionally, these researchers note that advances in materials science have allowed for the manufacture of 3D printing resins with physical attributes ideal for applications in dentistry. (For example, as discussed below, EnvisionTEC's system can allow a dental office or lab to 3D print and finish custom permanent dental implants for patients in about one hour.)

61.     At all relevant times, Defendants shared in this positive view regarding the future of dental printing and its implications for the profitability of the 3D printing market generally. For example, in a June 2021 interview with California Business Journal, Defendant Jafar admitted that the present and future of additive manufacturing is in the biotech space:

_____

[15] _See_ "Dental 3D Printing Market by Product (Material (Plastic, Metal), Equipment (3D Scanner & Printer), Service), Technology (Vat Photopolymerization, FDM, SLS, Polyjet), Application (Prosthodontics, Implants), End-User (Labs, Hospitals) – Global Forecast to 2027," MARKETSANDMARKETS, available as of December 19, 2022, at https://www.marketsandmarkets.com/Market-Reports/dental-3d-printing-market-258228239.html (last visited Dec. 19, 2022).

> Five years from now, the crown jewel of this business is dentistry. From there, we will open up many other verticals, from dermatology, ophthalmology, plastic surgery, orthopedics and beyond.[16]

62.     Likewise, in the Company's March 15, 2021 earnings call and presentation to investors on its fourth quarter and full year 2020 results, the Company claimed that the dental industry and its "$30B+ annual parts spend" was "a killer app for AM 2.0," given the Company's estimates that "the ~10% penetration of AM in dental lab parts today will grow up to 75% by 2025 (across metal and polymers)."[17]

63.     Defendant Fulop would also go on to explain during the March 15, 2021 earnings call that the Company immediately expected its interest in, and acquisition of, EnvisionTEC to pay off in terms of improving the Company's gross revenue and historic net losses.

> So as we think about contributions on the year and really we continue to integrate the businesses every day, we are really trying to leverage different sales channels and development strategies as we can. *As I think about revenue for the full year, I would say roughly 60% as we sit today is going to be on the organic DM side with 40% would be in EnvisionTEC.*

(Emphasis added.)

## C.     EnvisionTEC's 3D Printing Dental Technology for Medical Grade Dental Implants

64.     In simple terms, EnvisionTEC's Digital Light Processing ("DLP") 3D Printing solution for dental implants uses a three-step process to generate medical devices. First, a user sends the printing instructions to a 3D Printer, which, using a biocompatible material (typically resin), prints the desired object. Second, the user cleans the printed object (for example, in an alcoholic solution) to remove any excess resin remaining from the printing process. Finally, the

---

[16] *See* Judd Spicer, "Dentures . . . Printed In 3D," CALIFORNIA BUSINESS JOURNAL, https://calbizjournal.com/dentures-printed-in-3d/ (June 2021).

[17] *See* Desktop Metal Inc. Q4 2020 Earnings Call (Mar. 15, 2021).

user inserts the cleaned object into a curing unit (a/k/a curing box or oven) that utilizes a projected light source that causes the printed object to harden. According to FE-3 and the Company's publicly available manuals, the entire process on average takes about one hour, consisting of about 30 mins for printing, less than 2 minutes for cleaning, and up to 30 minutes for curing.

65.     The Company (formerly EnvisionTEC) sells each aspect of the 3D printing process, from the printers themselves to the resin material and post-printing finishing systems.

**F.8     Image from Company Website for EnvisionTEC Complete System**
*(includes Envision One Printer, Flexcera Resin, PCA 4000, and Otoflash)*



**1.     3D Printers**

66.     For its dental channel operations, EnvisionTEC manufactures and markets its own brand of 3D printers—the "flagship model" for the dental industry being the "Envision One." According to FE-3 (a dental channel sales manager for the Company), during the Class Periods, the Company sold the Envision One Printer at a price ranging between $18,000 to $30,000, depending on factors such as the nature of the customer, purchasing volumes, and other discounts.

**F.9     Sales Image of Envision One Dental Printer**



## Envision One cDLM Dental

Product# MIC-40-1000

The Envision One CDLM Dental package provides a complete solution for dental practices of all sizes. Intuitive, powerful software combined with an extensive selection of industry-leading dental materials means rapid turnaround time and happier patients.

**Key Features:**

• Continuous Digital Light Manufacturing (cDLM) 3D Printer
• 180 x 101 x 85 mm
• Resin / SLA
• A high-resolution projector produces ultra-high detail dental and orthodontic parts at up to 45 mm/hour

**Includes:**

• Envision One cDLM 3D Printer
• Oxygen Generator

$ Low Price Guarantee

✓ Brand New
✓ Usually ships in 3-5 days
✓ Includes Warranty
✓ Unlimited Toll-Free Support

**Get Quote**

## 2.     Resins

67.     During the Class Periods, the Company sold various 3D printing resins for end-use part production, prototyping, and industrial uses across a number of industries (e.g., aerospace, architecture, consumer goods, etc.). In colloquial terms, these resins constituted the "ink cartridges" for the Company's DLP dental printers. Some resins sold by the Company were made by and purchased from EnvisionTEC competitors, including NextDent and Keystone. According to former employees, the Company rebranded several of these resin products with the EnvisionTEC logo before selling (usually at a markup) to consumers.

68.     Flexcera is the trade name for the Company's proprietary resins used for the fabrication of 3D printed dentures and teeth, and it comes in two separate, specialized forms: Flexcera Smile and Flexcera Base. As explained in the Company's press releases: the former, "Flexcera Smile[,] is an FDA Class 1 Medical Device for the fabrication of lifelike denture teeth." On the other hand, the latter, "Flexcera Base[,] is an FDA Cleared Class 2 Medical Device for the

fabrication of premium denture bases. Both are formulated exclusively for use with EnvisionTEC 3D printers."[18]

69.    Similar claims regarding FDA clearance are echoed on the Company's website on the products page. For example, the Company refers to Flexcera Base as an "FDA cleared premium denture base[]" and as a "[l]ight-curable resin for the fabrication of high-impact and removable denture base[]" that is "[c]ompatible and validated for use with EnvisionTEC™ systems."

### F.10    Product Listing for Flexcera Base on Company Website



70.    Likewise, the Company claims Flexcera Smile is a "light-curable resin" that is "[c]ompatible and validated for use with EnvisionTEC™ systems."

---

**F.11    Product Listing for Flexcera Smile on Company Website**



**F.12    Product Listing for Flexcera Smile Ultra+ on Company Website**



71.     According to former employees and third-party reseller websites, one bottle of the Company's Flexcera resin can run between approximately $500 to $700. As seen in the advertising images below, the Company claimed that its Flexcera resin was, among other things, three times more resistant to fracture as compared to competing brands.

**F.13   Sales Images for Bottles of EnvisionTEC's Flexcera Smile Resin**
*(images also available on Company website)*





72.     The Company repeated claims regarding Flexcera's FDA clearance and physical attributes on the products page of its website throughout the Zhou Class Period, including on the website's Flexcera webpage, in which it states:

> Flexcera™ is expected to ship in the U.S. and Canada by the end of June 2021. Pre-order today while supplies last. Flexcera™ Base is an FDA 510(k) Cleared Class 2 Medical Device indicated for the fabrication of denture bases in dental laboratories for full removable dentures; Flexcera™ Smile is an FDA Class 1 Medical Device for the fabrication of artificial teeth for dental prostheses.[19]

73.     As discussed below, on March 29, 2021, the Company applied for regulatory approval to market Flexcera for permanent use by patients by filing a premarket notification on Form 510(k) with the FDA. *See* Part IV.D.3, *infra* (discussing premarket notifications). That same day, the Company also registered Flexcera as a trademark with the U.S. Patent and Trademark Office ("USPTO"). On May 12, 2021, the Company announced that it had obtained FDA clearance for the marketing of Flexcera products.

74.     According to the Company's FDA regulatory filings, Flexcera Base & Smile function as trade names for and/or are substantially equivalent to the Company's "E-Dent 1000" line of dental resins.[20] Additionally, at least one former employee, FE-4, independently represented that they believed EnvisionTEC's medical grade proprietary resin also went by E-Dent 1000 prior to adopting the Flexcera trade name.

---

[19]*See* Flexcera webpage on Desktop Metal's internal website, https://health.desktopmetal.com/products/materials/flexcera/ (last visited Dec. 19, 2022).

[20] *See* Enclosure to July 7, 2022 Correspondence between FDA and Stratasys Ltd RE: Section 510(k) Application for Stratasys TrueDent, at 2 (noting E-Dent 1000 is Flexcera Base & Smile"), https://www.accessdata.fda.gov/cdrh_docs/pdf22/K220771.pdf (last visited Dec. 19, 2022). USPTO records show that on March 31, 2021, the Company also applied to register "E-Dent 1000" as a standard character mark but abandoned the mark as of May 19, 2022.

75.     FE-4 further reported that, from their understanding, the documents the Company submitted to the FDA for 510(k) approval for Flexcera resin relied on testing data using the Otoflash—not the PCA 4000—to cure testing samples.

### 3.      Light-Based Curing Boxes

76.     The last major step in most 3D printing processes is washing off excess resin and curing the 3D printed object so that it will harden. For this last step, EnvisionTEC's DLP 3D printed resin-based products generally utilize concentrated light sources to cure resin so that it will transform from a wet and mushy substance into a solid product.

77.     In simple terms, DLP curing boxes are a lightbox into which 3D printed products are placed until the light can fully cure the resin. These boxes can have different levels and bandwidths of light. Some have a wider range of bandwidths so they can cure different types of resins.

78.     During the Class Periods, the Otoflash curing box—a device made by one of EnvisionTEC's competitors—was the "gold standard" for curing 3D printed products, particularly "medical grade" devices for the dental industry. The device has two flash bulbs at the bottom, which are operated at a frequency of 10 flashes per second in work mode. During the flashing, the flash bulbs generate a very intensive light radiation (200 to 250 Watts) at frequencies ranging from 300 to 700 nm, resulting in a thorough curing of the materials with very good physical values and reduced residual monomer content (which affects structure stability of a dental implant) as compared to other lamps.[21]

---

[21] *See* NK-Optik, "Instruction Manual Otoflash G171 UV-flash-device for Light Curing," https://www.voco.dental/us/portaldata/1/resources/products/instructions-for-use/e1/otoflash_ifu_gb.pdf (last visited Dec. 19, 2022).

79.     As put by one dental lab owner and brand representative reviewing Desktop Metal's Products, not all curing units are the same:[22]

> Not all curing units are the same. Some can cause material to become brittle. Some can cause it to become overcured and the color can almost burn or changed. Some can be under-cured, causing the material to be too flexible. So the Otoflash is the different curing system that is meant to increase strength, and that has been key to us. So we use the Otoflash for curing all of our denture bases and all of our nightguards. And so far we have had no problems with our basses breaking . . .

80.     As with third-party resins, EnvisionTEC purchased the Otoflash from other manufacturers before rebranding and reselling the curing device (at a markup) to consumers. FE-3 reported that, in 2020 and 2021, EnvisionTEC generally sold the Otoflash for approximately $4,000, even though the curing device was available from other sellers for significantly less.

81.     In addition to the Otoflash, EnvisionTEC had its own line of curing devices known as the PCA Series. When FE-3 started at the Company in 2018, it was selling its first curing box known as the PCA 1000. In 2019, the Company began selling a more powerful version known as the PCA 2000. According to FE-3, EnvisionTEC sold the PCA Series to customers for approximately $2,500 to $3,000 and earned a significantly higher profit margin from each sale as compared to re-sales of the Otoflash.

82.     In late 2020/early 2021, the Company began to manufacture and market its newest model, the PCA 4000, to compete with the Otoflash, even though the PCA 4000 had not been FDA-certified for use with certain of the Company's dental medical devices, including Flexcera. *See* Part V.F, *infra* (discussing Company decision to market the PCA 4000 for non-FDA certified

---

[22] Zahn Dental, "On-Demand Quick Bite: Introducing Flexcera™ for Ceramic Like Strength in a Bottle" (Jul. 21, 2021), https://www.youtube.com/watch?v=Yg0uo2cSbic&ab_channel=ZahnDental.

uses). As discussed below, customers discovered thereafter that, due to limits and/or defects with the PCA 4000's design, the device could not fully cure EnvisionTEC's dental resins to desired product specifications, such that these resins would come out "gummy." On January 20, 2022, the Company issued a product recall for the PCA 4000, instructing customers to "stop utilizing the PCA 4000 to print medical devices made from EnvisionTEC dental resins."[23]

**F.14    Images of EnvisionTEC-branded Otoflash and PCA 4000**
*Left: Otoflash; Right: PCA 4000*




**D.    Regulatory Regime for Medical Devices**

83.    Throughout the Class Periods, Defendants' 3D printing dental business sold materials and products deemed "medical devices" regulated by the U.S. Food and Drug Administration.

84.    Section 201(h) of the Food, Drug, and Cosmetic Act broadly defines "medical device" to include:

> [Any] instrument, machine, contrivance, implant, in vitro reagent, or other similar or related article, including a component part, or accessory which is . . . (B) intended for use in the diagnosis of

---

[23] FDA, "Class 2 Device Recall EGuard PCA 4000 Curing Units" (Mar. 10, 2022), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=191888.

> disease or other conditions, or in the cure, mitigation, treatment, or
> prevention of disease, in man or other animals or (C) intended to
> affect the structure or any function of the body of man or other
> animals [through non-chemical means] . . . .

As such, the term "medical device" encapsulates a range of products from simple tongue

depressors to complex pacemakers, including the dental products that can be printed with the

Company's 3D printing technology.

85.    "Medical devices" can be further divided into classes—Class I, II, and III—based

in part on the intended use of the device and the indications for use. A device's classification

defines its regulatory requirements, with regulatory control increasing from Class I to Class III.

As explained by the FDA:

> **Class I** – These devices present minimal potential for harm to the
> user and are often simpler in design than Class II or Class III
> devices. Examples include enema kits and elastic bandages. 47% of
> medical devices fall under this category and 95% of these are
> exempt from the regulatory process.
>
> **Class II** – Most medical devices are considered Class II devices.
> Examples of Class II devices include powered wheelchairs and
> some pregnancy test kits. 43% of medical devices fall under this
> category.
>
> **Class III** – These devices usually sustain or support life, are
> implanted, or present potential unreasonable risk of illness or injury.
> Examples of Class III devices include implantable pacemakers and
> breast implants. 10% of medical devices fall under this category.[24]

86.    Though the regulatory landscape is complex, the FDA's website explains at an

accessible level the basic regulatory requirements with which manufacturers of medical devices

---

[24] *See* FDA, "Learn if a Medical Device Has Been Cleared by FDA for Marketing,"
https://www.fda.gov/medical-devices/consumers-medical-devices/learn-if-medical-device-has-been-cleared-fda-marketing (last visited Dec. 19, 2022).

distributed in the U.S. must comply.[25] These requirements include: (i) registering manufacturing facilities that make medical devices ("establishment registration"); (ii) "labeling"; and (iii) obtaining FDA authorization (if the device requires the submission of a premarket notification 510(k) showing that the device is substantially equivalent to one legally in commercial distribution in the U.S.).[26]

## 1.    Establishment Registration

87.    Under the Establishment Registration requirement, *see* Title 21 C.F.R. Part 807, owners or operators of establishments that are involved in the production and distribution of medical devices intended for use in the U.S. are required to register annually with the FDA. As part of that process, the manufacturer must list *the "medical devices" that are made at its facilities and the activities that are performed on those devices*. If a device requires a premarket submission before being marketed in the U.S., the FDA advises that the owner/operator also identify the device's FDA premarket submission number.[27]

88.    The FDA maintains an online database for medical device manufacturers registered with the FDA and medical devices listed with the FDA. Though now part of Desktop Metal, the Company's acquired EnvisionTEC operations continues to operate under the trade name "EnvisionTEC" for purposes of FDA registration. As depicted below, EnvisionTEC's registration

---

[25] *See* FDA, "Overview of Device Regulation," https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/overview-device-regulation (last visited Dec. 19, 2022).

[26] As noted by the FDA, most Class I devices and some Class II devices are exempt from the premarket notification 510(k) submission. "Resin, Denture, Relining, Repairing, [and] Rebasing" devices for the dental industry, like the Company's 3D printed dental products, generally require a 510(k) submission. *See* FDA Product Classification: "EBI," (Dec. 12, 2022), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/classification.cfm?ID=EBI.

[27] *See generally* FDA, "Device Labeling," https://www.fda.gov/medical-device-registration-and-listing (last visited Dec. 19, 2022).

identifies that it has two "establishments" that can manufacture medical devices—its segment headquarters in Gladbeck, Germany, and its U.S. headquarters in Dearborn, Michigan.[28] The former is the only EnvisionTEC facility registered to manufacture dental resins, and the latter is registered to manufacture only swabs.

**F.15    FDA Establishment Registration & Device Listing for "EnvisionTEC"**



**F.16    FDA Full Device Listing for EnvisionTEC Germany Facility**

---

[28] *See* FDA Establishment Registration & Device Listing for "EnvisionTEC," https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfrl/rl.cfm (link to general database). Neither "Desktop" nor "Desktop Metal" yields any results in the database.

89.     Notably, the Company's Montreal, Canada facility is not FDA-registered as a
manufacturer for the Company's medical devices.

90.     For Flexcera/E-Dent 1000, the FDA's Device Listing provides the following
registration information for each product and its intended use.

### F.17   FDA Device Listings for EnvisionTEC "Flexcera" Products

| | |
|---|---|
| Proprietary Name: | Flexcera™ Base |
| Classification Name: | RESIN, DENTURE, RELINING, REPAIRING, REBASING |
| Product Code: | EBI |
| Device Class: | 2 |
| Regulation Number: | 872.3760 |
| Medical Specialty: | Dental |
| Registered Establishment Name: | ENVISIONTEC GMBH |
| Registered Establishment Number: | 3012389497 |
| Premarket Submission Number: | K203641 |
| Owner/Operator: | EnvisionTEC GmbH |
| Owner/Operator Number: | 10053558 |
| Establishment Operations: | Manufacturer |

**Flexcera™ Base**

| | |
|---|---|
| Proprietary Name: | Flexcera™ Smile; Flexcera™ Smile Ultra+ |
| Classification Name: | ADDITIVELY MANUFACTURED, PREFORMED, RESIN DENTURE TOOTH |
| Product Code: | PZY |
| Device Class: | 2 |
| Regulation Number: | 872.3590 |
| Medical Specialty: | Dental |
| Registered Establishment Name: | ENVISIONTEC GMBH |
| Registered Establishment Number: | 3012389497 |
| Owner/Operator: | EnvisionTEC GmbH |
| Owner/Operator Number: | 10053558 |
| Establishment Operations: | Manufacturer |

**Flexcera™ Smile; Flexcera™ Smile Ultra+**

| | |
|---|---|
| Proprietary Name: | E-Dent 1000; Flexcera™ Smile Ultra+ |
| Classification Name: | MATERIAL, TOOTH SHADE, RESIN |
| Product Code: | EBF |
| Device Class: | 2 |
| Regulation Number: | 872.3690 |
| Medical Specialty: | Dental |
| Registered Establishment Name: | ENVISIONTEC GMBH |
| Registered Establishment Number: | 3012389497 |
| Premarket Submission Number: | K210977 |
| Owner/Operator: | EnvisionTEC GmbH |
| Owner/Operator Number: | 10053558 |
| Establishment Operations: | Manufacturer |

**E-Dent 1000; Flexcera™ Smile Ultra+**

| | |
|---|---|
| Proprietary Name: | E-Dent 1000; Flexcera™ Smile Ultra+ |
| Classification Name: | RESIN, DENTURE, RELINING, REPAIRING, REBASING |
| Product Code: | EBI |
| Device Class: | 2 |
| Regulation Number: | 872.3760 |
| Medical Specialty: | Dental |
| Registered Establishment Name: | ENVISIONTEC GMBH |
| Registered Establishment Number: | 3012389497 |
| Premarket Submission Number: | K210977 |
| Owner/Operator: | EnvisionTEC GmbH |
| Owner/Operator Number: | 10053558 |
| Establishment Operations: | Manufacturer |

**E-Dent 1000; Flexcera™ Smile Ultra+**

| | |
|---|---|
| Proprietary Name: | E-Dent 1000; Flexcera™ Smile Ultra+ |
| Classification Name: | DENTURE, PLASTIC, TEETH |
| Product Code: | ELM |
| Device Class: | 2 |
| Regulation Number: | 872.3590 |
| Medical Specialty: | Dental |
| Registered Establishment Name: | ENVISIONTEC GMBH |
| Registered Establishment Number: | 3012389497 |
| Premarket Submission Number: | K210977 |
| Owner/Operator: | EnvisionTEC GmbH |
| Owner/Operator Number: | 10053558 |
| Establishment Operations: | Manufacturer |

**E-Dent 1000; Flexcera™ Smile Ultra+**

| | |
|---|---|
| Proprietary Name: | E-Temp; Flexcera™ Smile Ultra+ |
| Classification Name: | CROWN AND BRIDGE, TEMPORARY, RESIN |
| Product Code: | EBG |
| Device Class: | 2 |
| Regulation Number: | 872.3770 |
| Medical Specialty: | Dental |
| Registered Establishment Name: | ENVISIONTEC GMBH |
| Registered Establishment Number: | 3012389497 |
| Premarket Submission Number: | K211101 |
| Owner/Operator: | EnvisionTEC GmbH |
| Owner/Operator Number: | 10053558 |
| Establishment Operations: | Manufacturer |

**E-Temp; Flexcera™ Smile Ultra+**

As illustrated above, four of the above-depicted Flexcera devices required 510(k) premarket approval from the FDA before they could be lawfully sold to customers. *See* Part I.B.3, *infra* (describing the premarket notification process).

## 2.     Device Labeling

91.     The Device Labeling requirements for medical devices, which are listed in multiple Parts of Title 21 of the Code of Federal Regulations, cover both labels on the medical device as well as in accompanying descriptive or informational literature.[29] While the regulatory code sets forth specific requirements for certain device subtypes, all medical devices are subject to general labeling requirements. *See* Title 21 C.F.R. Part 801. For example, "[t]he label of a device in package form shall specify conspicuously the name and place of business of the manufacturer, packer, or distributor." 21 C.F.R. § 801.1(a). Additionally, "[w]here a device is not manufactured by the person whose name appears on the label, the name shall be qualified by a phrase that reveals the connection such person has with such device; such as, 'Manufactured for ___', 'Distributed by _____', or any other wording that expresses the facts." *Id.* § 801.1(c).

92.     Medical devices are "deemed to be misbranded" if, among other things, "its labeling is false or misleading in any particular."[30] 21 U.S.C. § 352(a). Under the Food, Drug, and Cosmetic Act, it is unlawful to introduce or deliver into interstate commerce any device that is

---

[29] *See generally* FDA, "Device Labeling," https://www.fda.gov/medical-devices/overview-device-regulation/device-labeling (last visited Dec. 19, 2022).

[30] *See also* 21 U.S.C. § 321(n) ("If an article is alleged to be misbranded because the labeling or advertising is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertising relates under the conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual.").

misbranded. *See* 21 U.S.C. § 331(a)-(b) (prohibited acts). Any person who violates this provision

(as well as others under the Act) may be criminally and/or civilly liable—with the civil penalty

not to exceed $15,000 for each such violation, and not to exceed $1,000,000 for all such violations

adjudicated in a single proceeding. *See id.* § 333(f) (violations related to devices).

### 3.      Premarket Notification

93.     Section 510(k) of the Food, Drug, and Cosmetic Act requires device manufacturers

intending to market a medical device to register the device with the FDA. This is known as a

premarket notification (PMN) or a 510(k). As explained by the FDA:

> A 510(k) is a premarket submission made to FDA to demonstrate
> that the device to be marketed is as safe and effective, that is,
> substantially equivalent, to a legally marketed device (section
> 513(i)(1)(A) FD&C Act). . . .
>
> Until the submitter receives an order declaring a device SE, the
> submitter may not proceed to market the device. Once the device is
> determined to be SE, it can then be marketed in the U.S. The SE
> determination is usually made within 90 days and is made based on
> the information submitted by the submitter.
>
> FDA does not typically perform 510(k) pre-clearance facility
> inspections. The submitter may market the device immediately after
> 510(k) clearance is granted. *The manufacturer should be prepared
> for an FDA quality system (21 CFR 820) inspection at any time after
> 510(k) clearance.*

(Emphasis added.)

94.     Such quality system inspections ensure that the manufacturer and/or handler of a

device is complying with current good manufacturing practice requirements set by federal

regulation and is disposing of product that does not conform to specified requirements, including

those set forth in the 510(k). *See* 21 C.F.R. § 820.[31]

---

[31] Under the FDA's Third-Party Review Program, a 510(k) submission for an eligible device
may first be submitted to an accredited "3P510k Review Organization" rather than directly to the
FDA. Use of this program is voluntary and is intended to improve the efficiency and timeliness

95.     With respect to 3D printed devices, the FDA has published additional guidance describing the types of information that should be provided in, among other submissions, 510(k) premarket notification submissions.[32] With respect to how a manufacturer must describe a device in its 510(k), the FDA has stated:

> Since each type of AM technology has different technical considerations, you *should describe the type of AM technology used to build your device*. In addition, because AM use for medical devices is relatively new, we recommend that you include a flow chart describing your AM process, including post-processing, in order to help determine if additional assessments are needed.[33]

Additionally, as to mechanical testing, the FDA has advised that:

> Performance testing should be conducted on final finished devices subjected to all post-processing, cleaning, and sterilization steps. As with any recommended testing, the final finished device should be used or a rationale should be provided explaining why the test coupon used was representative of the final finished device.[34]

96.     If a device falls into a generic category of exempted Class I devices, a premarket notification application and FDA clearance is not required before marketing the device in the U.S. However, the manufacturer is required to register their establishment and list their generic product with the FDA. Examples of exempt devices are manual stethoscopes, mercury thermometers, and

---

of the FDA's 510(k) process. After the Review Organization is satisfied with its review and has documented all necessary information for the submission, it sends the submission to the FDA, including the original 510(k) submission, the Review Organization's review, and a recommendation of either substantially equivalent or not substantially equivalent. *See* FDA, "410(k) Third Party Review Program," https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/510k-third-party-review-program (last visited Dec. 19, 2022).

[32] *See* FDA, "Technical Considerations for Additive Manufactured Medical Devices - Guidance for Industry and Food and Drug Administration Staff" (Dec. 5, 2017), https://www.fda.gov/media/97633/download.

[33] *Id.* at 22 (emphasis added).

[34] *Id.* (emphasis added).

bedpans. Additionally, certain temporary dental devices, such as dental cement for temporary tooth filling or fixing, constitute Class 1 medical devices, which are exempt from the 510(k) premarket notification procedure.

97.    In seeking FDA approval to market dental resins, the Company's Gladbeck, Germany facility filed several premarket notification 510(k) submissions. For example, to market its Flexcera Base product (identified as a Class 2 medical device), the Company indicated in its FDA filings that the product had been approved by the FDA through a premarket notification with submission number "K203641." A summary for this premarket notification is publicly available on the FDA's website.[35]

98.    For its premarket notification filing, the Company was also required to conduct performance, safety, and quality control testing and submit those findings for the FDA to review. For example, in its summary form for submission K203641, the Company represented that "[t]esting was conducted to evaluate the performance of a [sic] manufactured crowns, artificial teeth, veneers and dentures," according to the appropriate testing requirements set by the International Organization for Standardization ("ISO"). The full 510(k) submitted to the FDA under submission number "K203641" is also generally required to describe the full testing process employed by the Company, including the curing units used in resin testing and validation.

---

[35] *See* Ltr. from Michael E. Adjodha, M.ChE., Assistant Director, FDA, to Patsy Trisler, Regulatory Consultant, Qserve Group US, Inc. re: Premarket Notification 510(k) for E-Dent 1000" (May 25, 2021), https://www.accessdata.fda.gov/cdrh_docs/pdf21/K210977.pdf. As discussed above, the Company's FDA filings strongly suggest that Flexcera served as the trade name for the Company's E-Dent and E-Temp proprietary resins. Additionally, at least one former dental channel salesperson, FE-4, believed that Flexcera resin was originally called and/or marketed as E-Dent 1000.

## V.    DEFENDANTS' FRAUD SCHEME

### A.    The Company Announces Plans to Acquire EnvisionTEC—a 3D Printing Company Operating in the Highly Lucrative 3D Printing Dental Industry

99.    The Xie Class Period, which asserts claims against Desktop Metal, Fulop, and Haley, begins on January 15, 2021.

100.    On January 15, 2021, the Company announced via press release that it had signed a $300 million definitive agreement to acquire EnvisionTEC, Inc. and certain of its affiliates, a provider of volume production photopolymer 3D printing solutions for medical, professional, and industrial markets.[36] Therein, the Company represented among other things that:

> Today, EnvisionTEC has over 5,000 customers across a broad range of industries, including medical devices, jewelry, automotive, aerospace, and biofabrication. In addition, the company is a leader in the dental market, more than tripling the number of Envision One dental shipments from 2019 to 2020 and with over 1,000 dental customers now using its printers for end-use parts. . . . EnvisionTEC has a broad library of over 190 materials, featuring photopolymer resins with material properties in-line with or exceeding those of thermoplastics and multiple FDA-listed and 510(K)-cleared resins for the manufacturing of medical devices. The company augments its robust proprietary material development efforts with a selectively open business model, leveraging relationships with major chemical companies . . . to sell third-party, industry-validated resins for use with its additive manufacturing platforms.

101.    During a management call with investors held that same day, Defendant Fulop echoed several of the reasons behind the Company's purchase to analysts and investors.[37] Among other things, Defendant Fulop noted that:

---

[36] Press Release, Desktop Metal "Desktop Metal to Acquire EnvisionTEC, Entering Market for Volume Production Polymer Additive Manufacturing" (Jan. 15, 2021), https://ir.desktopmetal.com/news/press-releases/detail/43/desktop-metal-to-acquire-envisiontec-entering-market-for.

[37] *See* Desktop Metal, Investor Call Transcript (Jan. 15, 2021), https://d1io3yog0oux5. cloudfront.net/_2898c494c04c176f2147577e6ec9fd4e/desktopmetal/db/853/7458/presentation/D

In addition to engineering resins, EnvisionTEC has a number of biocompatible and medical materials including many FDA-listed and 510(k) cleared resins.

\*       \*       \*

The company has over 60 qualified dental materials that are best-in-class. I do just want to highlight for a second two very exciting ones that are undergoing 510(k) clearance with the FDA. The first one is the new E-Dent 1000 material, and the second one is the new E-Denture Pro, both are incredibly fantastic materials with industry leading performance. Compared to NextDent and carbon materials, these can achieve higher performance like Flexural Strength in our features.

102.   Additionally, Defendants provided a formal presentation on the acquisition. On slide 8 of the presentation, Defendants claimed as a strategic rationale for the acquisition EnvisionTEC's "[o]ptically transparent materials and comprehensive library of biocompatible materials including FDA Class II materials, silicones, and rigid materials with cytotoxicity, irritation and sensitization data." On slide 17 of the presentation, Defendants noted that the dental market, in particular, was "poised for significant growth" with "3x YoY growth in 2020 Envision One dental shipments." As stated on the slide's last bullet:

EnvisionTEC dental channel is one of the strongest in the industry, enabling opportunity to introduce DM metal additive manufacturing solutions to mass produce dental implants & other dental-related components—an overall $10B opportunity.

(Red text emphasis in original.)

103.   Furthermore, Defendants made claims regarding the regulatory status and physical attributes of its touted dental resin materials, including that:

Biocompatible material for monolithic dentures and fully digital dentures when fused with E-Denture Pro. Unparalleled strength and wear resistance.

---

esktop+Metal+Presentation+VF.pdf. In addition to Defendant Fulop, Defendant El-Siblani and Desktop Metal's Vice President of Product, Arjun Aggarwal, participated in the call.

Breakthrough material for denture bases for complete digital denture solutions. Incredible strength and pleasing aesthetics. Available in variety of colors to closely match natural gingiva.

[For these materials,] FDA 510(K) submission filed and pending clearance.

**F.18    Slide from "Desktop Metal to Acquire EnvisionTEC" PowerPoint Presentation**



104.    Following the January 15, 2021 announcement, the Company's shares jumped by 7% from $23.20 to $24.99, before settling back at $23.75 by close of trade on Friday.

105.    The press release and presentation sparked excitement among analysts in the 3D Printing Industry. Among other things, 3D printing analysts noted that the Desktop-EnvisionTEC acquisition "could open up new markets to its [Desktop's] products too, and by absorbing EnvisionTEC's distributor network, the firm will go from having 80 partners to over 200."[38]

---

[38] Paul Hanaphy, "Desktop Metal to Acquire Envisiontec in $300m Deal to Enter the DLP 3d Printing Market," 3D PRINTING INDUSTRY (Jan. 18, 2021), https://3dprintingindustry.com/news/desktop-metal-to-acquire-envisiontec-in-300m-deal-to-enter-the-dlp-3d-printing-market-182672/.

Additionally, analysts noted that, "given the widespread applications of the Envision One within dental 3D printing, Desktop will also be able to expand into what is a growing $10 billion industry,"[39] including EnvisionTEC's pre-existing customer base of 1,000 orthodontic users.

106.    Despite the market's positive reaction, former employee accounts suggest that the "not ready for primetime" Desktop Metal Defendants acted recklessly and/or knowingly lacked the expertise and resources to exercise sufficiently reasonable due diligence before closing on the announced acquisition.

107.    As recounted by FE-1, a former senior financial advisor for the Company who was hired by the Company in or about January 2021, prior to FE-1's hiring in January 2021, Desktop Metal had neither a dedicated team nor sufficient in-house, institutional expertise regarding M&A, tax, or treasury matters (beyond the Company's CFO). Accordingly, it was around this time that the Company hired Jim Quinlan—a senior finance and accounting professional—to head its M&A efforts. FE-1 states that, as a result of the Company's generally disorganized corporate organization (as to corporate matters, not products), it fell on Quinlan and others like FE-1 to create and fill out the Company's then-nonexistent in-house financial diligence capabilities. FE-1 reported that, in their view, the Company's merger and acquisition capabilities were not adequately built out until about the end of September 2021. FE-1 further relayed that, though FE-1 typically received throughout their extensive career a detailed due diligence report on an acquisition, which included in-depth information about the acquired company's financial status and structure, FE-1 "never saw anything like a due diligence report" for EnvisionTEC while working at the Company.

---

[39] *Id.* In espousing these opinions, analysts further noted that EnvisionTEC had recently "developed two new biocompatible resins called the E-Dent 1000 and E-Denture Pro, which [we]re currently undergoing 510k clearance."

FE-1 added that, to assist FE-1's work, their professional practice was to always request the due diligence report and/or any information that FE-1's employer had on a company to be acquired.

108.    FE-2, a former controller that worked at EnvisionTEC from 2019 through 2021, corroborates the extent of the Company's due diligence into EnvisionTEC between the completion of the SPAC Merger on December 9, 2020, and the announcement of the EnvisionTEC acquisition on January 15, 2021. During FE-2's tenure, they oversaw accounting activities for EnvisionTEC's United States and German operations, including after EnvisionTEC was acquired by Desktop. FE-2 reported directly to Defendant El-Siblani. And as part of their duties, FE-2 aided Desktop Metal's due diligence by submitting information to Desktop (and its independent advisor, KPMG).

109.    FE-2 relayed that, at the time Desktop was exploring an acquisition of EnvisionTEC, the Company's acquisition team merely consisted of Defendant Fulop, Defendant Haley, Thomas Nogueira (the Company's chief operating officer), and aids from independent accounting firm KPMG. As part of the Company's due diligence, both Fulop and Haley visited the EnvisionTEC facility in Dearborn, Michigan, and should have been able to observe the conditions on the factory floor, discussed in further detail in other employees' accounts below.[40]

110.    Less than a month later, on February 16, 2021, the Company completed the much-anticipated acquisition.

---

[40] As relayed by several former employees, the Dearborn, Michigan facility was notoriously dirty, so much so that employees, including members of the dental channel sales team, were embarrassed when clients asked to tour the facility. FE-6 noted, for example, that due to employee complaints, the Dearborn facility was regularly visited by the United Stated Department of Labor Occupational Safety and Health Administration ("OSHA"). Public records available on OSHA's website confirm that in 2018, the Dearborn facility received several citations for health and safety violations, which were ultimately resolved by an informal settlement with EnvisionTEC.

111.    As noted by analysts, the Company's acquisition of EnvisionTEC promised significant opportunities for growth:

> EnvisionTEC has given Desktop a substantial boost in terms of materials, processes and systems, and provides potential for combined innovation of RAM (robotic additive mfg. seen in Viridis) and Desktop's single jetting. The acquisition, at about $300 million, gives a broad platform of over 190 qualified materials and over 5,000 different customers, including over 1,000 in dental applications – important for Flexcera, which has now received both FDA approval and CE Mark certification, as it provides an expansive customer base for sales as Desktop pushes the product for an international launch.[41]

**B.    The Company Launches Desktop Health and Touts FDA Clearance of Products**

112.    The Zhou Class Period, which asserts claims against Defendants Desktop Metal, Fulop, El-Siblani, and Jafar, begins on March 15, 2021.

113.    On March 15, 2021—nearly one month after completing the acquisition of EnvisionTEC—Defendants caused the Company to issue several public statements and reports regarding EnvisionTEC's operations and newest dental products.

114.    First, Defendants caused the Company to issue a press release announcing the Company's "Fourth Quarter and Full Year 2020 Financial Results." In the press release, Defendants made a number of positive statements regarding its acquisition and integration of EnvisionTEC, claiming that the Company now had "[e]ntered photopolymer additive manufacturing market through EnvisionTEC acquisition, which closed in the first quarter of 2021," and that "[o]ur acquisition of EnvisionTEC in February strengthens our market position by

---

[41] *See*, Mobility Matters Research "Desktop Metal: High Risk, High Reward," SEEKING ALPHA (Jul. 13, 2021), https://seekingalpha.com/article/4438970-desktop-metal-stock-dm-high-risk-high-reward

adding a compelling lineup of production-focused photopolymer printers and over 190 qualified materials to our portfolio."

115.    Thereafter, Defendants caused the Company to publish a second release, which announced the launch of new additive healthcare business—Desktop Health—whose umbrella would cover the Company's recently acquired EnvisionTEC dental channel business. As stated in bold at the top of the press release, this new business was "to be led by industry executive Michael Jafar as President and CEO"[42] (an in-law relative of Defendant El-Siblani). Further in, Defendants advanced several representations regarding Desktop Health's business, including that it would:

- [L]everage Desktop Metal's comprehensive portfolio of additive manufacturing solutions for current and future applications spanning dentistry, orthodontics, dermatology, orthopedics, cardiology, plastic surgery and printed regenerative tissues and grafts

- Buil[d] on a proprietary technology infrastructure for end-use parts production, including Digital Light Processing (DLP), Continuous Digital Light Manufacturing (cDLM), and high-speed metal binder jetting, Desktop Health's mission is to create future patient-specific solutions in the medical field

- Enabled by 3D Bioplotter, the industry's most widely published translational bioprinting platform and an extensive library of printable advanced materials to create breakthrough healthcare products

116.    Additionally, the March 15 Desktop Health press release included a quote from Defendant Fulop, in which he suggested Desktop Health's core business segment—3D printed medical and dental device industry—would provide a "key opportunity" for Desktop Metal.

---

[42] Press Release, Desktop Metal, "Desktop Metal Launches Desktop Health to Redefine Patient-Specific Healthcare" (Mar. 15, 2021), https://ir.desktopmetal.com/news/press-releases/detail/51/desktop-metal-launches-desktop-health-to-redefine.

117.    Later that same day (March 15), Defendants held an earnings call with investors led by Defendants Fulop and Haley, at which Defendants published an investor PowerPoint deck entitled "Fourth Quarter and Full Year 2020 Investor Presentation." During this call, Fulop reiterated prior representations regarding the FDA clearance process for its medical grade dental products, stating:

> We've got [the Company has] several materials that have either received FDA 510(k) clearance or are in process, including proprietary materials for permanent crowns and full arch implant dentures with industry leading performance.

118.    Immediately thereafter, Defendant Fulop directed investors' attention to slide 22 of the accompanying presentation, which included the representation:

> E-Dent 1000 and E-Denture Pro [FN]: superior materials for high-quality monolithic dentures and outstanding fully digital permanent premium dentures; biocompatible resins with incredible strength and aesthetics

> [FN] Materials pending 510(k) clearance

119.    As explained below, Defendants' March 15 statements were materially false and presented a misleading state of affairs at EnvisionTEC, which in turn artificially inflated the price of Desktop Metal's securities. While specifically touting EnvisionTEC's operations and its dental products, Defendants omitted to disclose that EnvisionTEC was manufacturing Flexcera at an unauthorized facility in Montreal, Canada, as well as marketing and selling PCA 4000 curing boxes for uncertified uses, in violation of FDA regulations. These concealed FDA violations presented a material risk to the commercialization of EnvisionTEC's products, including recall of products, the loss of key executives, and reputational damage.

120.    Defendant Fulop's March 15 statements concerning EnvisionTEC's operations and dental products were important to investors. Defendants disclosed to investors that, for FY 2021, Defendants projected that sales attributable to the Company's newly acquired EnvisionTEC

segment (i.e., sales including E-Dent 1000/Flexcera)[43] would constitute approximately 40% of the Company's 2021 revenues. Moreover, the March 15, 2021 representations impressed securities analysts. Specifically, on March 16, 2021, analysts at Benchmark wrote in a report, "The thesis for DM is that unique additive manufacturing technologies and capital resources enable a first mover opportunity to build/acquire a generational broad-based Additive 2.0 platform. To that end, since coming public, DM has significantly expanded the platform with the $300M EnvisionTEC acquisition expanding the polymer AM portfolio, launched new product iterations (P-1, Studio System 2), enabled software differentiation with Live Sinter, added new materials such as copper and aluminum to the AM suite, and yesterday announced the launch of Desktop Health."[44]

C.   **Post-Acquisition, Defendants Push Unrealistic Sales Targets on Sales Team**

121.   Beginning after the March 15, 2021 launch of Desktop Health and the disclosure of the Company's then-current financials, Defendants took immediate and drastic measures to prop up the Company's reportable revenues. These measures primarily took three forms: (1) increase sales targets for the Company's dental channel sales team; (2) inflate the Company's market penetration for medical grade dental products by getting more Company products into commerce, even if such products were not FDA-compliant; and (3) earn higher sales margins on the sales of 3D printing hardware by pushing certain EnvisionTEC-brand products over competitors, even though EnvisionTEC hardware was not strong enough (and not cleared by the FDA) to handle Flexcera resin.

---

[43] *See* Part I.B.2, *supra* ¶¶ 74, 90 (alleging that E-Dent 1000 was the same product and/or substantially equivalent to the Company's later trademarked brand of premium dental resins, Flexcera based on former employee accounts and FDA filings).

[44] "Desktop Metal, Inc. (DM): Update 4Q:20: FY21 Guidance Shows the Upside and Realities of Growing AM Platform," BENCHMARK (Mar. 16, 2021).

122.    As for the first prong, Defendants quickly instituted harsh sales quotas on the Company's dental channel sales team that vastly exceeded historic pre-acquisition sales data. Multiple former members of the Company's dental channel sales team corroborate the extent to which the Company pushed for "ridiculous" sales targets.

123.    One such employee is FE-3, a former sales manager at EnvisionTEC who worked as part of EnvisionTEC's six-person sales team under EnvisionTEC's then-Director of Dental Channel Sales, P. Christian Rose, Defendant El-Siblani, and (after the launch of Desktop Health) Defendant Jafar up through their resignation in 2021. FE-3's supervisor, Mr. Rose, reported directly to the C-Suite executives, including Defendant El-Siblani. After the launch of Desktop Health, FE-3 also reported to Defendant Jafar.

124.    As a member of EnvisionTEC's small sales team, FE-3 had extensive knowledge regarding EnvisionTEC's products and sales practices. During the Class Periods, EnvisionTEC divided its sales territory into geographic regions—each of which was run by a singular sales manager working remotely outside EnvisionTEC's Dearborn, Michigan headquarters. FE-3 managed one such territory and was responsible for selling all products necessary—from printers to resin to curing boxes—for EnvisionTEC customers in their territory to employ the Company's 3D printing dental solution. Additionally, FE-3 regularly participated in the Company's weekly sales calls, which were generally led by dental sales manager P. Christian Rose. According to FE-3, Defendants El-Siblani and Jafar often attended these sales calls and also led the discussions. *See also* Part V.E, *infra* (discussing former employee accounts of March 2021 dental channel sales call, in which Defendant El-Siblani ordered the sales team, over vocal objections, to sell EnvisionTEC's PCA 4000 curing box over the Otoflash, even though the PCA 4000 was not cleared by the FDA to cure the Company's medical grade resins).

125.     FE-3 reported that, prior to the Company's acquisition of EnvisionTEC, the dental channel sales team did not have strictly set sales quotas but sold, on average, about $50,000 to $100,000 a month in product per team member, with increases and dips depending on expected seasonal changes in the industry (the first quarter typically being the slowest and the fourth being the best). According to FE-3, the Company's top salesperson at the time sold higher amounts, in the range of $75,000 to $150,000 per month, and in some months reaching $200,000 to $250,000. Furthermore, each member of the dental channel sales team brought in, on average, about $1 million annually in revenue. Based on these numbers, FE-3 estimated that EnvisionTEC's pre-acquisition revenue from 3D printed dental products—i.e., printers, resins, curing boxes, and other accessories, including product re-orders—totaled nearly $9 to $10 million annually—a figure FE-3 believed represented between 50 to 75% of EnvisionTEC's annual pre-acquisition revenues.

126.     According to FE-3, after the acquisition, Defendants instituted a formal quota target at nearly five to ten times historic sales numbers—between $1 million and $1.5 million a quarter for each employee—which caused dental channel sales team members to wonder how the new sales targets were derived. "They were quite ridiculous honestly," FE-3 said of the new quotas. "I have no clue how they got to those numbers," FE-3 added, despite their years of sales experience. "I would love to know how they got to that"—i.e., the $1+ million targets.

127.     Other former employee accounts corroborate FE-3's statements. FE-4, a former colleague of FE-3 on the dental channel sales team, similarly recounted that their sales quota increased "a ridiculous amount" after the Company acquired EnvisionTEC. FE-4 relayed that, prior to the acquisition, they needed to sell at least $65,000 per month to avoid harassment from his managers and that FE-4 generated about $1 million in sales each year. With the sales, FE-4 constituted one of the dental channel sales team higher earners. FE-4 stated, however, that after

Defendants instituted their "ridiculous" quotas, FE-4—a 10-plus year dental channel salesman—was unable to meet Defendants' expected demands.

**D.      Defendants Instruct EnvisionTEC Staff to Manufacture Flexcera Resin Intended for Permanent Patient Use in a Non-FDA Approved Facility and to Apply False Labels to Disguise Unlawful Origin**

128.     In addition to increasing sales quotas, Defendants took additional steps after the launch of Desktop Health to boost EnvisionTEC's sales and revenue numbers in contravention to FDA requirements. Specifically, Defendants directed the Company's Montreal facility—a facility lacking required FDA registration for manufacturing Class II medical devices like Flexcera—to secretly manufacture bottles of Flexcera resin to be sold for actual patient use. This resin, in turn, was shipped to, repackaged in, and given a label indicating German origins at the Company's Dearborn, Michigan facility—which also lacked required FDA registrations for handling the resin—before being sold to dental industry customers. Investigators' factual findings further suggest that the Company knowingly or recklessly sold distributed bottles of Flexcera and/or E-Dent 1000 to customers using the product for permanent patient use before the Company applied for and/or obtained FDA premarket clearance.

129.     Firsthand accounts provided by several former Desktop Metal and EnvisionTEC employees detail the scope of Defendants' fraudulent conduct.

130.     FE-5, a former senior manager at EnvisionTEC for several years, discovered Defendants' scheme during the course of their employment and, like other employees, ultimately decided to notify the Company's executives and human resources department of their concerns. As a result of their position, FE-5 possessed extensive knowledge regarding most aspects of the Company's EnvisionTEC operations, including its dental channel sales. Additionally, FE-5 reported directly to Defendant El-Siblani and was viewed by many former EnvisionTEC

employees as a direct communications conduit between the Company's EnvisionTEC-affiliated executives and its EnvisionTEC-affiliated employees (including managers).

131.    According to FE-5, around the time the Company was preparing for the launch of its Flexcera product line (April and May 2021), Defendant El-Siblani called the Company's head chemist, Vadim Nazarov, based at the Montreal, Canada facility, with instructions that Nazarov "up his production" of Flexcera resin.

132.    Generally, the Company's Montreal facility manufactured other types of resin, which, FE-5 recounted, were not for medical devices to be permanently used in humans (such as dentures or crowns), and thus did not need an FDA-certified facility to be produced. Additionally, though the Montreal facility had, in the past, made small batches of Flexcera resin, those batches were manufactured during the development cycle for Flexcera and were permissible *for testing purposes only*—or put differently, so long as the resin was not intended for permanent patient use.

133.    According to FE-5, Defendant El-Siblani was the only person at the Company (other than its C-Suite directors) with the authority to direct Nazarov to manufacture Flexcera at the Montreal facility.

134.    FE-5 reported that, after receiving El-Siblani's telephonic order, the Company's non-FDA registered Montreal facility manufactured the requested Flexcera resin (which would later be knowingly or recklessly sold to dental channel customers for permanent patient use) and then shipped it across the U.S.-Canada border to Dearborn, MI in large drums.[45] Employees in Dearborn then poured the batched resin into smaller, itemized bottles that could be sold to customers in the dental industry.

---

[45] FE-5 reports that, from their conversations with Nazarov at the time, Nazarov also knew his facility was not FDA registered to manufacture Flexcera for permanent patient use. FE-5 did not say whether Nazarov knew of the end purpose for the resin requested by El-Siblani.

135.    FE-5 stated that, unlike other EnvisionTEC's German facility, the Dearborn, MI facility lacked the requisite approval and/or certifications under FDA and other government regulations to repackage the medical grade Flexcera resin. Further, FE-5 added that, given the size of the labeled resin drums and the emitted fumes, many at the Dearborn, MI facility beyond FE-5 and El-Siblani knew that the Company was repackaging resin manufactured outside of the facility. As such, El-Siblani told other employees that the Company was using an *outside, FDA-certified lab* in Canada to manufacture the otherwise conspicuous Flexcera resin. FE-5 reports that, in her opinion, the employees repackaging the Montreal-sourced Flexcera in Dearborn likely were not aware that they were violating FDA regulations or of the exact material they were working with.

136.    FE-5 stated that they first learned of the true source of the Company's Montreal-facility manufactured Flexcera resin because of their role in producing labels for bottles to be shipped to customers. According to FE-5, each bottle required a label (per FDA regulations), which was ordered from the marketing department.

137.    FE-5 reported that the labels used for the bottles of Montreal-sourced resin were nearly the "exact same" as those for bottles made in the Company's FDA-certified facility in Germany. The only difference, FE-5 recalled, was the material on which the Company printed the labels. Though FE-5 could not confirm with certainty whether the labels printed for the unlawfully manufactured Flexcera resin indicated the product was made in Germany, FE-5 suspected that the labels indicated German origin. As discussed below, *see* Part V.H, *infra*, the Company has since issued an FDA recall for certain Flexcera products made during the Class Periods on the grounds that the resin was "manufactured in a non-FDA-registered manufacturing facility and [was] *mislabeled as being of German origin*." (Emphasis added.)

138.    Defendant El-Siblani instructed FE-5 to produce sticker labels for the Montreal manufactured resin at the Dearborn facility.

139.    After generating nearly 100 labels, FE-5 confronted Defendant El-Siblani in the office regarding FE-5's belief that the practice stood on infirm legal ground. Defendant El-Siblani reportedly brushed FE-5's concerns aside by saying that the practice was fine and "only temporary."

140.    After that meeting, FE-5 believed it to be pointless to press their concerns further with Defendant El-Siblani given his strong-handed managerial tactics. As FE-5 (and other employees) had learned from years of experience under the Company executive, El-Siblani did not take well to anyone telling him that he was doing something wrong. FE-5 added: "Most people were afraid to broach a subject like that with Al. He is not someone you tell no, or tell him, 'You are wrong, you are making a mistake.' That is not something most people are willing to do with Al." (referring to Defendant El-Siblani). Further, FE-5 believed, at the time, that FE-5 could look past the violation if it in fact was "only temporary," as El-Siblani had represented.

141.    Yet despite his representation that sales of Montreal-manufactured Flexcera resin would be "only temporary," Defendant El-Siblani continued to instruct Nazarov in Montreal to manufacture Flexcera resin. Though FE-5 did not know how many bottles of Flexcera were made in Montreal, FE-5 recalled ordering at least "a thousand or more" labels for the non-FDA compliant resin. "When we started ordering thousands [of bottles]," FE-5 realized, "Wait, that's a problem."

142.    As a result of the above-described scheme, the Company sold Montreal-made Flexcera resin to customers from at least April 1, 2021 (before the May 15 official launch date of Flexcera) until early October 2021 (before the Company launched an internal investigation based on a whistleblower complaint). FE-5 estimated that, during this time, Montreal-made Flexcera

constituted at least 10 percent of the Company's total Flexcera sales—an amount FE-5 agreed was significant and not immaterial.

143.    Recall data submitted by the Company for Flexcera corroborates FE-5's recollection. Therein, the Company conceded that it "manufactured [certain lots of Flexcera resin] in a non-FDA-registered manufacturing facility" as early as April 1, 2021, thereby suggesting that Defendant El-Siblani instructed the Montreal facility to manufacture in March 2021 around the launch of Desktop Health. Additionally, the Company admitted it "mislabeled" the Montreal-made resin as being of German origin."

144.    Additionally, former employee statements to investigators similarly evidence that the Company knowingly or recklessly sold Flexcera or substantially similar resins to dental channel customers for permanent patient use before the official May 2021 product launch date.

145.    FE-3, for example, reported that, prior to obtaining 510(k) clearance, the Company sold Flexcera resin to customers for "long-term temporary use." FE-3 explained that this generally meant resin could be used to print medical devices that were permitted to be used in a patient's mouth for up to a year.

146.    FE-4 independently added that these early, pre-FDA certification sales of Flexcera resin were to dentists, including Key Opinion Leaders ("KOLs"), who worked with the Company, recounted FE-4. In the dental industry, KOLs are trusted, well-respected influencers—generally dentists, practice managers, etc.—who can sway the opinions of others in the dental community through public statements, published research, or other means. As a result of their influence, KOLs can generate awareness about a new drug or device and help to increase sales volume for certain suppliers. KOLs might also be able to impact purchasing decisions within their own medical networks, allowing medical device manufacturers to gain access to target audiences.

147.    FE-4 noted that, even if the Company had advised dentists, including KOLs, that the resin they received was "not for permanent use," some likely used and made multiple repurchases of the FDA-preclearance pending Flexcera resin for permanent use in patients. Additionally, the Company knew, or should have known, based off customer repurchases that these KOLs (and other early customers) were obtaining non-FDA approved Flexcera resin for permanent use in patients, opined FE-4. FE-4 explained that the Company knew (or should have surmised) KOLs' uses for Flexcera resin sold based on their public statements, which the Company monitored, as well as the volume of KOLs' resin purchases. In particular, the Company knew (or should have surmised) that KOLs who reordered Flexcera products but did not publish any research were likely repurchasing "not for permanent use" resin for permanent use in actual patients, said FE-4.

148.    The timing of these sales, as reported by FE-3 and FE-4, strongly suggest that the resin sold to dental channel customers while FDA-preclearance was pending possibly consisted of resin manufactured in the Company's Montreal facility, thereby further exacerbating the risk of harm to dental patients.

**E.    Corporate Officers Take No Action To Alert Authorities or the Public Regarding Non-FDA Approved Manufacturing of Flexcera Resin**

149.    As discussed above, firsthand witness accounts confirm that several, high-level employees of the Company in the United States—including Defendants El-Siblani and Jafar—initially knew, or were aware, that the Company's Montreal facility was manufacturing Flexcera resin. As the fraud scheme progressed, however, other parts of the Company became alerted to the potential manufacturing violations through social media and customer contacts, but nevertheless did nothing to stop the practice or alert the FDA.

150.     According to FE-4 and FE-5, the dental industry has a very active social media user base, particularly among those using cutting edge products like EnvisionTEC's 3D printed devices. As such, it was reportedly quite common for Company customers to post about products on their individual social media accounts or in group forums, including a customer-created Facebook group called "Flexcera-In." Likewise, it was common for sales/marketing employees at the Company to monitor social media accounts to, among other things, answer customer questions, identify quality control issues, and gather market research.

151.     In addition to social media, FE-5 reported that, during the Zhou Class Period, the Company also operated a service hotline which, depending on the time of day, would be directed to a person in the United States or in Germany.

152.     Through these communication lines, FE-5 believes that the German facility likely learned that the Company was selling Flexcera resin made outside of Germany shortly after the Dearborn facility began shipping Flexcera to customers, as customers began posting on social media about these shipments before the German facility had shipped any of its Flexcera resin out. FE-5 contends that these "early" social media posts and customer hotline calls likely tipped off employees in the German office regarding Flexcera resin made elsewhere.

153.     FE-5 confirmed that, after the Dearborn facility began selling Montreal-made Flexcera, at least two managers at the Company's German facility—Ruediger Van Bernum and Sobhi Aris—knew of or likely discovered the Company's unlawful manufacturing of Flexcera. At that time, Van Bernum was responsible for obtaining FDA approval for EnvisionTEC-brand medical-grade products and served as the point of contact on many of the Company's premarket notification 510(k)s. FE-5 stated that all regulatory activity went through Van Bernum. Aris, on

the other hand, served as the German facility's Managing Director (a position he has held from 2005 to this day).[46]

154.    After Van Bernum learned that the Montreal facility was manufacturing Flexcera resin, he and FE-5 spoke multiple times about the subject and complained to each other about the things the Company should not be doing. FE-5 suspected that Van Bernum likely spoke to El-Siblani regarding the practice but lacked firsthand knowledge as to whether such conversation in fact occurred. Nevertheless, the Company continued to sell Flexcera resin manufactured in Montreal.

155.    Because the manufacturing and repackaging occurred in plain sight, the Company's other C-Suite executives certainly had the ability to observe and discover the unlawful resin operation.

156.    Additionally, because all products shipped into the U.S. are regulated by U.S. Customs and other regulatory bodies, each shipment of resin between the Montreal and Dearborn facilities had to be authorized by the Company's customs and trade compliance officers. Accordingly, these officers possessed the requisite information to observe the above-described fraud, but knowingly or recklessly declined to act.

**F.    Defendants Instruct Sales Team to Market and Sell Dental Resin Curing Boxing for Purposes Not Cleared by the FDA**

157.    As discussed above, customers using the Company's dental 3D printing system needed to utilize a "curing box" as the last step in finishing the 3D printing process. Unbeknownst to investors, during the Zhou Class Period, Defendants materially misrepresented the functionality

---

[46] Though, on EnvisionTEC's website, Aris claims to have been a driving force in EnvisionTEC's growth, "he credits the company's founder," Defendant El-Siblani, as "the main driver of this company." *See* EnvisionTEC, "Sobhi Aris," https://envisiontec.ciwebstudio.com/employees/sobhi-aris/ (last visited Dec. 19, 2022).

of the Company's curing products and failed to disclose that its increased reported revenues were based on the selling of products for patient uses not cleared by the FDA.

158.    Reliable former Company employees have provided firsthand accounts explaining Defendants' knowing scheme to push the sale of "homegrown" EnvisionTEC products for non-FDA-cleared uses to inflate Desktop's reported revenues.

159.    As discussed in greater detail above, *see* Part I.B.3, *supra*, at all relevant times, the "gold standard" curing box for photopolymer dental resins was the OtoFlash—a flash-light polymerization device for the curing of light-curable resins manufactured by one of Desktop's competitors. Because the product was superior to EnvisionTEC's curing-box technology—the PCA Series,[47] EnvisionTEC's sales team had advised the Company's customers for most of FE-3's tenure that the Otoflash was the best device for curing their EnvisionTEC-printed dental products. This sales advice was echoed in EnvisionTEC's manufacturing instructions for Flexcera products, which listed the Otoflash G171 as the only curing unit for finalizing Flexcera-printed dental products.

---

[47] Prior to the Relevant Time Period, the PCA Series consisted of the PCA 1000 and 2000 curing apparatuses. Compared to the Otoflash, the PCA 2000 can less generate light radiation (150 Watts) at a more limited frequency range: 385 to 405 nm. *See* EnvisionTEC, "PCA 2000 Brochure," https://pdf.directindustry.com/pdf/envisiontec/pca-2000/85667-929998.html (last visited Dec. 19, 2022). As a result, the Company does not recommend that the PCA 2000 (or the less powerful PCA 1000 for that matter) be used to cure its 3D printed Class I and Class II medical device products like Flexcera. *See* https://knowledge.envisiontec.com/hc/en-us/articles/4413844595095-Material-Cure-Times-PCA-2000 (last visited Dec. 19, 2022) (omitting material cure times for EnvisionTEC's medical grade resins/products).

**F.19    Excerpt from Desktop Health Manufacturing Instructions for Flexcera Base Light Curable Resin, Step H – Finishing the Dentures[48]**

4.  Post-cure the product in the Otoflash G171 with 1000 flashes.

5.  The product can now be used on the patient.
    If any further polishing during patient fitting is necessary, then the products must subsequently be post-cured with 1000 flashes in Otoflash G171.



*FIG. 10 FINISHED DENTURES*



160.    To capture some of the OtoFlash's market share and earn larger margins on its sales of resin-curing devices, the Company decided to design, manufacture, and produce its own device for curing DLP-printed medical grade dental products. This new curing device was called the PCA 4000. Given the Otoflash's hefty price tag (approximately $5,000 per curing unit), the PCA 4000 was designed as a less expensive alternative for curing a range of EnvisionTEC 3D printed products other than EnvisionTEC's Flexcera Smile line. According to FE-5, EnvisionTEC, under the direction of Defendant El-Siblani, had contracted a third-party manufacturing company in Italy, which had already been making EnvisionTEC's PCA 2000, to make a more powerful version of the PCA 2000 that could compete with the Otoflash.

161.    In Spring 2021, the Company began selling the PCA 4000 with the aim of marketing its newest curing apparatus for use with Flexcera Smile (an FDA-regulated medical

---

[48] Desktop Health, "Instructions for Use Flexcera Base Light Curable Resin," at 10, https://www.henryschein.com/us-es/images/zahn/Instruction-for-Use-Flexcera-Base-US-rev.04.pdf (last visited Dec. 19, 2022).

device). At that time, the FDA had not cleared the PCA 4000 for use with 3D printed medical devices. Additionally, the Company's premarket notification seeking FDA approval to market Flexcera resin used Otoflash-cured Flexcera products, not the PCA, for purposes of testing performance and quality. Simply put, the PCA 4000 was not yet a part of the FDA-approved process for making 3D printed Flexcera products.

162.    Because the PCA 4000 lacked FDA clearance, neither FE-3 nor other EnvisionTEC sales managers planned on advising customers to purchase the PCA 4000 curing box as a device to cure EnvisionTEC's Flexcera Smile products for permanent patient use. Defendants, however, had a different plan.

163.    In March 2021—after the EnvisionTEC Acquisition was complete and around the launch time for Desktop Health—the Company held a regularly scheduled dental channel sales conference call, led by Defendant El-Siblani and attended by the dental channel sales team members. Multiple former employees in attendance confirm that, on this call, Defendant El-Siblani ordered the dental channel sales team to begin pushing EnvisionTEC's "homemade" PCA 4000 as the default curing unit for EnvisionTEC dental resins, even though the FDA had not yet cleared the PCA 4000 for such a use. These employees further relayed that this direct order by El-Siblani did not sit well with EnvisionTEC's dental sales representatives.

164.    For example, FE-3 reports that during the March 2021 call, at least one other dental sales representative, Kevin Dillon, questioned Defendant El-Siblani during the call as to whether the PCA Series was strong enough to sufficiently cure, and had been FDA-certified to be used with, Flexcera products. Though FE-3 was unaware of the specific legal issues surrounding the PCA series authorized uses, they had a sense during the call that using the PCA Series with Flexcera was in a legal "grey area." Additionally, when FE-3 spoke with their colleagues after the

call, the colleagues relayed that they had been informed by the German facility that the PCA 4000 was not FDA-approved for curing Flexcera for permanent patient use. FE-3 states that, after Dillon raised concerns on the March 2021 sales call, Dillon told El-Siblani that he would not sell the PCA 4000. Defendant El-Siblani responded to Dillon by telling the sales team, in paraphrased terms: "This is the one I am telling you to sell, so do it."

165.    FE-3 recounts that, after the March 2021 phone conference, they were not convinced by Defendant El-Siblani's terse response that the PCA Series was FDA-compliant. Nevertheless, FE-3 knew that the Company's instruction to the sales team was clear: sell the PCA Series over the Otoflash. As FE-3 told investigators: "I remember thinking, I heard this information from [names omitted] that (the PCA 4000) is not approved, but here I have the CEO of the company saying to sell it." As corroborated by FE-3 and many other witnesses, El-Siblani's words carried significant weight, given his "do this or I am firing you" management style.

166.    FE-4—another member of EnvisionTEC's dental channel sales team—also attended the March 2021 sales meeting at issue and similarly recounted the exchange between Dillon and El-Siblani. FE-4 has over 10 years of experience in the dental industry and worked as a dental channel sales manager for EnvisionTEC (under Mr. Rose and Defendant El-Siblani) for nearly three years. In this role, FE-4 sold only the Company's dental line of products and did so across a territory spanning several states. FE-4 reports that, during their employment, they paid close attention to the Company's sales numbers and if a salesperson or the team's numbers were not on track for quotas, they could "expect a call" from El-Siblani. Moreover, FE-4 attended the weekly dental channel sales meetings, including the March 2021 call regarding the PCA 4000. FE-4 estimated that El-Siblani attended about 50 to 75 percent of these dental sales call meetings.

167.    FE-4 relayed that during the March 2021 call with Defendant El-Siblani, Kevin Dillon "flat out called him [Defendant El-Siblani] out" for instructing the sales team to push the PCA 4000 over the Otoflash. Further, FE-4 confirmed that: (i) El-Siblani responded to Dillon by stating he did not care what Dillon thought (possibly using "uglier words"); (ii) El-Siblani doubled down on his prior command: "That [the PCA 4000] is the machine you are going to sell"; (iii) after the call, Dillon relayed to FE-4 that he had spoken with EnvisionTEC's German facility; and (iv) the German facility had told Dillon that it had tested the PCA 4000 on Flexcera resin and had not found it to be compatible. As FE-4 further explained, "not compatible" meant that the PCA 4000's constant-light curing method was not "strong enough" to completely cure Flexcera resin.

168.    Senior manager FE-5, *see* Part III.D, *supra* ¶ 44 (describing FE-5), also confirmed that, under their understanding of FDA regulations, the PCA 4000 had not yet been approved by the FDA as a device to be used in the making of 3D printed Flexera devices. FE-5 explained that, in granting regulatory approval, the FDA reviewed the whole process for making a medical device—that is, the machines used and the materials inputted by EnvisionTEC in each step of production. FE-5 added that, when EnvisionTEC submitted its premarket notification for Flexcera to the FDA, the Company had utilized the OtoFlash, not the PCA 4000, to cure the Flexcera-manufactured crowns, artificial teeth, veneers, and dentures, that were then tested and evaluated to ensure specification and biocompatibility requirements had been met.[49] *See also* Part V.G, *infra* (discussing independent material researcher FE-6's discovery that PCA 4000 was not compatible with Flexcera resin). FE-5 further reported that the Company's German facility was responsible

---

[49] As indicated in EnvisionTEC's summary 501(K), these requirements included (i) surface quality, (ii) dimensional stability, (iii) color and color stability, (iv) translucency, (v) flexural strength and flexural modulus, (vi) freedom from porosity, (vii) water sorption, and (viii) water solubility. *See* E-Dent 1000 510(k) Summary, *supra* n.35.

for seeking FDA approval for the PCA 4000; however, the PCA 4000 "was never added to that device [Flexcera's FDA certification] because Van Bernum was not satisfied with some part of the performance."

169.    Customer comments on dental-related online forums show that, after the March 2021 sales call at issue, the Company, or some fraction of its dental channel sales team, began to advise potential customers to purchase the PCA 4000 for use in curing Flexcera resin.

**F.20   Example of Consumer Post on DentalLabNetwork.Com Bulletin Board Seeking Consumer Opinions on PCA 4000 and Flexcera Resin[50]**



**G.    Customer Complaints Regarding Resin Cured with PCA 4000**

170.    Soon after the Company began pushing the PCA 4000 into the market, customers began to report problems with the Company's resin not properly curing.

171.    According to FE-4, customers complained that Flexcera was coming out of the PCA 4000 "gummy." Further, they reported that the "biggest headaches" arose from the instructions the Company gave to customers regarding the curing times for Flexcera using the PCA 4000. FE-4

---

[50] mightymouse, "Desktop health Flexcera resin questions," DENTAL LAB NETWORK (Jul. 21, 2021), https://dentallabnetwork.com/forums/threads/desktop-health-flexcera-resin-questions.32691/#post-338521.

relayed that initially the Company told customers that, when using the PCA 4000, resin-printed products needed to be cured for 7.5 minutes on each side (15 minutes in total). FE-4 relayed that upon hearing about product complaints, the Company more than doubled its recommended curing time.

172.    These recommendations, however, did not match the expectation by the Company's German staff, which manufactured and tested the Flexcera resin. According to FE-4, the Company's German staff believed that the recommended curing time for Flexcera should have been at least 30 to 60 minutes in total.

173.    FE-6 corroborated these customer complaints. FE-6—a former EnvisionTEC employee—is a source material research expert who specializes in 3D dental implant technologies. During FE-6's time at EnvisionTEC, the sale of 3D printing dental applications became one of the Company's most significant sources of revenue. FE-6 reported that they nevertheless left the Company because they did not like how Defendant El-Siblani (who FE-6 reported directly to) operated the business.

174.    During the Class Periods, FE-6 worked in a senior research position for one of the nation's largest producers and sellers of dentures and dental implants, which had invited Desktop Health to make a pitch regarding its Flexcera Base and Flexcera Smile 3D printing products (including resins, printers, and curing boxes). As part of their company's due diligence to confirm the Company's reported quality claims about Flexcera, FE-6 sent the product out to an independent dental laboratory for validation testing to confirm that the Company's products conformed with the several standards that dental products must meet to be safe and effective for patients. The most import standards, FE-6 noted, was ISO20795 (the ISO standard for denture base polymers), which included metrics for "flexural strength," "flexural modulus," and "fracture toughness."

175. For the validation test, FE-6 instructed the independent lab to exactly follow the Company's Instructions for Use ("IFU"), which the Company had purportedly submitted to the FDA in a Form 510(k) for approval to sell the product. For context, as part of the IFU submission process, a company must include data proving that if the IFU are followed correctly, the product will meet certain standards for dental use. Put differently by FE-6, an IFU is simply "a detailed cookbook—a recipe to take a resin, 3D print it, and process it so it is safe and meeting standards that the OEM is advertising so the marketplace can get a known result." FE-6 noted that for Flexcera, the Company's IFU at the time included the use of the PCA 4000 to cure the Flexera dental components after they were 3D printed. Additionally, the Company purportedly submitted to FE-6 the same data the Company advertised on its website and in its marketing material, which differed significantly from what was discovered in the validation testing obtained by FE-6.

176. As stated by FE-6, "I was asked to corroborate [the Company]'s claims. But when we stated testing Flexcera at the validation testing center, we started finding huge differences from what they [the Company] were claiming online and in marketing versus the numbers I got back from testing centers." FE-6 noted that, in particular, the strength of Flexcera Smile cured with the PCA 4000 was significantly less than the Company claimed in its FDA filings. For example, though the Company claimed that Flexcera-printed dentures had a flexural strength of about 90 megapascals (MPa), FE-6's validation tests using the Company's IFU found a strength of only 72 MPa.

177. Independent validation testing for fracture toughness came back as "non-conforming," which FE-6 stated raised a "big red flag." As FE-6 further explained:

> To run the fracture toughness test, the product is soaked in water at high temperatures for seven days. Then it is placed on a machine that measures how much pressure it takes to fracture the product.

How do we get a non-conforming on that test? The product was
bending so much it wasn't breaking.

178.    As a result, FE-6 concluded that the Company's Flexcera line of medical grade
dental resin could not qualify as a "rigid dental material"—a requirement for dentures. In their
opinion, this was because the Flexcera resin did not reach a high enough temperature in the PCA
4000 curing box.

179.    FE-6 reportedly confronted Desktop Metal leadership, including Defendant Jafar,
regarding their findings in September 2021 via email. In response, the Company reportedly
conceded that, despite its public claims to the contrary, the data it submitted to the FDA and
thereafter listed in marketing materials was obtained by curing test Flexcera products with the
Otoflash, not the PCA 4000, as represented to FE-6.

## H.    Desktop Employees Blow the Whistle on Defendants' Fraud Scheme

180.    FE-5 reports that, in early November 2021, they compiled the information they
gathered regarding Defendants' fraudulent conduct and emailed their concerns to several, high-
level people in different departments across Desktop Metal, including Human Resources and
Operations. FE-5 states that they did so hoping to "catch the right person" who could "put a stop
to it."

181.    The "last straw" that reportedly prompted FE-5 to submit their concerns were
reports by their colleagues regarding fumes emitted from the bottling process for the non-FDA-
authorized resin. FE-5 relayed that, one day, "one of the warehouse guys came to me to complain
about the smell [of the Flexcera resin] when they were bottling it." At that time, FE-5 learned that

the unauthorized bottling process was potentially noxious to unknowing EnvisionTEC employees.[51] FE-5 confirmed they included human resources on their multi-department email.

182.    FE-5 reported that, thereafter, they spoke to a number of people from Desktop Metal's corporate headquarters.

## I.    The Truth Emerges

183.    On November 8, 2021, after the market closed, Desktop Metal filed a Form 8-K with the SEC, disclosing that on November 4, 2021, the Audit Committee of the Company's Board of Directors had retained a third party to conduct an independent internal investigation into certain matters, including "manufacturing and product compliance practices and procedures with respect to a subset of its photopolymer equipment and materials at its EnvisionTEC US LLC facility." Specifically, the Company stated:

> On November 4, 2021, the Audit Committee of the Board of Directors of Desktop Metal, Inc. (the "Company") engaged a third party to conduct an independent internal investigation as a result of a whistleblower complaint relating to, among other matters, manufacturing and product compliance practices and procedures with respect to a subset of its photopolymer equipment and materials at its EnvisionTEC US LLC facility in Dearborn, Michigan. While the investigation remains on-going, the Company has taken initial actions, including implementing changes in the management of and procedures associated with manufacturing the applicable products. Based on the investigation to date, the Company does not believe

---

[51] FE-7's account of FE-7's experiences at EnvisionTEC's Dearborn, Michigan facility corroborate FE-5's statements regarding the bottling process. FE-7 recalled that, in their time with the dental products 3D printing team, the Company was selling dental resins supplied by a "third party" for use with EnvisionTEC's dental-product 3D printers to make dentures that were repackaged by EnvisionTEC. According to FE-7, their supervisor, Miguel Gomez, told FE-7 that, because the resin from the third party was FDA-approved for medical grade use, it was not supposed to be repackaged at the Dearborn, Michigan facility. FE-7 also recalled that within EnvisionTEC's small, warehouse-like building in Dearborn, Michigan, "one or two" employees were responsible for mixing raw materials together into resin products complained that they did not have face masks or respirators.

the matters involved will have a material impact on the Company,
its financial statements or its business.

184.    Also, on November 8, 2021, the Company filed a separate Form 8-K with the SEC,

revealing that on November 5, 2021, just one day after commencing the independent internal

investigation, Defendant El-Siblani had abruptly resigned as Chief Executive Officer of

EnvisionTEC US LLC and as a director of Desktop Metal:

> On November 5, 2021, Ali El Siblani notified Desktop Metal, Inc.
> (together with its subsidiaries, the "Company") of his intent to resign
> as a member of the Company's Board of Directors and as an
> employee of the Company in his role as Chief Executive Officer of
> EnvisionTEC US LLC. The decision of Mr. Siblani was not the
> result of any disagreement relating to the Company's operations,
> policies or practices.

185.    Notwithstanding the Company's characterization of Defendant El-Siblani's

decision to resign, the financial press was quick to connect Defendant El-Siblani's immediate

departure with the internal investigation.[52]

186.    On this news, the Company's stock fell $1.02 over the next two trading days, or

9.2%, from $9.20 per share at the close of trading on November 8, 2021 to $8.19 at the close of

trading on November 10, 2021.

---

[52] *See, e.g.*, Lucia Maffei "Desktop Metal discloses whistleblower complaint related to
EnvisionTec," BOSTON BUSINESS JOURNAL (Nov. 9, 2021), https://www.bizjournals.com/
boston/news/2021/11/09/desktop-metal-discloses-whistleblower-complaint.html (noting, "Lynda
McKinney, vice president of communications at Desktop Metal, didn't answer a question from
the *Business Journal* about whether El Siblani's departure had anything to do with the internal
investigation. She said in a statement to the Business Journal that the integrity of manufacturing
and product compliance practices is of paramount importance to Desktop Metal, as the company
consistently strives to adhere to 'best-in-class procedures.' . . . 'We are taking the matter
seriously and remain focused on serving our customers,' she wrote about the investigation.").

**F.21    DM Stock Price After November 8, 2021 Disclosure**



187.    Then, on November 15, 2021, after the market closed, the Company revealed in its Quarterly Report that it would notify the U.S. Food and Drug Administration ("FDA") of "compliance issues with certain shipments of EnvisionTEC's Flexcera dental resins and its PCA 4000 curing box." Specifically, in its Form 10-Q for the period ended September 30, 2021, the Company stated:

> On November 4, 2021, the Audit Committee of the Board of Directors engaged a third party to conduct an independent internal investigation as a result of a whistleblower complaint relating to, among other matters, manufacturing and product compliance practices and procedures with respect to a subset of its photopolymer equipment and materials at its EnvisionTec US LLC facility in Dearborn, Michigan. While the investigation remains on-going, the Company has taken initial actions, including implementing changes in the management of and procedures associated with manufacturing the applicable products. Based on the investigation to date, the Company does not believe the matters involved will have a material impact on the Company, its financial statements or its business.

> On November 5, 2021, Ali El Siblani notified the Company of his intent to resign as a member of the Company's Board of Directors and as an employee of the Company in his role as Chief Executive Officer of EnvisionTec US LLC. The decision of Mr. Siblani was

not the result of any disagreement relating to the Company's operations, policies or practices.

As of November 12, 2021, based on compliance issues with certain shipments of EnvisionTEC's Flexcera dental resins and its PCA 4000 curing box, the Company has determined that it will notify the FDA and consult with them on the appropriate voluntary market action with respect to these products. The Company does not expect the costs of any such market action to have a material impact on its financial statements.

188.    On this news, the Company's stock fell $1.19, or 15%, from $8.02 at the close of trading on November 15, 2021 to close at $6.83 per share on November 16, 2021, on unusually heavy trading volume.

**F.22    DM Stock Price After November 15, 2021 Disclosure**



189.    Upon information and belief, the Company discontinued selling the PCA 4000 for use with Flexcera products contemporaneously with its public disclosure of the whistleblower complaint. The Company's sales team was still permitted to sell the PCA 4000, however, for use with other types of resins and 3D printed products. FE-4 reports that, shortly thereafter the

Company informed the dental channel sales team that it was discontinuing sales of the PCA 4000 for use with Flexcera, and that FE-4 spoke with the Company Chief Marketing Officer, Cecilia Gores, about the above-mentioned issues. During that conversation, FE-4 reminded Gores that Mr. Dillon had warned the Company months prior that the PCA 4000 was not strong enough to completely cure Flexcera resin.

190.    Approximately two months later, in January 2022, the Company initiated two recalls with the FDA. First, on January 6, 2022, the Company initiated a recall for "FLEXCERA SMILE - a Dental resin for the fabrication of artificial teeth" that was manufactured from April 1, 2021 to September 15, 2021, because it was "[m]anufactured in a non-FDA registered manufacturing facility" and because the "product was mislabeled as being of German origin."[53] Based on the Company's recall submission, the FDA determined that the product was a "nonconforming material/component." Among other things, the FDA ordered customers to "stop dispensing and distributing and quarantine [the identified] lots"—approximately "795 units" in total. Additionally, notifications of the recall were sent to all direct accounts of EnvisionTEC.

191.    Two weeks later, on January 20, 2022, the Company started a second recall for all "PCA 4000 Curing Units" with "SKU number ACC-06-1000" sold to non-industrial users because the device "may not fully cure EnvisionTEC dental resins to desired product specifications."[54] Again, the Company sent notifications to all direct accounts of EnvisionTEC directing them to "stop utilizing the PCA 4000 to print medical devices made from EnvisionTec dental resins."

---

[53] FDA, "Class 2 Device Recall FLEXCERA SMILE," (Feb. 15, 2022), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=191606#:~:text=ENVISIO NTEC%20US%20LLC%20issued%20Urgent,distributing%20and%20quarantine%20these%20l ots.

[54] FDA, "Class 2 Device Recall EGuard PCA 4000 Curing Units," (Mar. 10, 2022), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=191888.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    Summary of Defendants' Fraud Scheme

192.    As discussed above, during the Class Periods, Desktop Metal and the Individual Defendants elicited investor interest in the Company's then-revenue negative 3D printing business by repeatedly touting the value of EnvisionTEC's 3D printing technology and comprehensive library of biocompatible 3D printing materials—including multiple FDA-listed and 510(K)-cleared resins for the manufacturing of FDA-regulated medical devices—which would allow the Company to expand into the $10 billion dental industry market.

193.    These misstatements materially misled the investing public, thereby inflating the price of Desktop Metal's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Classes. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Periods resulted in Lead Plaintiffs and other members of the respective Classes purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

**B.       Materially False and Misleading Statements Issued During the Xie Class Period**

**1.       Company Announces EnvisionTEC Acquisition (Jan. 15, 2021)**

194.    The Xie Class Period begins on January 15, 2021, when Desktop Metal issued a

press release entitled, "Desktop Metal to Acquire EnvisionTEC, Entering Market for Volume

Production Polymer Additive Manufacturing." The press release stated, in relevant part:

> Desktop Metal, Inc. [. . .] a leader in mass production and turnkey
> additive manufacturing solutions, today announced the signing of a
> definitive agreement to acquire EnvisionTEC, a leading global
> provider of volume production photopolymer 3D printing solutions
> for end-use parts, for total consideration of $300 million, consisting
> of a combination of cash and newly issued Desktop Metal stock. The
> transaction is expected to close in the first quarter of 2021, subject
> to customary closing conditions. Following completion of the
> acquisition, EnvisionTEC will operate as a wholly owned subsidiary
> of Desktop Metal. EnvisionTEC founder Al Siblani will continue to
> serve as Chief Executive Officer of the EnvisionTEC business.
>
>                          *       *       *
>
> "I'm thrilled to partner with Al and the EnvisionTEC team to bring
> significant growth to the additive market," said Ric Fulop, Founder
> and Chief Executive Officer of Desktop Metal. "EnvisionTEC is a
> true pioneer and responsible for many of the leading technologies
> widely used today to produce end-use photopolymer parts through
> additive manufacturing. Together, Desktop Metal and EnvisionTEC
> have an opportunity to shape the future of Additive Manufacturing
> 2.0 and transform how parts are made around the world. I look
> forward to welcoming EnvisionTEC to the Desktop Metal team to
> deliver world-class additive manufacturing solutions that help make
> our customers successful."
>
> "I am excited and honored to partner with Ric and the Desktop Metal
> team to deliver end-use parts in both metal and polymers as we
> implement Ric's vision on the future of Additive Manufacturing
> 2.0," said Siblani. "Bringing the two companies together will deliver
> a global footprint of customers that can cross-benefit from our
> combined technology platforms. I believe we have many
> opportunities to scale the business, disrupt traditional
> manufacturing, expand our customer base, and create value for our
> shareholders."
>
>                          *       *       *

Today, EnvisionTEC has over 5,000 customers across a broad range of industries, including medical devices, jewelry, automotive, aerospace, and biofabrication. In addition, the company is a leader in the dental market, more than tripling the number of Envision One dental shipments from 2019 to 2020 and with over 1,000 dental customers now using its printers for end-use parts. . . . EnvisionTEC has a broad library of over 190 materials, featuring photopolymer resins with material properties in-line with or exceeding those of thermoplastics and multiple FDA-listed and 510(K)-cleared resins for the manufacturing of medical devices. The company augments its robust proprietary material development efforts with a selectively open business model, leveraging relationships with major chemical companies . . . to sell third-party, industry-validated resins for use with its additive manufacturing platforms.

195. The identified-above statements (¶194) from the Defendants' January 15, 2021 press release were false and misleading because they conveyed to investors that Desktop Metal had conducted due diligence sufficient to identify the issues surrounding EnvisionTEC's manufacturing and product compliance practices and procedures. Additionally, Defendants' misstatements and omissions were materially false and/or misleading because they failed to disclose material adverse information to investors, including that: (1) that there were deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures, including with the manufacture and distribution of Flexcera and the PCA 4000; (2) that the foregoing deficiencies presented a material risk to the commercialization of EnvisionTEC's products; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

2.      **Company Presents on Acquisition to Analysts/Investors (Jan. 15, 2021)**

196.    During a management call with investors held that same day, Defendant Fulop

echoed several of the reasons behind the firm's purchase to analysts and investors.[55] Among other

things, Defendant Fulop noted that:

> In addition to engineering resins, EnvisionTEC has a number of
> biocompatible and medical materials including many FDA-listed
> and 510(k) cleared resins.
>
> *       *       *
>
> The company has over 60 qualified dental materials that are best-in-
> class. I do just want to highlight for a second two very exciting ones
> that are undergoing 510(k) clearance with the FDA. The first one is
> the new E-Dent 1000 material, and the second one is the new E-
> Denture Pro, both are incredibly fantastic materials with industry
> leading performance. Compared to NextDent and carbon materials,
> these can achieve higher performance like Flexural Strength in our
> features.

197.    Additionally, Defendants provided a formal presentation on the merger. On slide 8

of the presentation, Defendants claimed as a strategic rationale for the acquisition EnvisionTEC's

"[o]ptically transparent materials and comprehensive library of biocompatible materials including

FDA Class II materials, silicones, and rigid materials with cytotoxicity, irritation and sensitization

data." Additionally, on slide 17 of the presentation, Defendants noted that the dental market, in

particular, was "poised for significant growth" with "3x YoY growth in 2020 Envision One dental

shipments." As stated on the slide's last bullet:

> EnvisionTEC dental channel is one of the strongest in the industry,
> enabling opportunity to introduce DM metal additive manufacturing

---

[55] *See* Desktop Metal, Investor Call Transcript (Jan. 15, 2021),
https://d1io3yog0oux5.cloudfront.net/_2898c494c04c176f2147577e6ec9fd4e/desktopmetal/db/8
53/7458/presentation/Desktop+Metal+Presentation+VF.pdf. In addition to Defendant Fulop,
Defendant El-Siblani and Desktop Metal's Vice President of Product, Arjun Aggarwal
participated in the call.

solutions to mass produce dental implants & other dental-related components—an overall $10B opportunity.

The slide also went on to make claims regarding dental resin materials, including that:

Biocompatible material for monolithic dentures and fully digital dentures when fused with E-Denture Pro. Unparalleled strength and wear resistance.

Breakthrough material for denture bases for complete digital denture solutions. Incredible strength and pleasing aesthetics. Available in variety of colors to closely match natural gingiva.

[For these materials,] FDA 510(K) submission filed and pending clearance.

### F.23   Slides From "Desktop Metal to Acquire EnvisionTEC" PowerPoint Presentation



The identified-above statements (¶¶ 196-197) from the Defendants' January 15, 2021 earnings call and investor presentation were false and misleading because they conveyed to investors that Desktop Metal had conducted due diligence sufficient to identify the issues surrounding EnvisionTEC's manufacturing and product compliance practices and procedures. Additionally, Defendants' misstatements and omissions were materially false and/or misleading because they

failed to disclose material adverse information to investors, including that: (1) that there were deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures, including with the manufacture and distribution of Flexcera and the PCA 4000; (2) that the foregoing deficiencies presented a material risk to the commercialization of EnvisionTEC's products; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. Further, Defendants' statements regarding the pending FDA clearance for E-Dent 1000 were particularly false and misleading, as they suggested that Defendants' manufacturing of E-Dent 1000 and Flexcera line of proprietary resins complied with FDA regulations, when in fact, significant portions of the E-Dent 1000 and Flexcera were not.

### 3. Defendants Announce EnvisionTEC Merger Completion (Feb 17, 2021)

198.   On February 17, 2021. Defendants caused the Company to issue a press release announcing the completion of the acquisition of EnvisionTEC, which stated in part:

> BOSTON, MA (February 17, 2021) – Desktop Metal, Inc. (NYSE: DM), a leader in mass production and turnkey additive manufacturing solutions, today announced it has completed the previously announced acquisition of EnvisionTEC, a leading global provider of volume production photopolymer 3D printing solutions for end use parts. The transaction is valued at $300 million, consisting of a combination of cash and newly issued Desktop Metal stock.
>
> EnvisionTEC will operate as a wholly owned subsidiary of Desktop Metal and continue to be led by founder Al Siblani, who will serve as Chief Executive Officer of the EnvisionTEC business.
>
> "With EnvisionTEC now a part of Desktop Metal, we are well-positioned to offer customers a complete platform across polymers and metals focused on Additive Manufacturing 2.0 solutions for volume production of end-use parts." said Ric Fulop, CEO and co-founder of Desktop Metal. "Together, we have more than 200 distribution partners around the world that extend our reach into applications across fast-growing markets for additive manufacturing, such as dental, medical, and jewelry, in addition to

doubling down on the broader industrial market. As we join forces, I'm more confident than ever we can accelerate the adoption of AM 2.0 and help customers transform how parts are made around the world."

As the original inventor of digital light processing (DLP) 3D printing technology, EnvisionTEC has one of the strongest intellectual property portfolios in the areawide photopolymer 3D printing market, counting more than 140 issued and pending patents. The company has in excess of 190 qualified materials for its platforms and more than 5,000 customers across a broad range of industries, including automotive, aerospace, medical devices, jewelry, and biofabrication. In addition, EnvisionTEC is a leader in the dental market, with over 1,000 dental customers now using its printers for pre-production and end-use parts in this segment.

EnvisionTEC also brings a compelling product portfolio for photopolymer additive manufacturing under Desktop Metal's umbrella, including the new Envision One and Xtreme 8K printing platforms designed to deliver high-speed and economic end-use parts production with exceptional accuracy and properties meeting or exceeding thermoplastics. The company is a pioneer in digital biofabrication additive manufacturing with its Bioplotter platform, which supports the production of biocompatible parts for medical applications such as bone regeneration, cartilage regeneration, soft tissue fabrication, drug release, and organ printing. In addition, Desktop Metal adds EnvisionTEC's robotic additive manufacturing (RAM) digital casting capabilities, which it plans to significantly advance using its proprietary and patent-pending Single Pass Jetting™ technology originally developed for the Production System™ to drive productivity enhancements and improve part economics.

The acquisition more than doubles Desktop Metal's global distribution network, adding vertically focused partners in markets such as medical, dental, and jewelry, and increasing its geographic sales capabilities to 68 countries around the world.

The identified-above statements (¶198) from the February 17, 2021 press release were false and misleading because they conveyed to investors that Desktop Metal had conducted due diligence sufficient to identify the issues surrounding EnvisionTEC's manufacturing and product compliance practices and procedures. Additionally, Defendants' misstatements and omissions were materially false and/or misleading because they failed to disclose material adverse

information to investors, including that: (1) that there were deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures, including with the manufacture and distribution of Flexcera and the PCA 4000; (2) that the foregoing deficiencies presented a material risk to the commercialization of EnvisionTEC's products; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. Further, Defendants' statements regarding the pending FDA clearance for E-Dent 1000 were particularly false and misleading, as they suggested that Defendants' manufacturing of E-Dent 1000 and Flexcera line of proprietary resins complied with FDA regulations, when in fact, significant portions of the E-Dent 1000 and Flexcera were not.

## C.  Materially False and Misleading Statements Issued During the Zhou Class Period

199.  Throughout the Zhou Class Period, Defendants published numerous false and misleading statements in the Company's SEC filings, earnings calls, investors presentations, interviews, and social media accounts about how EnvisionTEC's 3D printing technology and comprehensive library of biocompatible 3D printing materials—including multiple FDA-listed and 510(K)-cleared resins for the manufacturing of FDA-regulated medical devices—offered dental customers a robust, single system for the additive manufacturing of artificial teeth, individual permanent crows, bridges, veneers, and removable monolithic dentures.

200.  For example, throughout the Class Periods, the Company represented that the combination of its Flexcera (also known as E-Dent 1000) proprietary resin technology for dental prosthetics—an FDA-regulated medical device (Flexcera Smile being a Class I device and Flexcera Base being a Class II device requiring 510(k) clearance—combined with its advanced 3D printing technology would deliver superior strength, aesthetics, and function for dental patients.

These representations further suggested that the Company's products were manufactured and marketed in compliance with applicable practices, procedures, and FDA regulations.

201.    As corroborated by the Company's regulatory filings and former employee accounts, these statements were false and misleading, however because in truth, Defendants had manufactured and marketed certain 3D printing and resin products in contravention of FDA regulations and certified uses. Unbeknownst to investors: beginning on or about March 2021, Defendants caused Envision to manufacture Flexcera resin for consumer use at a Montreal, Canada facility that lacked required FDA approval for manufacturing medical grade devices. This resin, in turn, was shipped to and repackaged in the Company's Dearborn, MI facility—which also lacked required FDA approvals for handing the resin—before being sold to unknowing dental industry customers for permanent patient use. Additionally, Defendants had secretly directed EnvisionTEC sales personnel to market and sell the PCA 4000 curing box to customers for purposes of curing EnvisionTEC dental resins to desired medical grade specifications and biocompatibility requirements, even though the PCA 4000 had not been sufficiently internally tested and was not FDA-certified for use with Flexcera.

202.    Accordingly, statements regarding Flexcera's physical and regulatory characteristics, the PCA 4000's ability to cure Flexcera, and the manufacturing and product compliance practices and procedures at the Company's EnvisionTEC facilities were false and misleading for the following reasons, both together and individually: (a) though Defendants' statements suggested that the Company's Flexcera resin complied with FDA regulations, the Company did not manufacture certain lots of Flexcera resin in an FDA-registered facility (Montreal), in contravention to FDA regulations; (b) though Defendants' statements suggested that the Company's Flexcera resin complied with FDA regulations, the Company repackaged in to

bottles nonconforming FDA resin in a non-FDA registered facility (Dearborn), in contravention to FDA regulations; (c) though Defendants' statements suggested that the Company's Flexcera resin complied with FDA regulations, the Company mislabeled Flexcera resin manufactured in Canada and repackaged in the United States as being of German origin, in part, to disguise their fraudulent conduct; (d) the Company sold and included in its order counts sales of Flexcera resin prior to obtaining FDA premarket clearance even though the Company knew or recklessly disregarded the fact that purchasers were likely using non-FDA cleared resin as a Class II medical device (i.e., for permanent patient use); (e) despite the Company's claims to consumers, as instructed by Defendant El-Siblani, the PCA 4000 had not been sufficiently internally tested and was not FDA-certified for use with Flexcera; (f) despite the Company's claims to consumers, as instructed by Defendant El-Siblani, the PCA 4000's technology was not strong enough to sufficiently cure Flexcera resin for permanent human use; and (g) despite the Company's claims regarding Flexcera's physical characteristics (fracture resistance, moisture resistance, etc.), the Company's Flexcera could not meet claimed/required characteristics if cured with the PCA 4000.

1.    **The Company's FY 2020 Annual Report Filed on Form 10-K (Mar. 15, 2021)**

203.    The Zhou Class Period begins on March 15, 2021. On March 15, 2021, Defendants caused the Company to file its annual report on Form 10-K for the period ended December 31, 2020 (the "2020 10-K"), which was signed by, among other top Desktop executives, Defendants Fulop and El-Siblani, affirming the annual report's compliance with the requirements of the Securities Exchange Act of 1934. Therein, Defendants stated, in relevant part:

> ***We may experience difficulties in integrating the operations of EnvisionTEC into our business and in realizing the expected benefits of the EnvisionTEC acquisition.***
> In February 2021, we acquired EnvisionTEC, Inc., or EnvisionTEC, and certain of its affiliates. Additional information about our acquisition of EnvisionTEC, which we refer to as the EnvisionTEC Acquisition, are set forth in "Note 21. Subsequent Events" to our consolidated financial statements in this Annual Report on Form 10-

K. The success of the EnvisionTEC Acquisition will depend in part on our ability to realize the anticipated business opportunities from combining the operations of EnvisionTEC with our business in an efficient and effective manner. The integration process could take longer than anticipated and could result in the loss of key employees, the disruption of each company's ongoing businesses, tax costs or inefficiencies, or inconsistencies in standards, controls, information technology systems, procedures and policies, any of which could adversely affect our ability to maintain relationships with customers, employees or other third parties, or our ability to achieve the anticipated benefits of the EnvisionTEC Acquisition, and could harm our financial performance. If we are unable to successfully or timely integrate the operations of EnvisionTEC with our business, we may incur unanticipated liabilities and be unable to realize the revenue growth, synergies and other anticipated benefits resulting from the EnvisionTEC Acquisition, and our business, results of operations and financial condition could be materially and adversely affected.

(Italics emphasis added)

204.    The above-identified statements (¶ 203) from the Company's FY 2020 Annual Report identified above were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the precise event that the risk disclosures purported to warn against as a contingency (i.e., that Desktop *may* experience difficulties in integrating the operations of EnvisionTEC into its business and in realizing the expected benefits of the EnvisionTEC acquisition) had already become a reality or a certainty. In particular, Defendants knew but failed to disclose to investors of inconsistencies in EnvisionTEC's manufacturing standards and controls that would adversely affect Desktop's relationships with customers, employees, Desktop's ability to achieve the anticipated benefits of the EnvisionTEC acquisition, and could harm Desktop's financial performance, including: (1) that there were deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures; (2) that the foregoing deficiencies presented a material risk to the commercialization of EnvisionTEC's products; and (3) that Desktop Metal conducted insufficient due diligence into EnvisionTEC's manufacturing and product compliance practices and procedures.

2.    **The Company's 4Q20 Earnings Calla and Fourth Quarter and Full Year 2020 Investor Presentation (March 15, 2021)**

205.    Also on March 15, 2021, Defendants held an earnings call, attended by Defendants Fulop and Haley, at which they spoke with and published a presentation entitled "Fourth Quarter and Full Year 2020 Investor Presentation" for the benefit of investors.

206.    During the call Defendant Fulop reiterated that "We've [the Company has] got several materials that have either received FDA 510(k) clearance or are in process, including proprietary materials for permanent crowns and full arch implant dentures with industry leading performance."[56] He then directed attendees to slide 22 of the accompanying PowerPoint presentation. In the Presentation, the Company repeated the business highlights and financial summary detailed in its 2020 Annual Report filed on Form 10-K, including that it netted losses of $25.4 million for the quarter and $90.4 million for the full year. On slide 22, the Company claimed:

> "E-Dent 1000 and E-Denture Pro [FN]: superior materials for high-quality monolithic dentures and outstanding fully digital permanent premium dentures; biocompatible resins with incredible strength and aesthetics
>
> [FN] Materials pending 510(k) clearance

207.    The above-identified statements (¶¶ 205-206) made by Defendants during the March 15, 2021 earnings call and in the Fourth Quarter and Full Year 2020 Investor Presentation were false and misleading for the reasons set forth in ¶ 202. Of note, Defendants' references to the fact, that it "had several materials that have either received FDA 510(k) clearance or are in process, including proprietary materials for permanent crowns and full arch implant dentures with industry leading performance," followed by discussion of E-Dent 1000 (i.e., Flexcera), were particularly

---

[56] "Desktop Metal, Inc. (DM) CEO Ric Fulop on Q4 2020 Results - Earnings Call Transcript," SEEKING ALPHA (Mar. 15, 2021), https://seekingalpha.com/article/4414069-desktop-metal-inc-dm-ceo-ric-fulop-on-q4-2020-results-earnings-call-transcript.

false and misleading, as they give the false impression that the Company's manufacturing of its

premiere medical device resins complied with FDA regulations, when in fact, significant portions

did not. Additionally, these references failed to disclose that the Company's medical grade resins

could not meet claimed/required characteristics if cured with the PCA 4000, which Defendant El-

Siblani ordered the dental channel sales team to push on customers. Because such FDA violations

presented and ultimately resulted in material and adverse risks on the financial health of Desktop,

the omitted information was material to reasonable investors.

**3.      Defendants Announce Launch of Desktop Health (Mar. 15, 2021)**

208.    On March 15, 2021, Defendants caused the Company to publish a press release

titled "Desktop Metal Launches Desktop Health to Redefine Patient-Specific Healthcare," wherein

both Defendants Fulop and Jafar are quoted as speaking on behalf of the Company. In the press

release, Defendants claimed:

> **Additive Healthcare Business to Be Led by Industry Executive
> Michael Jafar As President and CEO**
>
> - New healthcare business will leverage Desktop Metal's
>   comprehensive portfolio of additive manufacturing solutions for
>   current and future applications spanning dentistry, orthodontics,
>   dermatology, orthopedics, cardiology, plastic surgery and
>   printed regenerative tissues and grafts
>
> - Built on a proprietary technology infrastructure for end-use parts
>   production, including Digital Light Processing (DLP),
>   Continuous Digital Light Manufacturing (cDLM), and high-
>   speed metal binder jetting, Desktop Health's mission is to create
>   future patient-specific solutions in the medical field
>
> - Enabled by 3D Bioplotter, the industry's most widely published
>   translational bioprinting platform1 and an extensive library of
>   printable advanced materials to create breakthrough healthcare
>   products
>
> BOSTON & NEWPORT BEACH, Calif.--(BUSINESS WIRE)--
> Desktop Metal, Inc. (NYSE: DM), a leader in mass production and
> turnkey additive manufacturing solutions, today announced the

> launch of Desktop Health™, a new business line focused on accelerating the growth of additive manufacturing solutions for dental, orthodontic and otolaryngology applications. Furthermore, the combination of new additive manufacturing technologies, including bioprinting, high-speed metal binder jetting, and the use of advanced biocompatible materials across polymers, ceramics and metals, puts Desktop Health in a strong position to develop advanced healthcare applications.

Additionally, Defendants acknowledged in disclaimers that "regulatory requirements will apply to Desktop Health's technology, products, materials and applications, including by the U.S. Food and Drug Administration and comparable agencies in other countries."

209.   The above-identified statements (¶ 208) made by Defendants in the March 15, 2021 press release for Desktop Health were false and misleading for the reasons set forth in for the reasons set forth in ¶ 202. Of note, Defendants' references to EnvisionTEC's core DLP and cDLM technologies, as well as their acknowledgement that Desktop Health's products would be bound by FDA regulations, were particularly false and misleading, as they gave the misleading impression that the Company's manufacturing of its premiere medical device resins complied with FDA regulations, when in fact, significant portions did not. Additionally, these references failed to disclose that the Company's medical grade resins could not meet claimed/required characteristics if cured with the PCA 4000, which Defendant El-Siblani order the dental channel sales team to push on customers. Once Defendants chose to tout EnvisionTEC's product portfolio regulated by the FDA, Defendants were bound to do so in a manner that would not mislead investors.

**4.    Defendants Announce FDA Clearance for Flexcera (May 12, 2021)**

210.   On May 12, 2021, Defendants caused the Company to publish a press release titled "Desktop Health Receives FDA Clearance for Flexcera for Next Generation 3D Printed Dentures,"

wherein Defendant Jafar is quoted as speaking on behalf of the Company. Therein, Defendants

claimed:

> Proprietary Resin Technology for Dental Prosthetics Delivers Superior Strength, Aesthetics and Function for Patients
>
> Developed, tested, and selected from more than 200 formulations
>
> Unique long-chain chemistry formulated and optimized for 3D printing
>
> Pioneers a same-day digital denture solution with three times the toughness of competitor denture material and lifelike tooth translucency
>
> NEWPORT BEACH, Calif.--(BUSINESS WIRE)--Desktop Health, recently launched by Desktop Metal, Inc. (NYSE: DM) and committed to developing 3D printing and biofabrication solutions for personalized medicine, today announced it has received U.S. Food and Drug Administration (FDA) 510(k) clearance of Flexcera™ Base, a proprietary resin for use in 3D fabrication of high-quality dental prosthetics. Flexcera Base along with the new Flexcera™ Smile are Desktop Health's first formulated and optimized digital dental solutions.
>
> "Three years ago, we set out to create a product that addressed the limitations of current 3D printed dental prosthetics – brittleness and poor aesthetics," said Michael Jafar, President & CEO of Desktop Health. "The introduction of Flexcera marks the inception of a remarkable new era in dentistry, combining advanced Flexcera science with 3D printing technology to deliver superior strength, aesthetics, and function for patients.
>
> *       *       *
>
> **The Science of Printing Teeth**
>
> Flexcera was developed with the strength of ceramic coupled with long chain chemistry to ensure optimal denture properties. When used exclusively with EnvisionTEC™ 3D printers, dental providers can print up to eight customized Flexcera dentures in less than two hours, delivering on the promise of same-day, high-quality dental prosthetics.
>
> For the first time in dental prosthetics, Flexcera offers:

High fracture resistance, three times more resistant to fracture than select competitive resins;

Moisture resistance to prevent staining or discoloration, two times more resistant than a leading competitive formulation; and

An overall natural aesthetic that offers lifelike tooth translucency and a natural-looking smile.

"Desktop Health has changed my approach to personalized dentistry," said Dr. Ryan Dunlop, DMD of Full Arch Masters, one of the leading experts in dental implants and digital dentistry. "The Flexcera resin delivers on the four cornerstones of why 3D printing works so well: strength, high aesthetics, accuracy and speed. With Flexcera, I am now able to deliver beautiful, high-quality and same-day dental prosthetics in record time, customized to the patient, while they are in the chair."

\*       \*       \*

Flexcera is expected to launch commercially in the U.S. and Canada by the end of June. Healthcare providers who wish to stay updated on product availability, or place a pre-order, can sign up at www.flexcera.com.

**About Flexcera Resins**

Flexcera is comprised of proprietary resins for the fabrication of beautiful, functional dentures with ceramic-like strength. Flexcera Smile is an FDA Class 1 Medical Device for the fabrication of lifelike denture teeth and Flexcera Base is an FDA Cleared Class 2 Medical Device for the fabrication of premium denture bases. Both are formulated exclusively for use with EnvisionTEC 3D printers. For more information, visit www.flexcera.com.

211.    The above-identified statements (¶ 210) made by Defendants in the May 12, 2021

FDA clearance press release were false and misleading for the reasons set forth in for the reasons

set forth in ¶ 202. Of note, Defendants' representation that it had "received U.S. Food and Drug

Administration (FDA) 510(k) clearance of Flexcera™ Base" was particularly false and misleading,

as they gave the misleading suggestion that the Company's manufacturing of its premiere medical

device resins complied with FDA regulations, when in fact, (i) the Company had manufactured

significant lots of Flexcera resin in a non-FDA-registered facility (Montreal), in contravention to

FDA regulations, (ii) the Company had repackaged into bottles nonconforming FDA resin produced in a non-FDA-registered facility (Dearborn), in contravention to FDA regulations, and (iii) the Company had mislabeled Flexcera resin manufactured in Canada and repackaged in the United States as being of German origin, in part, to disguise their fraudulent conduct. Additionally, Defendants' representations regarding Flexcera's physical attributes, including its "superior strength, aesthetics, and function for patients" failed to disclose that the Company's medical grade resins could not meet claimed/required characteristics if cured with the PCA 4000, which Defendant El-Siblani order the dental channel sales team to push on customers. Because such FDA violations and product failures were exceedingly likely to—and in fact did—impact the financial health of Desktop, this omitted information was material to reasonable investors and therefore should have been disclosed.

### 5. Defendants Publish Video Introducing Flexcera Products on Website and on Twitter (May 12, 2021)

212.    On or about May 12, 2021, Defendants also caused the Company to publish on its corporate website and corporate Twitter account a one-minute video, titled "Introducing Flexcera™," in which Defendant Jafar appeared and made several representations regarding the Company's recently launched Flexcera line of 3D printing resins on Desktop's behalf.

**F.24    Screenshot from "Introducing Flexcera™" Video Posted on @DesktopMetal Twitter Account and Retweeted by @ETEC on May 12, 2021**



213.    In the tweet, the Company claimed that "**Flexcera™**" was "a new FDA cleared resin for the fabrication of beautiful, functional dentures with ceramic-like strength." Additionally, in the video voiced by Jafar, Defendants further represented that it could "provide the flexibility of plastic and the strength of ceramic."

214.    The above-identified statements (¶ 212-213) made by Defendants on Desktop's corporate website and corporate Twitter account were false and misleading for the reasons set forth in ¶ 202. Of note, Defendants' emphasis that Flexera was "a new FDA cleared resin for the fabrication of beautiful, functional dentures with ceramic-like strength" was particularly false and misleading, as they gave the misleading suggestion that the Company's manufacturing of Flexcera, its premiere medical device resin, complied with FDA regulations, when in fact, (i) the Company

had manufactured significant lots of Flexcera resin in a non-FDA-registered facility (Montreal), in contravention to FDA regulations, (ii) the Company had repackaged into bottles nonconforming FDA resin produced in a non-FDA-registered facility (Dearborn), in contravention to FDA regulations, and (iii) the Company had mislabeled Flexcera resin manufactured in Canada and repackaged in the United States as being of German origin, in part, to disguise their fraudulent conduct. Additionally, Defendants' representations regarding Flexcera's physical attributes, including that it "provide[s] the flexibility of plastic and the strength of ceramic" failed to disclose that the Company's medical grade resins could not meet claimed/required characteristics if cured with the PCA 4000, which Defendant El-Siblani ordered the dental channel sales team to push on customers. Because these concealed FDA violations and product failures were exceedingly likely to – and in fact did – impact the financial health of Desktop, this omitted information was material to reasonable investors and therefore should have been disclosed.

**6.     The Company's 1Q21 Quarterly Report Filed on Form 10-Q (May 17, 2021)**

215.   On May 17, 2021, Defendants caused the Company to file its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q"), wherein Defendants claimed:

> In March 2021, we launched our Desktop Health business, which aims to grow the market for our existing health-related materials and applications, including dental, and to identify, develop and/or commercialize other opportunities related to biocompatible materials and biofabrication. This business operates in a highly competitive space which may make it difficult for us to implement business plans and expectations and identify and realize opportunities. *In addition, this business and its technology, products, materials and applications may be subject to strict regulatory requirements in the United States and other countries. The success of this business will also depend on our ability to attract, hire and retain qualified personnel, establish sales, marketing and distribution infrastructure, and establish and maintain supply and manufacturing relationships.*

(Emphasis added.)

216.    The above-identified statements (¶ 215) from the Company's 1Q21 identified above were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects for the reasons set forth in ¶ 202 and others. Specifically, the precise event that the risk disclosures purports to warn against as a contingency (i.e., that the Company may encounter difficulties in implementing its business plan due to the strict regulatory requirements applicable to EnvisionTEC's products, materials, and applications and EnvisionTEC's marketing and manufacturing processes) had already become a reality or a certainty. In particular, Defendants knew but failed to disclose that Desktop was encountering difficulties in implementing its business plan with respect to EnvisionTEC, given: (1) that there were deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures; (2) that the foregoing deficiencies presented a material risk to the commercialization of EnvisionTEC's products; and (3) that Desktop Metal conducted insufficient due diligence into EnvisionTEC's manufacturing and product compliance practices and procedures.

**7.    The Company's 1Q21 Earnings Call and 1Q21 Investor Presentation (May 17, 2021)**

217.    On May 17, 2021, the Company also held an earnings call and published an investor presentation entitled "First Quarter 2021 Financial Results Presentation" to discuss Desktop's first quarter 2021 results. During the call, Defendant Fulop stated that:

> As highlighted on slide 11, Desktop Health continues to gain significant traction. Dental shipments grew 64% year-over-year from the first quarter of 2020. We consider dental one of the early killer apps for AM 2.0 in metals, polymers and ceramics because almost every dental part is unique. It's a market that's both growing and adopting additive very quickly. More than $30 billion in dental parts are sold every year by labs to dentists, and only a small percentage are printed today. We expect that this number is going to grow considerably by 2025 to as much as 75% of the overall market.
>
> As we're positioning Desktop Health to best capture this in other healthcare markets, last week we launched our first major product line which we called Flexcera. *Flexcera is used to create 3D printed*

*dental prosthetics and dentures with unparalleled performance. Our Flexcera Smile is a Class 1 medical device and Flexcera Base is a Class 2 device recently cleared by the FDA,* and we're now starting to commercialize these products which come in a variety of colors. This is a very fast growing, exciting business. Dental is truly a killer app for additive, because every part is different. So it's really well suited for this type of production and we're investing in the business to be a major player in this market.

(Emphasis added.)

218.     On slide 11 of the Investor Presentation, the Company reported data regarding EnvisionTEC on a slide titled "Desktop Health: Dental growth & Flexcera[TM] launch." Therein, Defendants included a picture of EnvisionTEC's entire 3D printing solution, which featured Flexcera resin and the PCA 4000, but not the Otoflash. Additionally, the Company stated in relevant part that:

Launched Flexcera[TM] as the first major product line from Desktop Health

- Proprietary solution used to create 3D printed dental prosthetics and dentures

- Flexcera[TM] Smile– FDA-cleared Class 1 medical device for the 3D fabrication of lifelike denture teeth with realistic translucency

- Flexcera[TM] Base– FDA-cleared Class 2 medical device for the 3D fabrication of premium denture bases / gums

~3x More resistant to fracture

~2x More resistant to water

Flexcera[TM] resists fracture & moisture 2-3x better than competition

**F.25    Excerpt from 1Q21 Investor Presentation (orange highlight added)**



219.    The above-identified statements (¶¶ 217-218) made by Defendants on Desktop's first quarter 2021 earnings call and investor presentation were false and misleading for the reasons set forth in for the reasons set forth in ¶ 202. Of note, Defendants' emphasis that "Flexcera Smile is a Class 1 medical device and Flexcera Base is a Class 2 device recently cleared by the FDA" was particularly false and misleading, as they gave the misleading suggestion that the Company's manufacturing of Flexcera, its premiere medical device resin, complied with FDA regulations, when in fact, (i) the Company had manufactured significant lots of Flexcera resin in a non-FDA-registered facility (Montreal), in contravention to FDA regulations, (ii) the Company had repackaged into bottles nonconforming FDA resin produced in a non-FDA-registered facility (Dearborn), in contravention to FDA regulations, and (iii) the Company had mislabeled Flexcera resin manufactured in Canada and repackaged in the United States as being of German origin, in part, to disguise their fraudulent conduct. Additionally, Defendants' representations regarding Flexcera's physical attributes, including that its resistance to fracture and moisture failed to

disclose that the Company's medical grade resins could not meet claimed/required characteristics if cured with the PCA 4000, which Defendant El-Siblani ordered the dental channel sales team to push on customers. Because these concealed FDA violations and product failures were exceedingly likely to—and in fact did—impact the financial health of Desktop, this omitted information was material to reasonable investors and therefore should have been disclosed.

8.    **The Company's Form S-1 Registration Statement (May 26, 2021) and Subsequent Prospectuses and Registration Statements**

220.    On May 26, 2021, Defendants caused the Company to file with the SEC a Post-Effective Amendment to the February 4, 2021 Registration Statement in which they claimed, among other things, that:

> **Consumable materials**
>
> We sell an array of consumable materials, or consumables, for use with several of our additive manufacturing systems. The sales of these materials provide us with a recurring revenue stream from customers of our additive manufacturing solutions. These materials consist of:
>
> \*      \*      \*
>
> DLP and CDLM photopolymer resins. For use with our area-wide photopolymer print platforms, including D4K Pro, Envision One, P4K, and Xtreme 8K, we sell proprietary resins engineered in-house by our materials team to achieve high-performance material properties and support a broad range of applications across healthcare and dental, consumer products and industrial verticals. ***This extensive library of materials also includes biocompatible resins as well as several Food and Drug Administration- (FDA) cleared resins for us in medical and dental applications***.
>
> \*      \*      \*
>
> **Photopolymer Additive Manufacturing Systems**
>
> Our photopolymer additive manufacturing systems are designed using advanced, area-wide photopolymer print processes, such as DLP and CDLM, in which liquid photopolymer resin is cured using light from a high-resolution projector system to produce precision

polymer parts with smooth surface finish and properties in line with or exceed conventionally manufactured thermoplastics.

The PCA2000 and PCA 4000 are solutions for curing parts printed using our CDLM or DLP platforms and utilize a unique system of ultraviolet light emitting diode (LED) light sources that uses both 385 nanometer wavelengths to deep cure and 405 nanometer wavelengths to achieve smooth surface on each part.

221. Defendants would cause the Company to go on to repeat these representations in subsequent Prospectuses and Registration Statements, including those on June 11, June 30, July 12, August 20, September 15, October 7, and October 8, 2021.

222. The above-identified statements (¶ 220-221) made by Defendants in Desktop's Amended Registration Statement were false and misleading for the reasons set forth in for the reasons set forth in ¶ 202. Of note, Defendants' emphasis of its FDA cleared resins was particularly false and misleading, as they gave the misleading suggestion that the Company's manufacturing of Flexcera, its premiere medical device resin, complied with FDA regulations, when in fact, (i) the Company had manufactured significant lots of Flexcera resin in a non-FDA-registered facility (Montreal), in contravention to FDA regulations, (ii) the Company had repackaged into bottles nonconforming FDA resin produced in a non-FDA-registered facility (Dearborn), in contravention to FDA regulations, and (iii) the Company had mislabeled Flexcera resin manufactured in Canada and repackaged in the United States as being of German origin, in part, to disguise their fraudulent conduct. Additionally, Defendants' representations regarding its use of the PCA 4000 is misleading in that it failed to disclose that Defendant El-Siblani had ordered the dental channel sales team to push the PCA 4000 on customers for curing Flexcera resin, a practice in violation of FDA regulations and leading to significant product failures. Because these concealed FDA violations and product failures were exceedingly likely to—and in fact did—impact the financial

health of Desktop, this omitted information was material to reasonable investors and therefore should have been disclosed.

## 9. Defendants Announce CE Mark Certification and International Launch for Flexera (June 10, 2021)

223.    On June 10, 2021, Defendants caused the Company to publish a press release titled "Desktop Health Announces CE Mark Certification and International Launch for Flexcera Next Generation 3D Printed Dentures," wherein Defendant Jafar is quoted as speaking on behalf of the Company.[57] In the press release, Defendants claimed, in relevant parts:

> Proprietary Resin Technology for Dental Prosthetics Delivering Superior Strength, Aesthetics and Function for Patients to Be Available to European Dental Professionals Beginning This Summer
>
> Developed, tested, and selected from more than 200 formulations
>
> Unique long-chain chemistry formulated and optimized for 3D printing
>
> Pioneers a same-day digital denture solution with three times the toughness of select competitor denture material and lifelike tooth translucency
>
> Desktop Health announces CE Mark certification and the international launch of Flexcera, a proprietary resin for use in 3D fabrication of high-quality dental prosthetics. The introduction of Flexcera Base and Flexcera Smile marks the inception of a new era in dentistry, combining advanced science with 3D printing technology to deliver superior strength, aesthetics, and function for patients. (Photo: Business Wire)
>
> NEWPORT BEACH, Calif.--(BUSINESS WIRE)--Desktop Health, recently launched by Desktop Metal, Inc. (NYSE: DM) and committed to developing 3D printing and biofabrication solutions for personalized medicine, today announced Conformité

---

[57] Press Release, Desktop Health, "Desktop Health Announces CE Mark Certification and International Launch for Flexcera Next Generation 3D Printed Dentures" (Jun. 10, 2021), https://www.businesswire.com/news/home/20210610005323/en/Desktop-Health-Announces-CE-Mark-Certification-and-International-Launch-for-Flexcera-Next-Generation-3D-Printed-Dentures

Européenne (CE) Mark certification for its FlexceraTM resin, a proprietary technology for use in 3D fabrication of high-quality dental prosthetics. The CE Mark affirms that Flexcera resins meet the requirements of the European Medical Devices Directive, paving the way for Desktop Health to launch Flexcera resins to dental professionals within the European Union (EU) and other CE Mark geographies. *Flexcera Base, which recently received U.S. Food and Drug Administration (FDA) 510(k) clearance, and Flexcera Smile are Desktop Health's first formulated and optimized digital dental solutions.* "We are very pleased to report CE Mark certification for Flexcera, launching our global expansion to meet the needs of dental professionals and their patients," said Michael Jafar, President & CEO of Desktop Health. "*The introduction of Flexcera marks the inception of a remarkable new era in dentistry, combining advanced Flexcera science with 3D printing technology to deliver superior strength, aesthetics, and function for patients.*"

\*     \*     \*

The Science of Printing Teeth

Flexcera resin was developed with the strength of ceramic coupled with long chain chemistry to ensure optimal denture properties. When used exclusively with EnvisionTEC™ 3D printers, dental providers can print up to eight customized Flexcera dentures in less than two hours, delivering on the promise of same-day, high quality dental prosthetics.

For the first time in dental prosthetics, Flexcera resin offers:

High fracture resistance, three times more resistant to fracture than select competitive resins;

Moisture resistance to prevent staining or discoloration, two times more resistant than a leading competitive formulation; and

An overall natural aesthetic that offers lifelike tooth translucency and a natural-looking smile.

\*     \*     \*

Flexcera resin is expected to launch commercially in Europe in late summer 2021 and in the U.S. and Canada by the end of June. Healthcare providers who wish to stay updated on product availability, or place a pre-order, can sign up at www.flexcera.com.

About Flexcera Resins

- 108 -

> Proprietary Flexcera resins enable the fabrication of beautiful, functional dentures with ceramic-like strength. Flexcera Smile is an FDA Class 1 and CE-marked medical device for the fabrication of lifelike denture teeth, and Flexcera Base is an FDA 510(k)- cleared Class 2 and CE-marked medical device for the fabrication of premium denture bases. Both are formulated exclusively for use with EnvisionTEC 3D printers. For more information, visit www.flexcera.com.

(Italics emphasis added.)

224. The above-identified statements (¶ 223**Error! Reference source not found.**) made by Defendants on Desktop's June 10, 2021 press release were false and misleading for the reasons set forth in for the reasons set forth in ¶ 202. Of note, Defendants' emphasis of Flexcera Smile and Flexcera Base's FDA clearance and CE-mark was particularly false and misleading, as they gave the misleading suggestion that the Company's manufacturing of Flexcera, its premiere medical device resin, complied with FDA regulations, when in fact, (i) the Company had manufactured significant lots of Flexcera resin in a non-FDA-registered facility (Montreal), in contravention to FDA regulations, (ii) the Company had repackaged into bottles nonconforming FDA resin produced in a non-FDA-registered facility (Dearborn), in contravention to FDA regulations, and (iii) the Company had mislabeled Flexcera resin manufactured in Canada and repackaged in the United States as being of German origin, in part, to disguise their fraudulent conduct. Additionally, Defendants' representations regarding Flexcera's physical attributes, including that its strength and resistance to fracture and moisture failed to disclose that the Company's medical grade resins could not meet claimed/required characteristics if cured with the PCA 4000, which Defendant El-Siblani ordered the dental channel sales team to push on customers. Because these concealed FDA violations and product failures were exceedingly likely to—and in fact did—impact the financial health of Desktop, this omitted information was material to reasonable investors and therefore should have been disclosed.

**10.      Defendant Fulop's Public Statement Regarding FDA Approval at Stifel Cross Sector Insight Conference (June 10, 2021)**

225.     On June 10, 2021, Defendant Fulop participated in the Stifel Cross Sector Insight Conference, during which stated the following in a question-and-answer section with securities analysts:

> Yeah. I mean, we have – so we're – we have a very fast-growing dental market. Our dental business grew 63% year-over-year and it's accelerating month-over-month. *We have unique proprietary products in that space like our Flexcera products that allow you to – they just received FDA approval that I did do same-day full arch implant dentures instead of having multiple appointments and a lot of things like that*. So – but in the denture and – in the dental space, in the ortho in particular which was your question, dental has three segments. You've got ortho, you've got the lab parts, lab parts is about $38 billion of lab made parts there's orthodontist. And then, there's a new market called chairside which hasn't really happened yet, but it's slow – it's going to happen this decade.

(Emphasis added.)

226.     The above-identified statements (¶ 225) made by Defendants on the June 10, 2021 the Stifel Cross Sector Insight Conference were false and misleading for the reasons set forth in for the reasons set forth in ¶ 202. Of note, Defendant Fulop's emphasis of Flexcera's FDA approval was particularly false and misleading, as it gave the misleading suggestion that the Company's manufacturing of Flexcera, its premiere medical device resin, complied with FDA regulations, when in fact, (i) the Company had manufactured significant lots of Flexcera resin in a non-FDA-registered facility (Montreal), in contravention to FDA regulations, (ii) the Company had repackaged into bottles nonconforming FDA resin produced in a non-FDA-registered facility (Dearborn), in contravention to FDA regulations, and (iii) the Company had mislabeled Flexcera resin manufactured in Canada and repackaged in the United States as being of German origin, in part, to disguise their fraudulent conduct. Because these concealed FDA violations were

exceedingly likely to – and in fact did – impact the financial health of Desktop, this omitted

information was material to reasonable investors and therefore should have been disclosed.

**11.    Defendant Jafar's Interview with *Inside Dental Technology* (June 2021)**

227.    In June 2021, *Inside Dental Technology* published a Q&A done with Defendant

Jafar, in which Defendant Jafar spoke on behalf of Desktop regarding the Company's line of

medical grade dental products:[58]

> ***Inside Dental Technology (IDT):*** What should people in the dental profession know about Desktop Health?
>
> **Michael Jafar:** We are a technology company looking to personalize medicine across many verticals. Our core business will always be dental, due to the speed of innovation and the history of EnvisionTEC's dental business, which we acquired and expect to be the driver of our growth in the dental space. We also have a line of sight to expand in orthopedics, ophthalmology, dermatology, plastic surgery, and cardiology. . . . *One of the polymers we recently released for dental applications is Flexcera, and we are really proud of that product. Approximately 2 years of work went into that product, which was developed, tested, and selected from over 200 formulations. The product is three times stronger than one of the most popular denture base materials on the market, and two times more resistant to water. So it is a great value proposition and the next era of what Desktop Health will be releasing in terms of innovation and R&D.*
>
> ***IDT:*** With so many 3D printing companies on the market, why did you find EnvisionTEC to be an attractive investment?
>
> **Jafar:** There were two main reasons. First and foremost, EnvisionTEC founded DLP, which is the gold standard of 3D printing. Between DLP and its sister technology cDLM, the innovation and the investment that has been made over 18 years in that company was hard to match. The dental know-how with a company that entered dentistry in 2007 also positions them as a leader in that space. The second reason was the opportunity—the opportunity to scale a business and the opportunity to resource the business was a perfect marriage. That is the sweet spot of our

---

[58] "Q&A with Michale Mazan Jafar of Desktop Health," INSIDE DENTAL TECHNOLOGY, Vol. 12, Issue 6 (June 2021), https://www.aegisdentalnetwork.com/idt/2021/06/qa-with-michael-mazan-jafar-of-desktop-health (capitalization altered).

acquisition strategy: Second to none in leading technology, and in need of scale.

*    *    *

*IDT:* How much research has been put into testing Flexcera and other resins for permanent restorations? The ability to adapt positively to the oral environment has been such a challenge.

**Jafar:** The reason why I am so proud of this Flexcera launch is because, over the course of the past two years, the team has done their due diligence to extract the correct and necessary data. We have tested this product in 37°C conditions for 2 days to try to mimic the atmosphere within the mouth. We have tested it against leading products on the market. Not only did we test for water absorption, but we also did a 48-hour coffee test to evaluate staining, stress fracture, brittleness. There is not a measure that is commonly requested that we did not put behind this launch.

*IDT:* What are some of the challenges that dentistry prevents that you have found to be unique? Is one the fact that some of these printed parts need to go in the oral environment?

**Jafar:** Fortunately, the FDA provides a very clear path for approval; anything beyond their requirements just strengthens a product. . . .

(Emphasis added.)

228.    The above-identified statements (¶ 227) made by Defendants on Jafar's June 2021 Interview with *Inside Dental Technology* were false and misleading for the reasons set forth in for the reasons set forth in ¶ 202. Of note, Defendants' emphasis that Flexcera's FDA clearance, EnvisionTEC's operational expertise in the dental industry, and the due diligence the Company had carried out in Flexcera's product launch was particularly false and misleading, as they gave the misleading suggestion that the Company's manufacturing of Flexcera, its premiere medical device resin, complied with FDA regulations, when in fact, (i) the Company had manufactured significant lots of Flexcera resin in a non-FDA-registered facility (Montreal), in contravention to FDA regulations, (ii) the Company had repackaged into bottles nonconforming FDA resin produced in a non-FDA-registered facility (Dearborn), in contravention to FDA regulations, and

- 112 -

(iii) the Company had mislabeled Flexcera resin manufactured in Canada and repackaged in the United States as being of German origin, in part, to disguise their fraudulent conduct. Additionally, while touting Flexcera's launch and features, Defendants failed to disclose that the Company's medical grade resins could not meet claimed/required characteristics if cured with the PCA 4000, which Defendant El-Siblani ordered the dental channel sales team to push on customers. Because these concealed FDA violations and product failures were exceedingly likely to—and in fact did—impact the financial health of Desktop, this omitted information was material to reasonable investors and therefore should have been disclosed.

**12.    Defendant Jafar's Interview with California Business Journal (June 2021)**

229.    Also in June 2021, California Business Journal published online and in-print an interview with Defendant Jafar where he spoke on behalf of Desktop regarding Desktop Health and its 3D printing medical grade products. Therein, the article relayed information provided by Jafar, including:

> From the purview of scientists and engineers, a bold new world in the field of dentures has been unveiled in FDA-approved, proprietary resin technology -- the result of 200+ formulations of testing

> \*       \*       \*

> According to Jafar, in 2019 alone, 50 additive manufacturing devices (defined by 3D printing) received FDA 510(k) clearance; that number might seem modest, but it actually represents a quarter of all 510(k) clearances in the past decade.

> \*       \*       \*

> Jafar adds that there are now 20 companies with FDA clearance to design additive manufacturing dental applications for patients' mouths . . . with another 21 approvals to come in the next year.

> \*       \*       \*

From the purview of scientists and engineers, the bold new world of dental work – namely in the field of dentures at present – is made possible by the unveiling of Flexera, an FDA-cleared, proprietary resin technology which is the result of over three years of research and development, and more than 200 formulations of testing.

"Whatever you're creating using additive manufacturing, it needs to have that ideal relationship between hardware and materials. The beauty of Flexera is that when we tested it against the market leader, it showed improved strength and water absorption," Jafar adds, "and both factors are vitally important because you don't want a tooth that cracks or changes color."

In concert with aesthetics, the 3D printing process of new teeth also presents impressive alacrity; working with Flexera, when the patients' scans are passed on to EnvisionTEC 3D printers, eight sets of dentures can be produced in just two hours.

"When the consumer really begins to see the speed and efficiency of this ecosystem, people will start to realize the power of the manufacturing component," enthuses Jafar.

230.    The above-identified statements (¶ 229) made in Defendant Jafar's June 2021 Interview with California Business Journal were false and misleading for the reasons set forth in for the reasons set forth in ¶ 202. Of note, Defendants' emphasis that Flexcera's FDA clearance was particularly false and misleading, as they gave the misleading suggestion that the Company's manufacturing of Flexera, its premiere medical device resin, complied with FDA regulations, when in fact, (i) the Company had manufactured significant lots of Flexcera resin in a non-FDA-registered facility (Montreal), in contravention to FDA regulations, (ii) the Company had repackaged into bottles nonconforming FDA resin produced in a non-FDA-registered facility (Dearborn), in contravention to FDA regulations, and (iii) the Company had mislabeled Flexcera resin manufactured in Canada and repackaged in the United States as being of German origin, in part, to disguise their fraudulent conduct. Additionally, Defendants' representations regarding Flexera's physical attributes, including that its tested strength and water absorption failed to disclose that the Company's medical grade resins could not meet claimed/required characteristics

if cured with the PCA 4000, which Defendant El-Siblani ordered the dental channel sales team to push on customers. Because these concealed FDA violations and product failures were exceedingly likely to—and in fact did—impact the financial health of Desktop, this omitted information was material to reasonable investors and therefore should have been disclosed.

**13.    Defendants Release 2Q21 Quarterly Report on Form 10-Q (Aug. 11, 2021)**

231.    On August 11, 2021, Defendants caused the Company to file its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 10-Q"), signed by Defendants Fulop and Haley. Therein, Defendants represented that it and its medical grade products were subject to FDA regulations. Specifically, it stated that:

> Compliance with regulations for medical devices and solutions is expensive and time-consuming, and failure to obtain or maintain approvals, clearances, or compliance could impact financial projections and/or subject us to penalties or liabilities.
>
> Our Desktop Health products and services, and its healthcare provider customers and distributors, are and will be subject to extensive federal, state, local and foreign regulations, including, without limitation, regulations with respect to approvals and clearances for products, design, manufacturing and testing, labeling, marketing, sales, quality control, and privacy. Unless an exemption applies, we must obtain clearance or approval from the Food and Drug Administration (or comparable foreign regulatory body) before a medical device or solution can be marketed or sold; this process involves significant time, effort and expense. The healthcare market overall is highly regulated and subject to frequent and sudden change. Our failure to secure clearances or approvals or comply with regulations could have an adverse impact on our business and reputation and subject us to lost research and development costs, withdrawal of clearance/approval, operating restrictions, liabilities, fines, penalties and/or litigation.[59]

---

[59] The Company would repeat this statement in its September 15, October 7, and October 8, 2021 Prospectuses.

232.    The above-identified statements (¶ 231) from the Company's 2Q21 Quarterly Report identified above were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects for the reasons set forth in ¶ 202 and others. Specifically, the precise event that the risk disclosures purported to warn against as a contingency (i.e., that Desktop non-compliance could impact financial projections and/or subject us to penalties or liabilities) had already become a reality or a certainty. In particular, Defendants knew but failed to disclose to investors: (1) that there were deficiencies in EnvisionTEC's manufacturing and product compliance practices and procedures in violation of FDA regulations; (2) that the foregoing deficiencies presented a material risk to the commercialization of EnvisionTEC's products; and (3) that Desktop Metal conducted insufficient due diligence into EnvisionTEC's manufacturing and product compliance practices and procedures.

**14.    The Company's 2Q21 Press Release and Earnings Call (Aug. 11, 2021)**

233.    Also on August 11, 2021, Defendants caused the Company to issue a press release and held an earnings call with investors regarding its second quarter financial results. In the press release, the Company repeated the news that it "[c]ontinued material portfolio on expansion including . . . Flexcera Smile and FDA-cleared Flexcera Base on EnvisionTEC platforms." Additionally, during the earnings call, Defendant Fulop stated, in relevant part:

> Also in the quarter, Desktop Health completed CE certification for our Flexcera Base and Smile resins and received FDA clearance for Class II permanent indications with Flexcera Base. Together, Flexcera Base and Smile enable next-generation digital dentures and same day full arch implant procedures. Flexcera solutions sold out within the first four weeks of launch, and we're adding capacity to meet the robust demand.

234.    Defendants caused the Company to repeat both of these exact statements in its August 20, 2021 Prospectus.

235.    The above-identified statements (¶ 233-234) made in the Company's 2Q21 Press Release and Earnings Call and August 20, 2021 Prospectus were false and misleading for the reasons set forth in for the reasons set forth in ¶ 202. Of note, Defendants' emphasis that Flexcera's FDA clearance was particularly false and misleading, as they gave the misleading suggestion that the Company's manufacturing of Flexcera, its premiere medical device resin, complied with FDA regulations, when in fact, (i) the Company had manufactured significant lots of Flexcera resin in a non-FDA-registered facility (Montreal), in contravention to FDA regulations, (ii) the Company had repackaged into bottles nonconforming FDA resin produced in a non-FDA-registered facility (Dearborn), in contravention to FDA regulations, and (iii) the Company had mislabeled Flexcera resin manufactured in Canada and repackaged in the United States as being of German origin, in part, to disguise their fraudulent conduct.

**15.    Statements on the Company's Website**

236.    Throughout the Zhou Class Period, Defendants published numerous false or misleading statements on the Company's website about how Flexcera was an FDA-cleared medical device and how Flexcera resin could achieve touted medical grade specifications and biocompatibility requirements utilizing the Company's 3D printing systems.

237.    For example, throughout portions of the Zhou Class Period, the Company's website claimed that Flexcera Base as a "FDA cleared premium denture base[]" and as "[l]ight-curable resin for the fabrication of high-impact and removable denture base[]" that is "[c]ompatible and validated for use with EnvisionTEC™ systems." Likewise, the Company's website claimed, among other things that:

- Flexcera Smile to be a "light-curable resin" that is "[c]ompatible and validated for use with EnvisionTEC™ systems."

- Flexcera smile was three times more resistant to fracture as compared to competing brands.

- Flexcera™ is expected to ship in the U.S. and Canada by the end of June 2021. Pre-order today while supplies last. Flexcera™ Base is an FDA 510(k) Cleared Class 2 Medical Device indicated for the fabrication of denture bases in dental laboratories for full removable dentures; Flexcera™ Smile is an FDA Class 1 Medical Device for the fabrication of artificial teeth for dental prostheses.

**F.26   Product Listings for Flexcera Products on Company Website**











238.   The above-identified statements and screenshots (¶ 236-237) made on the Company's website and other digital media feeds were false and misleading for the reasons set forth in for the reasons set forth in ¶ 202. Of note, Defendants' emphasis that Flexcera's FDA clearance was particularly false and misleading, as they gave the misleading suggestion that the Company's manufacturing of Flexcera, its premiere medical device resin, complied with FDA regulations, when in fact, (i) the Company had manufactured significant lots of Flexcera resin in a non-FDA-registered facility (Montreal), in contravention to FDA regulations, (ii) the Company had repackaged into bottles nonconforming FDA resin produced in a non-FDA-registered facility (Dearborn), in contravention to FDA regulations, and (iii) the Company had mislabeled Flexcera resin manufactured in Canada and repackaged in the United States as being of German origin, in part, to disguise their fraudulent conduct. Additionally, Defendants' representations regarding Flexcera's physical attributes, including that its tested strength and water absorption failed to disclose that the Company's medical grade resins could not meet claimed/required characteristics if cured with the PCA 4000, which Defendant El-Siblani ordered the dental channel sales team to push on customers. Because these concealed FDA violations and product failures were exceedingly likely to—and in fact did—impact the financial health of Desktop, this omitted information was material to reasonable investors and therefore should have been disclosed.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

239.   As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The Individual Defendants, by virtue of their receipt of information

reflecting the true facts regarding Desktop Metal, their control over, and/or receipt and/or modification of Desktop Metal's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Desktop Metal, participated in the fraudulent scheme alleged herein.

240.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under respondeat superior and agency principles.

## A.    Defendant El-Siblani Knowingly or Recklessly Disregarded FDA Regulations that Restricted the Sale of the Company's Dental Channel Products

241.    This is an unusual securities fraud case, insofar that multiple witnesses with first-hand personal knowledge confirm at the pleading stage that Defendant El-Siblani knowingly or recklessly caused the Company to engage in fraudulent conduct which rendered Defendants statements to investors false or misleading.

242.    As discussed above, starting on or about March 15, 2021 (around the same time the Company announced the launch of Desktop Health), Defendant El-Siblani (and possibly others) caused the Company's EnvisionTEC segment to manufacture Flexcera resin for consumer use at its Montreal, Canada facility even though that facility lacked the requisite FDA registrations for manufacturing Class II medical grade devices intended for permanent patient use. At El-Siblani's direction, this resin was shipped across international borders in large drums to the Company's Dearborn, MI facility—which also lacked required FDA registrations for handing the resin—for repackaging. Despite knowing the resin's true origins, El-Siblani falsely told EnvisionTEC employees in Dearborn, Michigan that the Company imported the resin from an outside, FDA-certified lab in Canada. Additionally, El-Siblani instructed employees to produce labels for the repackaged resin that were nearly the exact same as those for resin made in the Company's FDA-certified facilities in Germany and identified the Canadian-produced product of having German

origins. Given El-Siblani's near-20-year tenure as EnvisionTEC's CEO and co-founder, his extensive knowledge of its North American and German operations (the latter being the only facility with FDA certification), and his inordinate control over EnvisionTEC's day-to-day operations, it cannot be plausibly suggested that El-Siblani did not know that his instructions violated FDA regulations. And even if such a suggestion were plausible, Defendant El-Siblani was confronted by FE-5 regarding the legality of selling Flexcera resin made in Montreal; however, El-Siblani dismissed the concerns and continued to instruct the Montreal facility to unlawfully manufacture resin that El-Siblani knew or recklessly disregarded would be used by customers for permanent dental applications.

243.   Additionally, reliable former Company employees confirmed that, in March 2021, during a weekly sales call for EnvisionTEC's dental channel sales team, Defendant El-Siblani knowingly instructed the sales team to push the PCA 4000 for use with Flexcera even though the PCA 4000 was not identified in Desktop's 510(k) medical device application for Flexcera on file with the FDA. As recounted by FE-3 and FE-4, El-Siblani issued his orders over the objection of Kevin Dillon—a dental channel sales manager—who heard from the German facility that the PCA 4000 had not been FDA certified for use with Flexcera. When challenged, El-Siblani doubled down on his instructions, declaring, "This is the one I am telling you to sell, so do it."

244.   These manufacturing deficiencies and FDA compliance failures at EnvisionTEC presented a material risk to the commercialization of EnvisionTEC's products, and as a result, rendered Defendants' positive statements about Desktop's acquisition and successful integration of EnvisionTEC materially misleading and/or lacking a reasonable basis.

245.   El-Siblani's conduct, combined with his efforts to obfuscate the illegality of his instructions, firmly shows that he consciously intended to defraud.

**B.      Defendants' Imputed Knowledge about Core Operations**

246.    As discussed above, dental 3D printing is the golden goose of the 3D printing industry, with the global dental 3D printing market valued to be nearly $2 billion in 2021 alone and nearly $10 billion by the end of the decade. Accordingly, for a negative revenue company like pre-SPAC merger Desktop Metal, an acquisition in the dental 3D printing sector constituted a key component to the Company's path to profitability and financial success. Indeed, no more than one month after acquiring EnvisionTEC, Defendant Fulop disclosed to investors that the Company projected its EnvisionTEC segment to contribute to 40% of its revenue in 2021 (versus 60% for the Company's traditional metal printing technologies).

247.    Because dental channel sales were core to the Company's short-term profitability and longer-term success, the materially false statements and omissions detailed herein could not have occurred without the Individual Defendants' knowledge and approval. Indeed, as highlighted above, Defendants frequently touted the importance of EnvisionTEC's area-wide photopolymer 3D printing system, customer networks, and library of 190+ qualified materials in its public statements, SEC filings, and investors presentations. For example, Defendants frequently boasted of its proprietary resin developed for use in the 3D fabrication of high-quality dental products (i.e., Flexcera), claiming, among other things, that it was "a new FDA cleared resin for the fabrication of beautiful, functional dentures with ceramic-like strength," and that Flexera could "provide the flexibility of plastic and the strength of ceramic." They also hyped, for instance, the PCA 4000 curing box in public filings, stating it was "a solution[] for curing parts printed using our CDLM or DLP platforms and utilize a unique system of ultraviolet light emitting diode (LED) light sources that uses both 385 nanometer wavelengths to deep cure and 405 nanometer wavelengths to achieve smooth surface on each part." Indeed, Defendants so strongly believed the dental industry to be a crown jewel in its 3D-pritning industry crown that they launched a new business,

Desktop Health, to leverage the Company's portfolio into the dental (and later, greater biotech) space.

248.    Given the multitude of statements concerning Flexcera resin, its FDA certifications, and its characteristics (if properly cured), as well as Flexcera's importance to the company's financial success, it is unreasonable to think that the Individual Defendants—who were responsible for tracking or reporting the Company's revenue—would be unaware of the financial significance and status of its dental channel systems.

249.    The Individual Defendants were highly sophisticated and in positions to know that their statements concerning both committed orders and Desktop's customer base were false. For example, Defendant Fulop—the founder of five other technology companies—co-founded Desktop Metal in 2015 and was involved in all aspects of operations, including its strategy for "constructive consolidation in the additive manufacturing industry." To that end, Fulop frequently spoke on the Company's acquisition of EnvisionTEC and its acquired EnvisionTEC products, including the fact that several had received or were pending clearance from the FDA, during earnings calls and other interactions with investors. Defendant Haley served in senior finance roles at Desktop Metal for over two years and, before then, held four senior finance roles at public companies and two divisions of global public companies. During the Class Periods, both Fulop and Haley approved and signed the Company's filings with the SEC.

250.    Prior to his resignation, Defendant El-Siblani oversaw EnvisionTEC's operations for nearly 20 years, during which he was highly involved and "extremely hands-on" with EnvisionTEC's day-to-day operations and strategy. Indeed, many former EnvisionTEC employees interviewed commented on El-Siblani's inordinate control over EnvisionTEC. For example, FE-7 commented that because there were no other C-Suite executives or vice presidents based in

Dearborn, Michigan, El-Siblani ran the Company "like a dictatorship" And "seemed to be involved in the majority of projects that went on" and often attended plant operations meetings and spent time on the facility floor. Likewise, FE-3 reported that El-Siblani ruled by fear and threats—a "do this or I'm firing you" management style—and was involved in day-to-day operations at EnvisionTEC, including direct contact and sales to customers. Defendant Mike Jafar was brought into the Company (possibly at the direction of Defendant El-Siblani) to lead its new Desktop Health Operations. When Jafar became CEO, he began to oversee dental sales and kept tabs on day-to-day operations. Jafar also began to run the weekly sales meetings attended by the sales team, as corroborated by FE-3.

251.    The sophistication of the Individual Defendants strengthens the allegations of scienter, by undermining an exculpating explanation for the fraud.

252.    At all relevant times during the Class Periods, the Company's EnvisionTEC segment has remained a small-to-medium sized company with about 100-150 employees, and a smaller, tight-knit upper management and dental sales team. Given EnvisionTEC's size, and that EnvisionTEC's dental channel sales are purported to be a key focus of Desktop Metal's business operations, it may be strongly inferred that Defendants Fulop, Haley, El-Siblani, and Jafar were fully aware of the status of all material matters involving Desktop's core business operations throughout the Class Periods, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Lead Plaintiffs and the members of the Class.

253.    Moreover, in each quarterly and annual report filed with the SEC during their tenure, Defendants Fulop and Haley signed certifications certifying that they had evaluated Desktop's operations and had disclosed "[a]ny fraud, whether or not material, that involves

management or other employees who have a significant role in the registrant's internal control over financial reporting."

## C.   "Resignation" of El-Siblani and Jafar

254.   The terminations of Defendants El-Siblani and Jafar—the two senior Company executives with direct oversight of EnvisionTEC's operations—further support an inference of scienter.

255.   For Defendant El-Siblani, the Company announced his immediate resignation on November 8, 2021—the same day it disclosed the Board's decision to engage a third-party to conduct an internal investigation arising from a whistleblower complaint relating to the fraud alleged above—or as phrased in the Company's press release "matters, manufacturing and product compliance practices and procedures with respect to a subset of its photopolymer equipment and materials at its EnvisionTec US LLC facility in Dearborn, Michigan." As discussed above, El-Siblani oversaw and played a key part in the Company's unlawful sales of non-FDA compliant Flexcera resin, as well as pushed sales of the PCA 4000 for non-FDA certified uses. As CEO of the Company's EnvisionTEC segment, El-Siblani was the Company executive with the most responsibility for the EnvisionTEC facility in Dearborn, Michigan facility. And, pursuant to Defendant El-Siblani's Separation Agreement, all outstanding equity awards held by El Siblani were forfeited as of the effective date of his termination, as well as his annual bonus under the cash-based incentive compensation program and the 2021 Founder Award he was granted in October 2021. These facts, combined with the timing of the press release announcing the whistleblower investigation and El-Siblani's resignation, both corroborate the above-described former employee account and strongly suggest that El-Siblani was pushed out for known misconduct.

256.    As for Jafar, the Company announced on June 13, 2022 that "Desktop Metal, Inc. [had] determined that Michael Jafar will cease to serve as Chief Executive Office of Desktop Health, effective June 30, 2022." Thereafter, it took the Company nearly two months (until August 22, 2022) to reach a Separation Agreement with Jafar, under which Jafar received a one-time payment of nearly $250,000 (approximately two weeks of pay of his nearly $5.5 million per year salary) and COBRA benefits. Though the Company did not disclose the reason for Jafar's termination, the statements by former employees described above corroborate that Defendants knew, recklessly disregarded, and/or were complicit in the problems surrounding El-Siblani and EnvisionTEC during the Class Periods. As discussed above, Jafar served as CEO of Desktop Health, the core product portfolio for which centered on EnvisionTEC's dental products. At least two former employees reported that Jafar was a relative of Defendant El-Siblani and suspected Jafar was brought on, in part, due to this relation with El-Siblani. Additionally, one former employee, FE-3, reported that, during their exit interview from the Company, Defendant Jafar conceded FE-3's expressed frustrations with El-Siblani's management of EnvisionTEC were legitimate and that Jafar also admitted aloud, "we have some skeletons to clean up and one of them is El-Siblani." These facts, combined with the circumstances of Jafar's resignation, strongly suggest that Jafar too was pushed out for knowingly or recklessly engaging in misconduct.

## VIII.   LOSS CAUSATION

257.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant losses and damages.

258.    During the Class Periods, as detailed herein, Defendants engaged in a scheme to deceive the market and engaged in a fraudulent course of conduct that artificially inflated the price of Desktop's securities and operated as a fraud or deceit on Class Periods purchasers of Desktop's

securities. By failing to disclose the true state of the Company's business and operations, Defendants presented a misleading picture of the Company's condition and value, which had the intended effect and caused the Company's stock to trade at artificially inflated prices during the Class Periods. Shareholders invested based on these false premises. And Desktop stock could not have been issued, or would have been sold at dramatically lower prices, had investors been aware of Defendants' fraudulent scheme.

259.    Because Lead Plaintiffs were unaware that Defendants' representations identified above were false and misleading (and that Defendants omitted and failed to disclose that its financial results were achieved through a fraudulent scheme), Lead Plaintiffs paid an artificially inflated and unreasonable price for their purchases of Desktop's stock.

260.    Loss causation is demonstrated when the truth behind Defendants' various false statements and material omissions was revealed to the market through two partial disclosures, causing Lead Plaintiffs to suffer significant losses when the following non-exhaustive examples of partial corrective disclosures caused the price of Desktop securities to decline sharply in market price as the prior artificial inflation came out of the shares.

261.    Specifically, on November 8, 2021, after the market closed, Desktop Metal disclosed that it was conducting an internal investigation into certain matters, including "manufacturing and product compliance practices and procedures with respect to a subset of its photopolymer equipment and materials at its EnvisionTec US LLC facility." The Company also stated that the Chief Executive Officer of EnvisionTEC had resigned. On this news, the Company's stock price fell $1.02 over the next two trading days, or 9.2%, from a close price at $9.20 per share on November 8, 2021 to close price at $8.19 per share on November 10, 2021.

262.    Then, on November 15, 2021, after the market closed, the Company stated that it would notify the U.S. Food & Drug Administration ("FDA") of "compliance issues with certain shipments of EnvisionTEC's Flexcera dental resins and its PCA 4000 curing box. On this news, the Company's stock fell $1.19, or 15%, from a close price of $8.02 per share on November 15, 2021 to a close price at $6.83 per share on November 16, 2021, on unusually heavy trading volume.

## II.    NO SAFE HARBOR

263.    Neither the federal statutory safe harbor applicable forward-looking statements under certain circumstances nor the bespeaks caution doctrine applies to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then existing facts and conditions. The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the Company's current and historical financial accounting practices, financial condition, and internal controls, among other topics.

264.    To the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward looking statements" when made, and/or were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by the Company were insufficient to insulate Defendants from liability for their materially false and misleading statements.

265.    Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for such statements because, at the time each such statement was made, the speaker had actual knowledge that it was materially false or misleading, and/or the statement was authorized or approved by an executive officer of Desktop who knew that the statement was materially false or misleading when made.

## III.    CLASS ACTION ALLEGATIONS

266.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of their representative Classes, consisting of all those who purchased or otherwise acquired the publicly traded securities of Desktop and/or the publicly traded securities of Decarbonization Plus Acquisition Corporation during the respective Class Periods and were damaged thereby. Excluded from both Classes are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

267.    The members of the Classes are so numerous that joinder of all members is impracticable. During the Class Periods, the Company's securities and Decarbonization Plus Acquisition Corporation's securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Classes. Record owners and other members of the Classes may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

268.    Lead Plaintiffs' claims are typical of the claims of the members of the Classes as all members of the Classes are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

269.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Classes.

270.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. Among the questions of law and fact common to the Classes are:

(a)    whether Defendants' acts as alleged violated the federal securities laws;

(b)    whether Defendants' statements to the investing public during the Class Periods misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)    whether Defendants' statements to the investing public during the Class Periods omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Periods;

(e)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Periods;

(f)    whether the prices of the Company's securities during the Class Periods were artificially inflated because of Defendants' conduct complained of herein; and

(g)    whether the members of the Classes have sustained damages and, if so, what is the proper measure of damages.

271.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Xie and Zhou Class members may be relatively small, the expense

and burden of individual litigation make it impossible for members of the Xie and Zhou Classes to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

272.    Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Periods;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with moderate to heavy volume during the Class Periods;

(e)    the Company traded on the New York Stock Exchange, a highly efficient and automated market and was covered by market analysts;

(f)    as a regulated issuer, the Company filed periodic public reports with the SEC and/or the NYSE;

(g)    the Company regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(h)    the Company was followed by securities analysts employed by brokerage firms who wrote reports about the Company, these reports were distributed to the sales force and certain customers of their respective brokerage firms, and the content of these reports ultimately became publicly available and entered the public marketplace;

(i)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(j)    Lead Plaintiffs and members of the Classes purchased and/or sold the Company's securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(k)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Periods.

273.    Based upon the foregoing, Lead Plaintiffs and the members of the Classes are entitled to a presumption of reliance upon the integrity of the market.

274.    Desktop Metal regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

275.    Desktop Metal was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

276.    Alternatively, Lead Plaintiffs and the members of the Classes are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Periods statements in violation of a duty to disclose such information, as detailed above.

277.    Additionally, Defendants corrupted the market for Desktop securities through a course of conduct that misled the market as to the value of Desktop securities, to the extent that these Defendants disrupted the integrity of the market for Desktop securities. Lead Plaintiffs and members of the Classes are not required to provide further proof of reliance, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

IX.    **CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT**

## XIE CLASS PERIOD CLAIMS

### COUNT ONE

**VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND
RULE 10B-5 PROMULGATED THEREUNDER AGAINST DEFENDANTS
DESKTOP METAL, FULOP, AND HALEY**

278.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

279.    During the Xie Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Xie Class Period, did: (i) deceive the investing public, including Lead Plaintiff Xie and other Class members, as to their due diligence regarding the EnvisionTEC Acquisition and the Company's manufacturing and product compliance practices, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Classes to purchase Desktop Metal's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

280.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Desktop Metal's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

281.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Desktop Metal's financial well-being and prospects, as specified herein.

282.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Desktop Metal's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Desktop Metal and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Xie Class Period.

283.    Each of the Desktop Metal Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Desktop Metal Individual Defendants were high-level executives and/or directors at the Company during the Class Periods and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of

the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

284.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Desktop Metal's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Periods, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

285.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Desktop Metal's securities was artificially inflated during the Xie Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Xie Class Period, Lead Plaintiff Xie and the other members of the Classes acquired Desktop Metal's securities during the Xie Class Period at artificially high prices and were damaged thereby.

286.     At the time of said misrepresentations and/or omissions, Lead Plaintiffs and other members of the Xie Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff Xie and the other members of the Xie Class and the marketplace known the truth regarding the problems that Desktop Metal was experiencing, which were not disclosed by Defendants, Lead Plaintiff Xie and other members of the Xie Class would not have purchased or otherwise acquired their Desktop Metal securities, or, if they had acquired such securities during the Xie Class Period, they would not have done so at the artificially inflated prices which they paid.

287.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

288.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff Xie and the other members of the Xie Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Xie Class Period.

**COUNT TWO**

**VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
AGAINST DEFENDANTS FULOP AND HALEY**

289.     Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

290.     The Desktop Metal Individual Defendants acted as controlling persons of Desktop Metal within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Desktop Metal Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the

various statements which Lead Plaintiffs contend are false and misleading. The Desktop Metal Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

291.    In particular, the Desktop Metal Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

292.    As set forth above, Desktop Metal and the Desktop Metal Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Desktop Metal Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff Xie and other members of the Xie Class suffered damages in connection with their purchases of the Company's securities during the Xie Class Period.

### ZHOU CLASS PERIOD CLAIMS

### COUNT THREE

### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST DEFENDANTS DESKTOP METAL, EL-SIBLANI, JAFAR, AND FULOP

293.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

294.    During the Zhou Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Zhou Class Period, did: (i) deceive the

investing public, including Lead Plaintiff Zhou and other Class members, as to Flexcera, the PCA 4000, the FDA certification of the Company's facilities and products, and the Company's manufacturing and product compliance practices, as alleged herein; and (ii) cause Lead Plaintiff Zhou and other members of the Zhou Class to purchase Desktop Metal's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

295.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Desktop Metal's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

296.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Desktop Metal's financial well-being and prospects, as specified herein.

297.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Desktop Metal's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Desktop Metal and its business operations

and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Zhou Class Period.

298.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Periods and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

299.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Desktop Metal's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations,

financial well-being, and prospects throughout the Class Periods, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

300.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Desktop Metal's securities was artificially inflated during the Zhou Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff Zhou and the other members of the Zhou Class acquired Desktop Metal's securities during the Zhou Class Period at artificially high prices and were damaged thereby.

301.    At the time of said misrepresentations and/or omissions, Lead Plaintiff Zhou and other members of the Zhou Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff Zhou and the other members of the Zhou Class and the marketplace known the truth regarding the problems that Desktop Metal was experiencing, which were not disclosed by Defendants, Lead Plaintiff Zhou and other members of the Zhou Class would not have purchased or otherwise acquired their Desktop Metal securities, or, if they had acquired such securities during the Zhou Class Period, they would not have done so at the artificially inflated prices which they paid.

302.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

303.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff Zhou and the other members of the Zhou Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Zhou Class Period.

### COUNT FOUR

### VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST DEFENDANTS EL-SIBLANI, JAFAR, AND FULOP

304.     Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

305.     Individual Defendants acted as controlling persons of Desktop Metal within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

306.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

307.     As set forth above, Desktop Metal and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff Zhou and other members of the Zhou Class suffered damages in connection with their purchases of the Company's securities during the Zhou Class Period.

## X.     PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying the Xie and Zhou Classes;

B.     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiffs and the Classes their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: December 19, 2022

Respectfully submitted,

*/s/ Lucas E. Gilmore*

Lucas E. Gilmore (*pro hac vice*)
Reed R. Kathrein (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

Raffi Melanson (BBO# 688650)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
raffim@hbsslaw.com

Steve W. Berman (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Attorneys for Lead Plaintiff Sophia Zhou*

Brenda Szydlo (*pro hac vice*)
Dean P. Ferrogari (*pro hac vice*)
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bszydlo@pomlaw.com
dferrogari@pomlaw.com

*Attorneys for Lead Plaintiff Yichun Xie*

Daryl Andrews (BBO #658523)
Glen DeValerio (BBO #122010)
ANDREWS DEVALERIO LLP
265 Franklin Street, Suite 1702
Boston, Massachusetts 02110
Telephone: (617) 936-2796
daryl@andrewsdevalerio.com
glen@andrewsdevalerio.com

*Liaison Counsel for Lead Plaintiff Yichun Xie*

Peretz Bronstein
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff Yichun Xie*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: December 19, 2022                    */s/ Lucas E. Gilmore*                    
                                                             Lucas E. Gilmore